UNITED STATES of America, Plaintiff,

v.

COMMONWEALTH OF PENNSYLVANIA, Robert Casey, Governor of the Commonwealth of Pennsylvania, Karen F. Snyder, Acting Secretary Department of Public Welfare, Steven M. Eidelman, Deputy Secretary of Mental Retardation Office of Mental Retardation, Alan M. Bellomo, Director Ebensburg Center, Defendants.

Civ. A. No. 92–33J.

United States District Court,
W.D. Pennsylvania.

July 27, 1995.

Robinsue Frohboese, Judith Preston, U.S. Dept. of Justice, Civil Rights Division, Washington, DC, for plaintiff.

Thomas York, Eckert Seamans Cherin & Mellott, Harrisburg, PA, Christine Demichele, Department of Public Welfare, Office of Legal Counsel, Harrisburg, PA, for defendants.

## TABLE OF CONTENTS

Page

I. Introduction ................................................................. 577

II. Standard Of Proof .......................................................... 578

 A. CRIPA Actions ........................................................ 578

 B. Substantive Due Process Rights of Institutionalized Mentally Retarded Persons ........................................................... 580

 C. The Professional Judgment Standard ................................. 582

III. Findings of Fact and Conclusions Regarding Liberty Interests at Issue in this Litigation ............................................................ 584

 A. The Center's Structure and Services ................................. 584

 B. Adequate Basic Care ................................................ 588

 C. Adequate Medical Care .............................................. 591

 1. Neurological Care ............................................... 591

2. Psychiatric Care ...........................................598

 a. Psychiatric Assessment Techniques ......................598
 b. Differential Diagnosis .........................................601
 c. Psychiatric Treatment ........................................604

3. Gastroesophageal Reflux and Aspiration.............................607

4. Nutritional Management .........................................611
 a. Screening.....................................................611
 b. Assessment ..................................................612
 c. Intervention .................................................614
 d. Monitoring...................................................614
 e. Training .....................................................615

5. Physical Therapy ...............................................616
 a. Assessment ..................................................619
 b. Wheelchairs..................................................622
 c. Transfers ....................................................624

6. General Medical Care ...........................................626

7. General Nursing Care...........................................628

D. Adequate Training and Freedom From Undue Restraint..................631

E. Reasonable Safety and Protection From Harm..........................640

IV. CONCLUSION ..................................................649

## OPINION AND ORDER

D. BROOKS SMITH, District Judge.

### I. INTRODUCTION

This action presents a claim by the Attorney General, on behalf of the United States of America ("United States"), under the Civil Rights of Institutionalized Persons Act of 1980, 42 U.S.C. §§ 1997–1997j ("CRIPA"). The United States contends that the Commonwealth of Pennsylvania ("Commonwealth") and the individually-named defendants (officers of the Executive Branch of the Commonwealth sued in their official capacities) are depriving institutionalized mentally retarded persons at the Ebensburg Center (the "Center") of rights, privileges or immunities secured by the Constitution of the United States. Complaint (Docket No. 1), ¶¶ 1, 6–11. The United States seeks equitable relief, the sole remedy authorized by CRIPA (see 42 U.S.C. § 1997a(a)), and asks this Court to enjoin defendants from "continuing the acts, practices and omissions" at the Center which allegedly violate the Constitution, and "to require defendants to take such action as will provide constitutional conditions of care to persons" who reside at the Center. Complaint, p. 5.

The instant CRIPA action was tried before this Court over the course of twenty (20) days. Extensive testimony by lay and expert witnesses was presented, hundreds of exhibits were received into evidence, and this Court conducted a detailed view of the facility in the presence of counsel.

Inasmuch as "[d]ecisional law interpreting [CRIPA] is virtually nonexistent" (*United States v. Pennsylvania*, 863 F.Supp. 217, 218 (E.D.Pa.1994)), and in order to properly evaluate the evidence presented, I will first address the applicable standard of proof. Thereafter, for each alleged constitutional violation, I will discuss the nature of the duty owed, my findings of fact regarding the alleged violative conduct, and my conclusion regarding whether a violation exists.

For the reasons explained below, I find that the residents at the Ebensburg Center are not being deprived of their rights, privileges, or immunities secured or protected by

the Constitution or laws of the United States. Accordingly, the United States' request for injunctive relief shall be denied.

## II. STANDARD OF PROOF

### A. CRIPA Actions

The Commonwealth submits that the standard of proof in this CRIPA action requires the United States to satisfy five elements set forth in 42 U.S.C. § 1997a. According to the Commonwealth, the United States must demonstrate:

1. egregious and flagrant conditions in a State institution resulting in;

2. a deprivation of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States;

3. said deprivation is pursuant to a pattern or practice of resistance to the full enjoyment of such rights, privileges or immunities; and

4. said deprivation causes;

5. grievous harm to persons residing in an institution.

*See* Docket No. 22, pp. 34–35.[1] The United States argues that the Commonwealth's extrapolation of these elements from 42 U.S.C. § 1997a is in error because that statute merely establishes the elements of the "Attorney General's 'reasonable cause' determination that conditions at the institution in question merit Department of Justice involvement." 30/3–4.

None of CRIPA's provisions specifically address the elements which must be demonstrated by the United States at trial in order to obtain the equitable relief sought. *See* 42 U.S.C. §§ 1997–1997j. Section 1997a is entitled "Initiation of civil actions," and subsection (a)'s caption reads: "Discretionary authority of Attorney General; preconditions." 42 U.S.C. § 1997a. Subsection (a) provides:

Whenever the Attorney General has reasonable cause to believe that any State ... is subjecting persons residing in or confined to an institution, as defined in section 1997 of this title, to egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States causing such persons to suffer grievous harm, and that such deprivation is pursuant to a pattern or practice of resistance to the full enjoyment of such rights, privileges, or immunities, *the Attorney General,* for or in the name of the United States, *may institute a civil action* in any appropriate United States district court against such party for such equitable relief as may be appropriate to insure the minimum corrective measures necessary to insure the full enjoyment of such rights, privileges, or immunities ...

42 U.S.C. § 1997a(a) (emphasis added).

■ The plain language of § 1997a(a) reveals that the statute simply confers standing upon the Attorney General, thereby providing authority for the United States to initiate a lawsuit on behalf of mentally retarded persons, and others, who reside or are confined in an institution. *See Patsy v. Florida Bd. of Regents,* 457 U.S. 496, 507–08, 102 S.Ct. 2557, 2563, 73 L.Ed.2d 172 (1982) ("The Civil Rights of Institutionalized Persons Act ... was enacted primarily to ensure that the United States Attorney General has 'legal standing to enforce existing constitutional and Federal statutory rights of institutionalized persons.'" (quoting H.R.Conf.Rep. No. 96–897, 9 (1980) U.S.Code Cong. & Admin.News 1980, p. 787, 833); *United States v. Pennsylvania,* 863 F.Supp. at 219–20 ("From this language [in § 1997a(a)] the Court must hold that the Attorney General is vested with the discretion to bring suit whenever she is satisfied that a case is serious enough to warrant federal involvement. Once such a determination is made by the Attorney General, the standard of proof to be borne by the United States at trial must be the same as any other plaintiff."); *United States v. Ten-*

---

1. Because resolution of this matter is fact intensive, frequent citations to the record appear throughout this opinion. In an effort to minimize the length of this adjudication (admittedly not by much), all record citations will reference the docket number and the appropriate page(s) separated by a diagonal slash. Hence, Docket No. 22, pp. 34–35, would be designated by 22/34–35.

*nessee,* 798 F.Supp. 483, 488 (W.D.Tenn.1992) ("CRIPA is a standing statute.").

■ The five elements identified by the Commonwealth apply only to the Attorney General's "reasonable cause" determination, which must be made before the Attorney General may properly institute a CRIPA action. 42 U.S.C. § 1997a(a). One court has concluded that this plain reading of the statute is supported by its legislative history.[2] Inasmuch as I conclude that it is clear from the text that § 1997a(a) is a standing statute, I believe an examination of its legislative history is unnecessary.[3]

■ As the Supreme Court of the United States has noted, CRIPA is legislation pertaining to "a specific class of § 1983 actions." *Felder v. Casey,* 487 U.S. 131, 148, 108 S.Ct. 2302, 2312, 101 L.Ed.2d 123 (1988) (state statute creating exhaustion requirement for § 1983 action held violative of Supremacy Clause). For purposes of the instant action, it is important to remember that § 1983 did not *create* any new rights, but was enacted by Congress "to give a *remedy* to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." *Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961) (emphasis added). *See also Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981) (Section 1983 provides "a 'civil remedy' for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind.").

■ The Supreme Court has identified "two essential elements" to a § 1983 civil rights action:

(1) whether the conduct complained of was committed by a person acting under color of state law; and

(2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Id. Accord Shaw v. Strackhouse,* 920 F.2d 1135, 1141–42 (3d Cir.1990). Because CRIPA was enacted to provide standing for the Attorney General to initiate civil rights actions on behalf of institutionalized persons, the "essential elements" that the United States must prove are the same as in any civil rights action. *See United States v. Pennsylvania,* 863 F.Supp. at 220 ("[T]he United States has no greater standard of proof than an individual plaintiff would bear in a case alleging the same illegal conduct on the part of a state.").

■ In this case, the United States alleges—and the Commonwealth does not dispute—that "defendants have acted or failed to act ... under color of state law." Complaint, ¶ 15. The core of the dispute here concerns whether defendants have "deprive[d] residents of Ebensburg of rights, privileges, or immunities secured or protected by the Constitution of the United States." *Id.,* ¶ 21. The individually-named defendants have been sued in their official capacities, which " 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (quoting *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)). *Accord Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.").[4]

---

**2.** *United States v. Pennsylvania,* 863 F.Supp. at 219.

**3.** *See Chicago v. Environmental Defense Fund,* —— U.S. ——, ——, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994) (when text of statute is clear, it is inappropriate to resort to legislative history for purposes of interpreting statute).

**4.** For purposes of the Eleventh Amendment, the Supreme Court has held that "official-capacity actions for prospective relief are not treated as actions against the State." *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14 (citing *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). In *Ex parte Young,* the Supreme Court held that the Eleventh Amendment interposes no bar to an action in federal court for prospective injunctive relief against a defendant official named in his or her official capacity because the defendant state official "comes into conflict with

In an official-capacity suit, a "governmental entity is liable ... only when the entity itself is a ' "moving force" ' behind the deprivation; thus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." *Graham*, 473 U.S. at 166, 105 S.Ct. at 3105 (citations omitted). The United States' Complaint in this action alleges that the Commonwealth's "policy or custom" as implemented at the Center has violated the residents' constitutional rights. *See* Complaint, ¶ 21 ("The acts and omissions alleged ... constitute patterns or practices of resistance to the full enjoyment of rights, privileges or immunities secured or protected by the Constitution of the United States, and deprive residents of Ebensburg of such rights, privileges or immunities.").

B. *Substantive Due Process Rights of Institutionalized Mentally Retarded Persons*

The United States contends that the Commonwealth has subjected the residents of the Center to a deprivation of their liberty interests protected by the Due Process clause of the Fourteenth Amendment of the United States Constitution,[5] because they have not been provided:

a. adequate basic care—in particular, adequate food, shelter, clothing, and hygiene;

b. adequate medical care;

c. freedom from undue restraint, and training programs to ensure freedom from undue restraint; and

d. safe conditions.

In *Youngberg v. Romeo*, 457 U.S. 307, 314, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982), the Supreme Court considered "for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution." The *Youngberg* Court acknowledged that "[t]he mere fact that Romeo has been committed [to a Pennsylvania state institution] under proper procedures does not deprive him of all *substantive liberty interests* under the Fourteenth Amendment." *Id.* (emphasis added).

The defendants in *Youngberg* (three administrators of the Pennsylvania institution) "concede[d] a duty to provide adequate food, shelter, clothing, and medical care." *Id.* at 324, 102 S.Ct. at 2462. The Supreme Court noted that these duties "are the essentials of the care that the State must provide." *Id.* Separate and apart from these interests, however, the plaintiff argued that he had "a constitutionally protected liberty interest in safety, freedom of movement, and training within the institution; and that [the defendants] infringed these rights by failing to provide constitutionally required conditions of confinement." *Id.* at 315, 102 S.Ct. at 2457. The Court's task, therefore, was to "decide whether liberty interests also exist in safety, freedom of movement, and training,"

the superior authority of [the] Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." 209 U.S. at 159–60, 28 S.Ct. at 454. Although the Eleventh Amendment typically bars actions for damages in federal court against States and state officials sued in their official capacities (*see Will*, 491 U.S. at 66, 109 S.Ct. at 2309–10 (§ 1983 was not intended "to disregard the well-established immunity of a State from being sued without its consent"; in actions for damages, neither States nor state officials acting in their official capacities are considered "persons" within the meaning of § 1983)), the Eleventh Amendment poses no bar to actions for prospective injunctive relief against state officials sued in their official capacities, and in such circumstances, the state officials are considered "persons" for purposes of § 1983. 473 U.S. at

167 n. 14, 105 S.Ct. at 3106 n. 14. Nevertheless, the Court still considers such actions for prospective injunctive relief as addressing the State's official policy or custom. *Graham*, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14 ("[I]mplementation of state policy or custom may be reached in federal court only because official-capacity actions for prospective relief are not treated as actions against the State."). Moreover, the Eleventh Amendment does not apply to suits by the United States against a State. *United States v. Mississippi*, 380 U.S. 128, 140–41, 85 S.Ct. 808, 814–15, 13 L.Ed.2d 717 (1965).

5. The Fourteenth Amendment provides, in pertinent part, that a State shall not "deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1.

and, if so, to "decide whether they have been infringed in this case." *Id.*

■ The *Youngberg* Court found that the first two claims—safe conditions and freedom from bodily restraint—involved "liberty interests recognized by prior decisions of this Court, interests that involuntary commitment proceedings do not extinguish." *Id.* (footnote omitted). The plaintiff's other claim—a constitutional right to minimally adequate training—was, in the words of the Court, "more troubling." *Id.* at 316, 102 S.Ct. at 2458.

> In addressing the asserted right to training, we start from established principles. As a general matter, a State is under no constitutional duty to provide substantive services for those within its border. When a person is institutionalized—and wholly dependent on the State— it is conceded by petitioner that a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities. Nor must a State "choose between attacking every aspect of a problem or not attacking the problem at all."

*Id.* at 317, 102 S.Ct. at 2459 (citations omitted). The Court noted that the plaintiff's "primary needs" were "bodily safety and a minimum of physical restraint," and the plaintiff "clearly claim[ed] training related to these needs." *Id.* at 317–18, 102 S.Ct. at

2459. The Court therefore held that "[i]n the circumstances presented by this case, and on the basis of the record developed to date, we agree ... that [the plaintiff's] liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.* at 319, 102 S.Ct. at 2460.[6]

■ Significantly, although the Court found that a constitutional liberty interest existed that required Pennsylvania to provide "minimally adequate or reasonable training," the Court cautioned against adopting an unrestrained notion of liberty interests that would impose additional duties on a State:

> It is not feasible, as is evident from the variety of language and formulations in the opinions below and the various briefs here, to define or identify the type of training that may be required in every case. A court properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy, in terms more familiar to courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case. *A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State.*

---

6. The Commonwealth, as it did at an earlier stage of this proceeding, argues that the Supreme Court's decision in *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), limits the reach of *Youngberg* (and the Due Process protections recognized there) to those mentally retarded individuals who have been *involuntarily* committed to the Center. *See* 489 U.S. at 199–200, 109 S.Ct. at 1005 (*Youngberg* stands "only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."); *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 465–66 (3d Cir.1990) (severely mentally retarded individual's Due Process rights not curtailed by the state because his parents voluntarily placed him at the facility and, pursuant to the reasoning in *DeShaney*, he was not deprived of freedom " 'through incarceration, institutionalization or other similar restraint of personal liberty' "). *But see United States v. Pennsylvania*, 832

F.Supp. 122, 124 (E.D.Pa.1994) ("[W]here the initial institutionalization of an individual is made pursuant to a 'voluntary' decision, such institutionalization in its course may become one which necessarily curtails an individual's liberty, for instance, through excessive or inappropriate use of physical or chemical restraints. In such a case, the fundamentals of due process would be offended if treatment and care were not provided."). The instant action challenges the Commonwealth's policy and customs as implemented "across the board" at the Center (as opposed to an action vindicating the liberty interests of a single individual, as in *Fialkowski*). The testimony presented during the trial demonstrated that, with respect to some of the residents, their backgrounds and the severity of their conditions make it difficult to characterize their institutionalization as being "voluntary." In addition, the Commonwealth appears to concede that some of the individuals at the Center were placed there involuntarily. *See* Docket No. 22, at 34 ("Most, if not all, of the residents at Ebensburg Center are voluntarily placed without any restraint.").

*Id.* at 319 n. 25, 102 S.Ct. at 2460 n. 25 (emphasis added).

■■■ After establishing that the plaintiff in *Youngberg* retained "liberty interests in safety and freedom from bodily restraint," the Court explained the need to set forth a standard to apply in determining whether the State has violated these substantive due process rights of an involuntarily committed mentally retarded individual.

> The question ... is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process.

> \*　\*　\*　\*　\*　\*

> [W]hether [the plaintiff's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests. If there is to be any uniformity in protecting these interests, this balancing cannot be left to the unguided discretion of a judge or jury.

*Id.* at 320–21, 102 S.Ct. at 2460–61. The Court then held that " 'the Constitution only requires that the courts make certain that professional judgment in fact was exercised. *It is not appropriate for the courts to specify which of several professional choices should have been made.*' " *Id.* at 321, 102 S.Ct. at 2461 (emphasis added) (citation omitted).[7]

■■■ With respect to the plaintiff's claim for minimally adequate training, the *Youngberg* Court explained the deference to be shown in applying the "professional judgment" standard:

In this case, the minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints. In determining what is "reasonable"—in this and in any case presenting a claim for training by a State—we emphasize that the courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized.... [T]he decision, if made by a professional, is presumptively valid; *liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.*

*Id.* at 322–23, 102 S.Ct. at 2462–63 (emphasis added) (footnotes omitted). *See also Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1248 (2d Cir.1984) (*"Youngberg* held that due process is satisfied if restraints are imposed on mentally retarded individuals in accordance with the judgment of qualified professionals and that courts should defer to this professional judgment.").

### C. *The Professional Judgment Standard*

■■■ The United States contends that the "professional judgment" standard set forth in *Youngberg* is not applicable, but if it is applicable, the standard pertains only to the claim regarding training. 87/30–33.[8] The United

---

7. The Court defined a "professional" decisionmaker as "a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons." *Id.* at 323 n. 30, 102 S.Ct. at 2462 n. 30.

8. The United States' argument is undermined by its own Complaint in this action, which makes repeated references to the defendants' alleged failure to exercise "professional judgment." *See, e.g.,* Complaint, ¶ 20 ("Defendants have failed and are continuing to fail to prescribe and administer psychotropic medication safely and pursuant to the exercise of professional judgment by appropriately qualified staff."). The United States' effort to avoid application of the professional judgment standard—and its presentation of evidence and argument throughout this case that was not tailored to address the professional judgment standard (instead, for example, presenting evidence of and argument about "deficient care" or "malpractice")—was unhelpful to

States' argument is based on a tortured reading of *Youngberg,* and completely ignores Third Circuit precedent interpreting *Youngberg,* which is binding on this Court. *See Shaw v. Strackhouse,* 920 F.2d 1135, 1146 (3d Cir.1992) ("Absent even a hint that the Court meant to so limit its holding, we must read *Youngberg* at face value and apply the professional judgment standard to all failure to protect, excessive restraint, and failure to habilitate claims brought by mentally retarded persons who are institutionalized, whether such claims are brought independently or in tandem.").

The United States argues: "As contemplated in *Youngberg,* safety is an objective standard that can be measured through objective criteria." 87/30. The United States fails to explain how this novel proposition is "contemplated" in *Youngberg,* and fails to indicate the source of the "objective standard" that this Court should apply. To the contrary, the Supreme Court in *Youngberg* specifically stated that, in determining whether the constitutional rights of an institutionalized individual have been violated, a court must balance the individual's liberty interests against the relevant state interests, and that "[i]f there is to be any uniformity in protecting these interests, this balancing cannot be left to the unguided discretion of a judge or jury." 457 U.S. at 321, 102 S.Ct. at 2461. For this very reason, the Supreme Court set forth the "professional judgment" standard. The United States' argument must be rejected.[9]

In *Shaw,* the Third Circuit attempted to clarify the meaning of the "professional judgment" standard established in *Youngberg,* and stressed that mere negligence "cannot trigger due process protection." *Id.* at 1146.

Professional judgment is a relatively deferential standard. It requires *only* that a state actor exercise professional judgment in choosing the appropriate course of action. Negligence, however, imposes on a state official the burden of choosing, from among alternatives, a course of action consistent with the exercise of 'due care.' That means, as we see it, rejecting negligent alternatives that might nonetheless satisfy the demands of professional judgment. .... [Professional judgment] appears to us to be a substantially less onerous standard than negligence from the viewpoint of the public actor. Indeed, in our view, professional judgment more closely approximates—although, as we have discussed, remains somewhat less deferential than—a recklessness or gross negligence standard. Professional judgment, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct.

*Id.* (emphasis added). *Accord Society for Good Will to Retarded Children,* 737 F.2d at 1248 (" '[P]rofessional judgment' has nothing to do with what course of action would make patients 'safer, happier and more productive.' Rather, it is a standard that determines whether a particular decision has substantially met professionally accepted minimum standards.").

As *Shaw* and other cases decided since *Youngberg* explain, the "professional judgment" standard (*i.e.,* deciding whether a decisionmaker's action, or inaction, constituted "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment," 457 U.S. at 323, 102 S.Ct. at 2462,) is a less onerous standard for a state actor to meet than that of negligence

this Court as it labored with the difficult task of adjudicating this factually complex controversy.

**9.** Alternatively, the United States submits that the "professional judgment" standard is not applicable in this case because CRIPA actions enable the Attorney General to seek only equitable relief, and *Youngberg*'s professional judgment standard was fashioned in response to a § 1983 action for money damages so that professionals would not be "required to make each decision in the shadow of an action for damages." 87/31–32 (quoting *Youngberg,* 457 U.S. at 325, 102 S.Ct. at 2463). The United States' injunctive relief argument is unavailing for the reasons explained in *Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473, 487–88 (D.N.D.1982) (relying on principles of federalism and avoiding unnecessary judicial intervention in state institutions), *aff'd,* 713 F.2d 1384 (8th Cir.1983).

or medical malpractice. Optimal courses of treatment as determined by some expert, while laudable, do not establish the minimal constitutional standard. *Society for Good Will to Retarded Children*, 737 F.2d at 1248.[10] Instead, the factfinder must determine whether the decision made by the professional comports with minimally accepted professional standards.

In making this determination, expert testimony is "relevant not because of the experts' own opinions—which are likely to diverge widely—but because that testimony may shed light on what constitutes minimally accepted standards across the profession." *Society for Good Will to Retarded Children, Inc.*, 737 F.2d at 1248.

> The role of the experts is only to assist the court in ascertaining what the minimum professional standard is; the ultimate question is whether " 'professional judgment *in fact* was exercised.' " Even if every expert testifying at trial agrees that another type of treatment or residence setting might be better, the federal courts may only decide whether the treatment or residence setting that actually was selected was a "substantial departure" from prevailing standards of practice.

*Id.* at 1248–49 (citations omitted). *Accord Society for Good Will to Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085, 1090 (2d Cir. 1990) (district court erred in finding constitutional violations without first determining whether the conditions and treatment substantially departed from accepted professional judgment; "the district court should use expert testimony to identify 'substantial departures', but not to choose from among several professionally acceptable remedies").

### III. FINDINGS OF FACT AND CONCLUSIONS REGARDING LIBERTY INTERESTS AT ISSUE IN THIS LITIGATION

The United States alleges that four separate categories of "liberty interests" have been violated at the Center. To properly analyze the evidence, I must evaluate (1) the nature of the liberty interests of the residents at issue (and defendants' corresponding duty to protect those rights); and (2) whether defendants' official customs and policies, as implemented at the Center, so substantially departed from accepted professional judgment, practice, or standards as to demonstrate that defendants actually did not base their decisions on professional judgment.

This case has been carefully and exhaustively litigated by the United States and the defendants. Constraints of time and space do not permit me to respond to every one of the manifold factual and legal contentions raised by the United States with respect to the liberty interests at issue in this litigation. As the lengthy opinion which follows demonstrates, however, I have attempted to address in detail the more serious issues, while confronting the remaining issues in a general manner. Before addressing the United States' contentions, a brief overview of the Center's structure and services is in order.

### A. The Center's Structure and Services

The Ebensburg Center is an institution operated by the Commonwealth for mentally retarded persons, serving Bedford, Blair, Cambria and Somerset Counties. The Center is licensed as an intermediate care facility for persons with mental retardation and is geared toward caring for individuals with significant behavioral deficits who require assistance to meet their daily needs, and who have been unable to procure like services elsewhere. Exh. 11. The Center has a full operating license under the federal standards of the Title XIX Medicaid Program, which is a prerequisite for participating in the Medicaid Program. 62/158.

The Center was built in the 1950s. Many of the residents were placed at the center as children, and currently the median age of the residents is 32.5 years. 62/163. The Center's 475 residents live in five buildings or living units, each of which has four separate wings. There are approximately 96 residents to each building or 24 residents to each

---

**10.** *Cf. DeShaney*, 489 U.S. at 202, 109 S.Ct. at 1006 ("[T]he claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation.").

wing. 62/140–41; Exh. 608/62.[11] The Center currently provides four private rooms per unit and plans to increase the number of private rooms available. Exh. 603/104; 63/27.

The living units are the Keystone House, Laurel House, Sunset House, Horizon House, and the Villa House. The Keystone Unit houses the residents who are more profoundly mentally retarded and more physically disabled. Some physically handicapped residents also live in the Laurel, Horizon, Sunset and Villa living units. 34/98. Approximately one third of the residents of the Keystone unit are essentially immobile—meaning that, as a result of their physical handicaps, they have no active movement, except for the ability to move their head, or to slightly move an arm or leg. 34/98. The physical handicaps manifested by the residents at the Center are a result of damage to the brain. 34/107.

Laurel Unit houses mentally retarded women. Some of the mentally retarded men reside in the Sunset House. Horizon House houses residents who are visually impaired or blind. Villa is home for the Center's higher functioning individuals who are mildly to moderately mentally retarded. 43/81.

The Center has been budgeted a total of 790 full-time staff, which includes direct staff, professional staff and administrative staff. Exh. 601/53, 95. Additional staff may be requested during or before the fiscal year from a pool of staff serving facilities operated by the state. Exh. 600/95–99. Approximately 366 of the Center's staff are involved solely with direct care. Exh. 600/99.

Alan M. Bellomo was appointed as Director of the Ebensburg Center in 1985 and continues to serve in that capacity. 62/130. As Director, he oversees the total operation of the facility to insure that the residents are receiving adequate services, care and treatment. Exh. 600/51–52. All staff of the Center are ultimately responsible to Mr. Bellomo. Exh. 600/52. Mr. Bellomo relies in part on the judgments of his division director, disciplinary coordinator, outside reviews, advocacy groups and family association members to keep him updated on the needs of the facility. Exh. 600/63.

Mr. Bellomo reports to Dr. Sneed, who is the Director of the Bureau of Direct Program Operations for the OMR. 63/25. Dr. Sneed supervises the direction of eight other mental retardation facilities and is supervised himself by the Pennsylvania Deputy Secretary for Mental Retardation. Exh. 600/64–67. Dr. Sneed speaks with Mr. Bellomo at least once a week and attends monthly meetings with Mr. Bellomo. Exh. 600/67–73.

Under Mr. Bellomo's direction, the Center's Executive Staff perform rounds of the facility to remain abreast of resident's concerns and care. These rounds give management the opportunity to know the residents personally, provide oversight when there would otherwise be none, and give the employees an opportunity to speak openly with facility management. Exh. 600/11–12; 63/8–9; 63/59. Management submits weekly observations and criticisms of the facility to Mr. Bellomo for consideration. Exh. 603/10. Mr. Bellomo addresses these concerns as they arise and creates incremental plans to relieve problems. Exh. 600/25–27.

As facility director, Mr. Bellomo also chairs the Executive Staff and Risk Management committees and participates on the Mortality and Morbidity Review and Budget committees. Exh. 600/49. Mr. Bellomo often attends the annual reviews that occur at the facility. *Id.* Additionally, Mr. Bellomo chairs town meetings so that he may address concerns of the residents. Exh. 600/49.

---

**11.** The deposition testimony admitted in this case is delineated by the United States' line designations and the Commonwealth of Pennsylvania's counter-line designations, while some citations to the record refer to testimony which is neither. Such testimony was considered, and cited in some instances, because it aided me in understanding the context of the testimony. In addition, some testimony was considered because it was a means of fully appreciating the structure of and the services provided by the Center. The consideration of such evidence is consistent with the spirit of Federal Rule of Evidence 106, which provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

As part of his management and oversight, Mr. Bellomo receives copies of the Center's incident reports. Exh. 600/42–43; 63/16. Mr. Fulton, the Center's safety director, also receives copies of the incident reports. As safety director, Mr. Fulton investigates all suspicious injuries, as well as any incident which Mr. Bellomo believes warrants further investigation. Exh. 601/131–35.

Richard G. O'Brien has been Director of Program Services at the Center since 1982. 64/65. As Director of Program Services, Mr. O'Brien is responsible for monitoring discipline coordinators in the areas of psychology, nursing, speech pathology, volunteer resources and social services. He also is responsible for the contract services provided to the Center by Liberty Health Care, Mercy Hospital, Camco's physical therapy services, and various laboratory services. In addition, Mr. O'Brien is responsible for the operation of and monitoring of the quality assurance program. 64/66. This program insures that Ebensburg complies with various federal standards and properly implements the standard for Intermediate Care Facilities for the Mentally Retarded (ICFMR). Exh. 600/53.

The Center is organized along the lines of a "unit system"—a method of operation that became popular in the 1970s in an effort "to get away from the clearly delineated—what became isolated—roles of different professionals." 51/17. The unit system strives to better coordinate the services of all the professional disciplines that are provided to the residents, with each unit director or manager administratively supervising the provision of services to his or her residents. 51/17–19.

Under the unit system, all of the living units are served by the Center's Director of Residential Unit Management (DRUM), David Devine. Mr. Devine supervises each building's Unit Manager, and Mr. Devine is ultimately responsible for providing adequate residential services and care to the residents of the facility. Exh. 608/22; 63/8. Mr. Devine's direct supervisor is Mr. Bellomo. Exh. 608/34.

The Unit Managers run each unit in three shifts. The first shift is supervised by a Residential Service Supervisor (RSS), who is a Qualified Mental Retardation Professional (QMRP). The QMRP is the staff person responsible for a resident's case management, which includes a ninety-day review to insure that all services are being properly provided. The QMRP also coordinates that resident's annual staffing and insures that any provider of a program service documents activity in the chart. 64/130. The RSS also supervises the Residential Service Aids (RSAs) who provide direct care to the residents. Exh. 608/190. Residential Service Aide Supervisors (RSAS) and Residential Service Night Aide Supervisors (RSNAS) act as RSA supervisors on the second and third shifts, respectively. Exh. 601/78.

Mr. Devine also is responsible for scheduling staff and meeting direct care employee quotas. Quotas, the minimum number of RSAs allowed for a shift, are set by Mr. Bellomo to insure that residents receive adequate attention and care. Currently, the Center employs approximately 366 full-time and twenty-nine substitute RSAs to meet the existing quotas. Exh. 601/7–8. Professional staff are not included when determining the quota, but the record reveals that approximately 30% of the RSAS' time per month is spent working in cooperation with the RSA quota, providing hands-on care and at the same time monitoring their staff. Exh. 600/140; Exh. 601/69–71; Exh. 608/97. RSASs are not included in the quota because they also are responsible for administrative tasks, such as assisting in the design and implementation of the residents' programs. Exh. 601/78.

On occasion, Mr. Devine also uses unit "pulls" to meet his minimum quota. Generally RSAs are "pulled" from one unit to work in another so that both units are able to make quota for that shift. Exh. 601/78–80. Occasionally, Mr. Devine must pull nurses, so that the Registered Nurse Supervisors are properly supported. Exh. 601/80. The Center's quota minimums exceed Title XIX's requirements and are reviewed on a monthly basis by the OMR. Exh. 600/149, 152.

Mr. Devine's duties also include the supervision of infection control, all staff of the third shift, as well as three nurse supervisors. Finally, as DRUM, Mr. Devine sits on

the Executive Staff Safety Committee, Risk Committee, Budget Committee, Approved Purchase Committee, Record Committee, Probationary Review, Mortality/Morbidity Committee, and the Policy Committee. Exh. 608/16–18, 188.

Mary Kay Bennett acts as the Center's guardian officer, and ensures that the residents' money is safeguarded and reasonably spent. Exh. 603/25, 56. Ms. Bennett is court-appointed and supervised by a western regional officer. Exh. 603/25–26.

The state, through the Pennsylvania Protection and Advocacy Organization (PP & A), also provides some residents with advocates. PP & A is recognized by Pennsylvania's governor as an advocate for the disabled and occasionally subcontracts its duties with the state Association for Retarded Citizens (ARC). Due to an inadequacy of representation, however, the Center began a program which utilizes citizens from the Ebensburg area as "special friends" and advocates for the residents. The special friends form relationships with the residents, visit on holidays, and attend the residents' annual care review if possible. Exh. 603/26–27.

The facility also attempts to place residents in the surrounding area so that they have an opportunity to live in a non-institutional community. 63/171. Mr. Bellomo recommends that residents be placed in the community, but the county's mental health/mental retardation administrator makes final determinations on placement. Exh. 600/81; 63/18. Although the Center has residents who could be placed in the community, no such facilities are currently available. In an effort to ameliorate this unfortunate situation, for those residents who qualify for community placement, the facility awards "grounds privileges," which allows those residents to walk independently on the grounds or go to the mini-mall located near the facility. 63/160.

The standards of Title XIX require that facilities such as the Center be subjected to an unannounced, annual survey. 62/158. The survey team is present for approximately one week and scrutinizes the Center for its compliance with approximately 475 different standards. 64/42. The survey team then provides a report to the Center listing its concerns, and the Center must provide a plan of correction, which specifies a particular date for compliance. Thereafter, the survey team will return unannounced to ascertain if the various deficiencies previously cited have, in fact, been completely corrected. 64/42.

As a result of a Title XIX survey in October 1990, the Center received a Provisional I license under Title XIX for January 31, 1991, to July 31, 1991. 62/144; Exh. 1101. The provisional license was recommended by the Title XIX survey team to the OMR (which is responsible for the licensure process and is under the aegis of the Pennsylvania Department of Public Welfare). 62/144–45. The survey team recommended the provisional license as a result of problematic sexual behavior presented by one male resident, Clifford P. The Title XIX survey team was of the opinion that the Center had to develop a sexuality program to address this problematic sexual behavior before a full operating license could be recommended. 602/113. Significantly, the Title XIX survey team noted "the deficiencies during this survey do not individually or collectively jeopardize client health and safety or seriously impair the facility's ability to render care." 62/144. The Provisional I license issued by the Pennsylvania Department of Public Welfare was not equivalent to the decertification process that exists under the Health Care Finance Administration. 62/147.

Subsequently, the Provisional I license was replaced by a full operating license issued by the Pennsylvania Department of Public Welfare. The record contains no evidence of the issuance of any other provisional license. A full operating license under the Title XIX Medicaid Program is not an indication that a facility does not have any deficiencies. In fact, it is rare for a Title XIX survey team not to find some deficiencies in a facility which it has inspected. 64/44.

In addition to the Title XIX Medicaid Program inspection and licensing process, the Center also is subject to the Inspection of Care (IoC) survey process carried out by the Office of Medical Assistance, a division of the Pennsylvania Department of Public Welfare.

The federal Title XIX survey and the Pennsylvania IoC survey are two separate processes. 62/159; *compare* Exh. 60 (11/92 Title XIX survey) and Exh. 67 (8/92 IOC survey). The IoC surveyors who visit the facility actually go page by page through all records of the Center, noting any deficiency which is apparent. A plan of correction for these deficiencies must be submitted and approved by the Office of Medical Assistance. 62/158–59; Exh. 63. If a plan of correction is not approved and implemented, the Center risks the loss of Medicaid funding. Exh. 63. The record does not contain any evidence of any plans of correction which have not been approved or implemented.

## B. *Adequate Basic Care*

The United States contends that defendants have failed to provide the residents at the Center with the constitutionally required level of basic care. In particular, the United States alleges that insects have been found on food and on the residents,[12] the clothing of some residents has been soiled, residents have not been bathed properly, and there is a disregard for the privacy of residents. 87/8–9; 92/22–3.[13]

As noted above, adequate food, shelter and clothing are "essentials of . . . care that the State must provide" to the residents of the Center. *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462. The United States' allegations with respect to inadequate food (nutritional management) are addressed below in the discussion concerning adequate medical care, and I limit this portion of the opinion to the right to receive adequate shelter and clothing.

In *Society for Good Will*, 737 F.2d at 1244, the Court of Appeals for the Second Circuit affirmed a district court's finding that "the quality of the shelter at [a state operated school for the mentally retarded] did not meet constitutional minimums." The Second Circuit noted the conditions of filth, insect and rodent infestation, unsanitary conditions resulting in the transmission of various diseases, and inordinately hot rooms and/or temperature control problems, and held that the record contained sufficient evidence to support the district court's conclusion that the shelter was constitutionally infirm. *Id.* The court specifically noted that the problems at the facility were pervasive, and were not simply isolated lapses in care—"there was sufficient evidence for the district court to conclude that problems in the living conditions at [the institution] were either not being corrected or were arising on a recurring basis and that these problems caused the living environment to fall below constitutional standards." *Id.*

In this case, the United States has persistently focused on two incidents involving insects as a basis for its assertion that the Center, as an institution, has failed to provide adequate shelter. The first instance involved the discovery of ants on two residents who had been placed on floor mats in the day room to sleep overnight because their rooms were being painted. The staff discovered the ants on their bodies on two separate mornings (*i.e.*, the first resident was discovered with ants on her body on one morning, and the other resident was discovered with ants the following morning). Exh. 87. Thereafter, the staff took steps to exterminate the insects, and the residents' beds were moved out to the day room for overnight sleeping purposes while the rooms were being painted. *Id.* at 00000918.

The other, more serious incident involved the discovery of an infestation of maggots in a resident's ear. Exh. 1022. Just how this infestation occurred could not be definitively established, but the Center's investigation concluded that this resident's ear most likely became infested as a result of outdoor activity in the grass, which was confirmed by the emergency room physician. 63/77. No other similar incidents were reported.

---

12. The issue of "flies on the food" is addressed, *infra*, in the discussion concerning alleged constitutional deficiencies at meal time.

13. The United States also contends that instances when the staff has been unable to locate a resi-

dent's whereabouts support a conclusion that inadequate care is provided. This is an issue of safety and will be discussed in that section of the opinion.

■ These two isolated instances related to insects, without more, are insufficient to demonstrate that the Center provides constitutionally inadequate basic care by tolerating insect infestations. To the contrary, the Commonwealth proffered credible evidence that these incidents were promptly reported by the staff. Upon notification of circumstances warranting attention, professional judgment was exercised; the situations were addressed, and the problems did not recur.

■ As the Third Circuit in *Shaw* explained (in addressing a claim for alleged inadequate safety), isolated examples of problems, while regrettable, do not establish constitutional violations.

> Although the failure to prevent a "pattern of attacks, injuries, or violent behavior" is actionable, "[t]he right to protection is not activated by an isolated mishap, or called into question by each bruise that a patient may suffer." We do not mean to minimize the seriousness of Shaw's February 3 injury. We conclude, however, that the failure of the responsible staff member to keep watch over Shaw at the instant he happened to leave or be taken from his ward on February 3 amounts to just such an "isolated mishap." It cannot amount to more than simple negligence.

920 F.2d at 1143 (citation omitted). *See also Society for Good Will*, 737 F.2d at 1245 ("While there have been occasions when patients' specific medical problems have been treated improperly, the district court's decision should not have been based on isolated instances of improper treatment, but on a finding that medical care was inadequate on a class-wide basis. Isolated instances of inadequate care, or even of malpractice, do not demonstrate a constitutional violation.").

The United States also asserts that the clothing provided to the residents of the Center violates constitutional minimum standards because, on occasions, residents have been found with soiled clothing and soiled diapers. In support of its position, the United States cites expert testimony regarding a patient who he discovered with vomitus on his face and clothing. Dr. Stark, a psychologist who specializes in the care of persons with developmental disabilities, testified that he notified someone about the resident's condition, and that it "took a while" for someone to clean it up. Dr. Stark also stated that he saw residents with food stains on their clothes, and that some residents had a body odor and others an odor of urine. 43/220.

■ Obviously, the presence of vomitus on one's person is unpleasant for that individual and repugnant to others. Again, however, the record indicates that this was an isolated occurrence, and, without more, I cannot deem this incident indicative of a failure by the Center to provide adequate clothing for the residents or to promptly respond to situations requiring care and attention. In particular, I note that the record contains credible testimony that the staff at the Center felt inhibited and hesitated to intervene on behalf of the residents in the presence of the United States' experts. 62/198.

■ Moreover, even if I consider this incident together with the testimony that residents had food stains on their clothes, I cannot find defendants constitutionally deficient in providing adequate clothing to the residents. There are stains which by their nature alter the appearance of clothing, but which do not automatically make it unfit to wear. The United States' own witness, Mr. Tackett, acknowledged that the Center routinely changed the clothing of those residents in the Keystone unit who "needed it." 38/17. In addition, the United States' photographic exhibits reveal that each resident had clean, presentable, and properly-fitting clothing. *See, e.g.*, Exhs. 670–71, 678–82, 705, 709–10, 713, 734–40. This is a trivial matter that does not warrant the constitutional analysis which the Government's contention requires of me.

■ With respect to the United States' contention that the residents smell like urine, the United States cites the conclusory testimony of Dr. Stark (which provided no evidence with respect to the frequency of this alleged problem), 43/220, and a November 6, 1992, Medical Assistance Survey. Exh. 60. The November 1992 Survey states that a Medicaid standard had not been met because 12 residents were confined to their wheelchairs for 5 hours without being changed,

and when changed, the Attends (a brand name of an adult diaper) worn by those residents were heavily saturated with urine. Exh. 60, 00503763. There is no reference to urine saturated residents or urine saturated Attends in any other of the Medical Assistance Surveys from 1983 to 1992 (*see* Exhs. 48–59) nor is there any other testimony in this regard. This single discovery by the survey team hardly proves a prevalent condition at the Center.

■ The United States contends the residents are not bathed properly, citing the testimony of Mr. Tackett, a former Center employee, and an anonymous complaint at a union meeting about residents being "hosed up one side and down the other." Exh. 995. As I indicated during the trial of this matter, the anonymous complaint at a union meeting about bathing the residents is not competent evidence. It is hearsay which is being offered to prove the truth of the matter asserted, Fed.R.Evid. 801(c). The declarant has not been subject to cross-examination, nor is his/her identity even known. Moreover, the reliability of the evidence is suspect in light of the fact that the employee would not repeat the allegation at the request of the Center so that the Center might seek to validate the complaint and, if necessary, address it. 64/46–47. There is no evidence to suggest that the employee wished to remain anonymous because he feared retaliation.

■ Mr. Tackett testified that the bathing process in the Keystone living unit was like an assembly line, "it could have been longer ... it was done very quickly...." 38/27–28. The substance of his testimony does not establish an inadequate bathing process. Although the procedure is done quickly, it is routine for the staff. Mr. Tackett's testimony does not assert that the residents were still dirty after being bathed, that they smelled, or that they were not bathed frequently enough. Rather, his testimony suggests no more than that they were bathed too quickly. This hardly demonstrates a failure to exercise professional judgment, or that the Center's bathing practices did not meet minimum professional standards.

■ Finally, the United States submits that the Center fails to provide adequate care for the residents because it does not provide the residents with privacy. Although the Supreme Court in *Youngberg* did not explicitly acknowledge a "right to privacy" for institutionalized mentally retarded individuals, it is only logical to infer from the Court's recognition of the right to adequate clothing that there exists a correlative right to avoid being viewed unclothed. 457 U.S. at 324, 102 S.Ct. at 2462; *see also Association for Retarded Citizens of North Dakota,* 561 F.Supp. at 491.

The United States points to the fact that privacy issues have been addressed in every annual state survey, and yet the Center has failed to respond effectively. The United States further notes that even Mr. Bellomo observed an incident involving seven residents clothed in only Attends, milling about a hallway while locked out of their rooms. Exh. 109. These problems with privacy have by and large occurred in the Sunset, Horizon or Villa living units, where the residents are more mobile.

The November/December 1983 Medical Assistance Survey for the Center noted a lack of privacy for residents during toileting and bathing. Exh. 48, # 00800265. In the October 1989 Medical Assistance Survey, a deficiency was noted because residents in Keystone were dressed, changed and bathed without privacy, and two residents in Horizon II used the bathroom stalls without closing the privacy curtain. Exh. 56, # 00800324. In October of 1990, the Medical Assistance Survey noted a deficiency because a resident was observed while in a Villa unit TV room without a blouse on, and another resident was observed walking naked from the bathroom to the TV room. Exh. 57, # 00004041.

■ For each of these deficiencies, the Center's Plan of Correction provided for inservicing or teaching the staff regarding the need to afford greater privacy to residents. The privacy issues were not ignored, and I find that the Plan of Correction implemented at the Center fully comports with accepted professional standards. The record is clear that the Center responded to the breaches of privacy by instituting more training. The

professional judgment exercised, therefore, is not a substantial departure from accepted professional standards.

■ The fact that the training did not bring about a complete cessation of incidents like those described above does not compel the finding of a violation of the residents' right to privacy. Improvements were made, and the United States failed to offer any testimony, expert or otherwise, concerning how the Center's action in responding to the privacy breaches constituted a substantial deviation from acceptable professional standards.[14]

■ To summarize, I find that the United States has failed to prove that the cited lapses in basic care at the Center—either individually or in total—have risen to the level of a constitutional violation, much less that the Commonwealth's official "policy or custom" played any role in the alleged deprivation of care. See Graham, 473 U.S. at 166, 105 S.Ct. at 3105 (in official-capacity suit, the governmental entity's "policy or custom" must have played a part in the violation of federal law). In response to each of the problems with care discussed above (which occurred in different areas over the course of several years at this large institution), the Center responded with corrective measures pursuant to the exercise of professional judgment. While the lapses by the Center may have been negligent—and are at least regrettable—I conclude that the basic care provided at the Center does not constitute a substantial deviation from professional standards and is not constitutionally infirm.

14. It is worth noting that some of the breaches of privacy (involving the more mobile residents) cited by the United States do not necessarily reflect even ineffective training on the part of the Center. For example, there is no indication that the staff had any involvement in the incident involving the two residents in the Horizon unit who used the bathroom without closing the curtains in the stall. If staff were not toileting these individuals, the fact that the state surveyor observed the residents utilizing the stall without closing the curtain does not necessarily indicate a failure on the part of the Center to respond appropriately to a breach of privacy. I note that the record contains evidence of appropriate responses by the staff to privacy issues. See Exh. 594b, # 00050400.(wherein an RSA observed a

## C. Adequate Medical Care

■ The right of an institutionalized mentally retarded person to receive adequate medical care—acknowledged without discussion by the Supreme Court in *Youngberg* as a substantive liberty interest protected by the Fourteenth Amendment (457 U.S. at 315, 324, 102 S.Ct. at 2457–58, 2462)—has been discussed by a number of courts. *See, e.g., Society for Good Will,* 737 F.2d at 1245 (district court's finding of inadequate medical care at facility was clearly erroneous; "Isolated instances of inadequate care, or even of malpractice, do not demonstrate a constitutional violation."); *Lelsz v. Kavanagh,* 673 F.Supp. 828, 834 (N.D.Tex.1987) (constitutionally required medical care "includes not only life-preserving or emergency care, but also regular and preventive treatment for ordinary or chronic ailments."). The United States challenges the following areas of medical care at the Center: neurologic care; psychiatric care; treatment of gastroesophageal reflux and aspiration; nutritional management; physical therapy and physical management; general medical care; and general nursing care.

### 1. NEUROLOGIC CARE

The United States contends that the Center's efforts to provide emergent neurological care for its residents who sustain status epilepticus[15] constitutes a substantial deviation from accepted professional judgment. 87/77–82. It further contends that the Center's provision of regular and preventive neurological care is likewise deficient. In particular,

resident who was stripping and directed her to the toilet).

15. Status epilepticus is a condition in which a resident manifests seizure activity that is either constant or recurrent without full recovery of consciousness before the next seizure activity begins. 48/118; 81/14; Exh. 1107, p. 854. Usually the diagnosis of status epilepticus is made in hindsight because the time frame of thirty minutes is a diagnostic criterion. That is, constant seizure activity of more than thirty minutes is consistent with the diagnosis of status epilepticus. Recurrent seizure activity within a thirty minute time frame that is not accompanied by a full recovery of consciousness also is consistent with a diagnosis of status epilepticus. *Id.*

the United States claims that the Center's treatment of residents with seizure disorders substantially deviates from accepted professional judgment because: (1) the residents receive more medication and combinations of medication to prevent seizures and sustain more adverse side effects than are acceptable, 87/84–86; (2) some of the residents receive anticonvulsant medication despite the fact that a diagnostic test, which has not been administered, may indicate that the resident does not experience seizure activity, 87/83–84; and (3) residents who experience seizure activity continue to sustain injuries of varying magnitude, 87/83.

In one sense, any seizure activity is an emergency. True status epilepticus, however, presents special concerns not only because of the seizure and its associated loss of consciousness, but also because of the potential to compromise an individual's respiratory status and the ability to oxygenate the tissues of the brain and other vital organs. 49/235; 36/50–51; 81/17. The longer the seizure activity persists, the more difficult it is to control with medication. 81/141. On the other hand, most seizures spontaneously cease within a few minutes. 36/201. A seizure that lasts one, two or three minutes and then ends with the resident responding, while clinically significant, is not an emergency situation. 81/34. To further complicate the assessment of status epilepticus and its treatment, neither the onset nor the duration of a seizure can be predicted. Exh. 1107, p. 854; 81/33, 119–20.

Against this backdrop, I must determine whether the Center's care of its residents with status epilepticus constitutes a substantial deviation from acceptable professional standards. Dr. Alvarez, an expert neurologist for the United States, testified that the Center's treatment of status epilepticus—which consists of observation and monitoring, the administration of oral or intramuscular anticonvulsants pursuant to a physician's order, and ambulance transportation to a hospital—is not acceptable treatment. Dr. Alvarez testified that the most acceptable treatment for status epilepticus is the use of intravenous Valium, and that the intramuscular administration of anticonvulsants is a sub-

stantial deviation from acceptable professional standards. 36/55; Exh. 1107. The Commonwealth responded with evidence from Dr. Chamovitz, the Center's consulting neurologist, that the Center is not licensed to provide intravenous therapy to its patients (64/171–2; Exh. 633 (1–19–93), pp. 25–26)), but that the treatment provided for residents in status epilepticus comported with acceptable medical treatment.

On rebuttal, Dr. Coulter, also a neurologist, emphasized the deficiency in the Center's treatment of status by reference to a protocol recommended by the Epilepsy Foundation of America (EFA) stating that "intramuscular therapy has no place treating status epilepticus or seizures in general." Exh. 1107/856. Dr. Coulter explained that the treatment protocol "pull[ed] together for the general medical community what neurologists have known for ten or fifteen years." 81/24. Dr. Coulter noted that although the EFA treatment protocol recommendation was not new, it had been recently codified and published in the August 18, 1993 *Journal of the American Medical Association.* 81/64. He noted that neurologists are the medical professionals most qualified to treat status epilepticus, and that the thrust of the EFA treatment protocol recommendation was for other medical practitioners who encountered patients in status. 81/18. The protocol recommendation was published in the *JAMA* for that reason—"the intent was to put it in a place where all general physicians would see it ..." 81/19.

The primary care physicians at the Center who ordered the intramuscular administration of anticonvulsants are not neurologists, but general practitioners. This is the audience the EFA treatment protocol was hoping to reach. As Dr. Coulter's testimony and the EFA treatment protocol itself establish, the "[t]reatment of status epilepticus varie[d], and archaic therapies with sedatives, insufficient doses, and intramuscular administration [were] still practiced in some areas." 81/18–25; Exh. 1107/854. As such, there was a tacit acknowledgment within the medical community that the protocol for the treatment of status epilepticus among medical practitioners, other than neurologists, before

the publication of the EFA treatment protocol in August of 1993, was anything but clear. 81/18, 25; *see also* 48/118–21 (Dr. Kastner's testimony regarding confusion in medical literature about treatment of status epilepticus).[16]

■ As a result, the direction by the Center's primary care physicians to administer anticonvulsants intramuscularly to treat status epilepticus was made pursuant to an exercise of professional judgment that had some basis in accepted professional practice among general practitioners at that time. The Center's administration of anticonvulsants intramuscularly for the treatment of status epilepticus during the period for which testimony was offered did not violate constitutional minimum standards.[17]

The Center's treatment of status epilepticus also includes observation and monitoring of the resident, and ambulance transportation to a hospital. Both Dr. Chamovitz and Dr. Coulter testified that this is the accepted modality of treatment for their patients who reside at home. 49/231–34; 81/33. Inasmuch as the Center is the "home" for the residents, both of these interventions are acceptable professional practices. Moreover, the observation and monitoring of a resident would appear to be a necessary component for purposes of determining whether that resident actually is in a state approaching status epilepticus, or has reached the point where additional services should be provided.

81/59. Once a determination has been made that the resident requires treatment that cannot be rendered at the Center, ambulance transportation is appropriate. 49/231–34. The Center's contract with an ambulance association provides access to practitioners licensed to administer advanced life support services in conjunction with a physician from one of the local hospitals. 64/98–99.[18]

Dr. Alvarez also challenged as deficient the regular neurologic care for the residents pertaining to the administration of anticonvulsants. Dr. Alvarez alleged that there were too many residents on multiple anticonvulsants, despite the fact that they had few seizures or were experiencing side effects. 36/114. It is undisputed that the acceptable standard for the treatment of seizures is the administration of the smallest dosage of anticonvulsant medications necessary to control seizures. 36/112; 48/126. However, if one anticonvulsant does not control an individual's seizures, another anticonvulsant may be added to the regime. If two anticonvulsants do not control the seizures, a third anticonvulsant may be added. Occasionally, if an individual's seizures still are not controlled, a fourth anticonvulsant may be added. 36/112–13; 49/241. Dr. Alvarez admitted that he himself had some patients on four anticonvulsants to control their seizures. 36/149–50.

Dr. Alvarez supported his opinion that the Center had too many of its residents on multiple anticonvulsant medications by re-

16. I take judicial notice (Fed.R.Evid. 201) that the *1995 Physicians' Desk Reference* provides that "[i]njectable valium is a useful adjunct in status epilepticus ... and severe recurrent convulsive seizures." *PDR*, at 2077. The intravenous route is preferred, but if that route is impossible, the intramuscular route may be used. *Id.*, at 2078.

17. Intramuscularly administered Valium for the treatment of status epilepticus in the future may in fact constitute a departure from professional judgment inasmuch as it is now clear to the Center that this means of treatment has lost acceptance within the medical community. Rectal administration of anticonvulsants, however, appears to remain acceptable. 81/59; Exh. 1107.

18. Dr. Alvarez believed that the Center's decision to summon ambulance transportation was inadequate because it was usually delayed. 36/218. This was reiterated by Dr. Coulter on rebuttal, when he testified that after ten minutes of seizure

activity, it is appropriate to call an ambulance. 81/33. According to these doctors, the "ten minute time frame" should serve as a point to access emergency services, because continuous seizure activity may develop into status epilepticus. 81/33. This facet of the Center's treatment of status epilepticus does not alter my decision regarding the constitutionality of treatment rendered up to the time of trial, because I have found the primary care physicians exercised acceptable professional judgment in the administration of intramuscular valium. This treatment necessarily has an impact on the physicians' decisions as to the appropriate time to summon emergency services. The various components of treatment for status epilepticus cannot be dissected and evaluated in a vacuum—particularly since it cannot be ascertained with any certitude in many of the situations when an ambulance should have been summoned.

viewing the medication regime of residents on four anticonvulsants. *See* Exhs. 307(a) and 351(a). Dr. Alvarez noted that the recommendation of the consulting neurologist, Dr. Chamovitz, to reduce the dosage of certain anticonvulsants for these residents on four different medications had been ignored by the primary care physician.

In response to this testimony by Dr. Alvarez, however, Dr. Chamovitz explained that the decisions of the primary care physicians not to reduce the number of and dosages of anticonvulsants were acceptable professional practices. Dr. Chamovitz described the manner in which he discussed his recommendation with the primary care physicians, who ultimately implemented or rejected them, and that the rejection of his recommendation was based on the fact that the primary care physician was more familiar with the resident and aware of previous unsuccessful efforts to reduce the amount of medication needed to control a resident's seizure disorder. 49/241, 244–47. Dr. Chamovitz also testified regarding his confidence in the judgment of the primary care physicians, who although they were not neurologists, were very well versed in the treatment of seizures because 50% of the Center's population is epileptic. 49/245.

Dr. Alvarez opined that even though polypharmacy with four drugs may be acceptable in some circumstances, it should only be instituted for a short period of time and for no more than two months. 36/112–13. The United States contends that the Center's use of four anticonvulsants has gone on for years, as opposed to acceptable short periods of time. In response, Dr. Chamovitz testified that although treatment with four anticonvulsants is not desirable, it is acceptable practice. 49/241.

Significantly, the Center has a total of 312 residents with a diagnosis of epilepsy, Exh. HH, Table 6, of whom 240 are prescribed anticonvulsant medication. Of the 312 epileptic residents, 17.63% are treated with polypharmacy: 13.46% are treated with three anticonvulsants and 4.17% treated with four anticonvulsants. Exh. HH, Table 6.[19] In addition, the Center has improved its treatment of seizures by reducing the number of anticonvulsants prescribed to control seizure activity. Dr. Kastner, a former Department of Justice consultant and a pediatrician who works with the developmentally disabled, testified that the Center's efforts to reduce polypharmacy started in 1990, shortly after the publication by researchers in the field of a protocol calling for such action. 48/110. The result of this effort was illustrated by Dr. Kastner in a table documenting the treatment from 1990 through 1992 of the epileptic residents for whom Dr. Shertz, one of the Center's primary care physicians, provided care. 48/109–10; Exh. HH, Table 7. Dr. Kastner opined that the "rate of polypharmacy is not high" at the Center. 48/111.

■ Although it is preferable for residents with seizure disorders to be treated with less than four anticonvulsants where possible, I find that the administration of multiple anticonvulsants to some of the Center's residents does not itself constitute a violation of the residents' right to adequate neurological care. My role is not to decide whether adding this drug or continuing that one is the better course of treatment; rather, I am to evaluate whether the care provided met professionally accepted minimum standards. *See Society for Good Will*, 902 F.2d at 1090 ("In its inquiry, the district court should use expert testimony to identify 'substantial departures', but not to choose from among several professionally acceptable remedies."). In each case of polypharmacy, the decision to use an additional anticonvulsant was the result of the exercise of professional judgment that is consistent with acceptable professional standards. 49/247.

Dr. Alvarez also claimed that the regular neurologic care for the residents was deficient because the residents manifested too many side effects and no efforts were made to reduce the incidence of the side effects.

---

**19.** While the United States contends that these percentages are skewed by including in the calculations 72 residents who are no longer epileptic, I note that the United States' own expert, Dr. Sulkes, recommended to the Center that it should have a neurologic consult for all residents who have a diagnosis of epilepsy, regardless of whether they experience active seizures. 64/88–89.

36/120. According to Dr. Alvarez, a successful treatment for seizure disorders involves obtaining control of an individual's seizures with the least amount of medication and with the fewest possible side effects. 36/152. To support his opinion that the residents manifested too many side effects from their anticonvulsant medications, Dr. Alvarez noted that Jeffrey K. continued to receive dosages of Depakote in an amount exceeding that recommended by the manufacturer, even though Dr. Chamovitz had questioned the high dosage. Exh. 393. Despite the high levels of Depakote, Jeffrey K.'s seizures were not controlled, and he was transferred to a local hospital for treatment. Although his Depakote level was within the therapeutic range, Jeffrey K. had developed thrombocytopenia,[20] a side effect of Depakote. In explaining the Center's care of Jeffrey K., Dr. Chamovitz testified that the treatment was acceptable because the high dosage was being administered in an effort to keep his blood level in the therapeutic range, in order to determine its effectiveness. 50/201–02. Thus, for this patient, the high dosage was consistent with the treatment recommendation of the manufacturer.

Dr. Alvarez also pointed to the case of Neil S. 36/125–7. Dr. Alvarez noted the documentation of persistent lethargy over a period of months, and blood levels of Dilantin which exceeded the upper limit of the therapeutic range. Neil S. was eventually hospitalized, treated for an infection, and his Dilantin dosage was reduced. His blood level returned to the therapeutic range, and he was discharged alert and improved. Exh. 468. *See also* Exhs. 462A (Charles S.), 372A (Roberta H.), and 36/125–33 for other residents with dilantin toxicity.

Dr. Alvarez was critical of the care provided to Neil S. and these residents because, despite the manifestation of sedation and lethargy, common symptoms of Dilantin therapy, either no blood levels were obtained (*i.e.*, the residents' blood levels were not tested) or the anticonvulsant dosage was not adjusted in response to high blood levels. 36/127–32. Dr. Chamovitz testified that the blood levels are routinely monitored. But Dr. Chamovitz's testimony failed to establish why blood levels were not obtained when there is evidence of lethargy and sedation, or why the dosage of an anticonvulsant was not adjusted in light of facially toxic levels.[21] The Center provided no explanation, through documentary evidence or otherwise, for why these anticonvulsants were continued without adjustment.

 Although monitoring by observation and obtaining more frequent blood levels may be acceptable in some cases, in the situations highlighted by Dr. Alvarez, there is no indication that the Center's physicians made any conscious decision whatsoever regarding this aspect of treatment. As a result, professional judgment was not exercised. For this reason, I find the Center's care in monitoring and responding to sedation caused by Dilantin [22] substantially devi-

---

**20.** Thrombocytopenia is a condition in which the circulating blood has an abnormally small number of platelets, the blood component which functions in clotting. *Stedman's Medical Dictionary,* 1596 (25th ed. 1990).

**21.** Dr. Chamovitz also explained that a Dilantin level may increase due to an infectious process or the dumping of Dilantin into the blood stream from soft tissues. 50/192, 193, 195. Although that testimony is relevant to understanding how a resident's Dilantin level may suddenly exceed the upper limit of the therapeutic range, it has no relevance to why the professional did not act to address a side effect that has become apparent over a course of time, or a blood level that may be toxic.

**22.** This finding pertains only to the Center's care as it relates to detecting and responding to the side effect of sedation produced by Dilantin. Al-

though reference is made in passing to other side effects, the record does not present any discussion of a failure to detect or respond to other side effects on a widespread basis, and I need not address it. Presumably, this is why Dr. Chamovitz testified about routine monitoring of liver enzymes and blood counts which may be adversely affected by anticonvulsant therapy. 49/244. I also note that this finding pertains to the anticonvulsant Dilantin. The record is inadequate to make a determination regarding the acceptability of the Center's detection and response to side effects produced by other anticonvulsants. *See* 84/28–32 (United States' proposed finding re: Center's failure to manage side effects and citation of seven residents, five of whom suffered from Dilantin toxicity).

ates from acceptable professional standards for patients with seizure disorders.

Injunctive relief in this action, however, is not warranted because the United States did not even attempt to establish that this lapse in the Center's neurological care was the result of the Commonwealth's "policy or custom" as implemented at the Center. *See Graham*, 473 U.S. at 166, 105 S.Ct. at 3105 (in official-capacity suit, entity's "policy or custom" must have played a part in the violation of federal law). The United States' constitutional challenge to neurological care in this "official-capacity" action, therefore, fails as a matter of law.

The provision of regular neurologic care to the Center's residents also was faulted by Dr. Alvarez because the Center does not utilize videotaped EEGs. Dr. Alvarez explained that a videotaped EEG is a noninvasive diagnostic procedure that entails gluing electrodes to a patient's scalp, with the patient's brain activity then being recorded, while videotaping the patient. If the videotape captures a seizure event, the physician may be able to determine (in some cases) by comparing the tracing of the brain's electrical activity and the patient's activity on the videotape, whether what is being observed is in fact seizure activity. 36/97–98. Such identification is helpful because the detection of pseudoseizure activity would obviate the need for trial or long term administration of anticonvulsant medication. 36/97.

Dr. Alvarez's testimony clearly establishes that utilizing a videotaped EEG is one option, and is a course of treatment to which many in the medical community aspire. Other evidence presented at trial, however, revealed that other acceptable options exist within the medical community to determine if activity is seizure-related, including direct observation of seizure activity, prescribing medication and evaluating its effectiveness. 50/236. Deciding whether to perform a particular diagnostic study is a matter of professional judgment. 49/239; *see also* Exh. 633

(1–19–93)/28–29.[23] The fact that Dr. Chamovitz did not believe that he needed a videotaped EEG to validate the existence of seizure activity supports a finding that the Center exercised professional judgment in this regard. 49/239.[24] Dr. Alvarez's opinion appears to be attributable to the fact that he espouses a newer school of thought. But the adherence by a professional to the older of two widely-accepted schools of thought does not establish a failure to exercise acceptable professional judgment.

Finally, Dr. Alvarez opined that the Center's provision of neurological care was not proper, and therefore deficient, because residents who experienced seizure activity continued to sustain injuries of varying magnitude. 36/78–79. Dr. Alvarez testified that physical injuries are common with epileptics because the sudden loss of muscle tone during the seizure causes the epileptic to fall or hit objects. 36/76. Dr. Alvarez stated that an institution has the responsibility to provide an individualized plan of protection and prevention for epileptics who are prone to sustain injuries as a result of seizure activity. 36/78.

To support his opinion, Dr. Alvarez again cited examples of care for individual residents. For example, he noted the care provided to Barbara K., who frequently sustained injuries as a result of seizure activity which caused her to "fall[ ] straight as a rock right on her face." 36/80; Exh. 611–A. Dr. Alvarez testified that her seizures occurred once or twice a month, that the use of a helmet was discussed at interdisciplinary team meetings, Exh. 268a, but that there was a substantial delay in obtaining one for her. He further noted that even when a helmet was procured for her, she continued to sustain injuries. 36/81–87, Exh. 392(c).

The addressing of Barbara K's falls by an interdisciplinary team and the obtaining of protective gear illustrate that professional judgment was exercised on her

23. Dr. Alvarez found Dr. Chamovitz to be a competent neurologist. 36/159.

24. Indeed, Dr. Kastner believed that the "value of the EEG is over-estimated...." 48/165.

Some individuals with seizure activity have a normal EEG and some individuals without a seizure disorder have abnormal EEGs. 49/240; 48/164–5; Exh. 633 (1–19–93), p. 28.

behalf.[25] The record indicates that the delay in obtaining the helmet was not due to any omission by the medical professionals at the Center, but rather was attributable to the Human Rights Committee, an independent body which must approve all restrictive devices placed on the residents. Exh. 392(a). Past efforts to use a helmet had been unsuccessful with this resident, and that factor may have contributed to the delay in its approval. Exh. 392(c), # 00203661.

In addition, the continued occurrence of injuries after securing the helmet for Barbara K. does not in and of itself indicate that professional judgment has not been exercised. Instead, it indicates that a helmet may not protect a resident from all possible injuries. 49/257; 50/187–88.

Dr. Alvarez also cited the care of Ronald A. as an example of how the Center's provision of neurological care to prevent injuries from seizure activity was deficient. Ronald A. sustained multiple cuts and bruises because of falls due to seizures, and at one point, the Pennsylvania Inspection of Care report noted Ronald's injuries and questioned whether a helmet had been considered. 36/87–91; Exhs. 66 and 268(b). Ronald A.'s seizures were not as frequent as Barbara K.'s seizures, however (*compare* Exhs. 268a and 268b), occurring on a sporadic basis, with periods of four to five months between seizure activity. Dr. Alvarez opined that in light of the Inspection of Care report and the Center's documentation, the Center was aware of the seizure related injuries and failed to utilize a protective helmet. *See also* Exh. 67 (Pennsylvania Inspection of Care recommending helmet tolerance in view of three uncontrolled seizures and injuries for resident Glenn A.).[26]

Dr. Alvarez' opinion that the Center's care is constitutionally deficient, based on the Center's alleged failure to use protective helmets, is not persuasive. As with the control of seizures through polypharmacy, there are tradeoffs in the use of physical restraints between protection from injury and freedom from restraint. Because helmets are a restrictive measure and constitute an infringement of a resident's liberty interests if implemented, the right to be protected from harm due to seizure activity requires such protection as may be reasonable in light of the liberty interest in freedom from unreasonable restraints. *See Youngberg*, 457 U.S. at 316, 102 S.Ct. at 2458. At the Center, the final decisionmaker with regard to implementing the use of a helmet is the Human Rights Committee—an independent body that conducts an evaluation and either approves or rejects the proposed restrictive device. Exh. 93. Because the Center utilizes this additional step to insure that professional standards are followed before restraining an individual, I do not find the neurological care deficient for those instances when a helmet has not been approved, or approved as quickly as Dr. Alvarez would have liked.

The United States' arguments with respect to this aspect of the Center's neurological care suffer from an additional flaw. For a number of reasons, the frequency and severity of injuries sustained by the residents who have seizure disorders—disorders which obviously are difficult to control—cannot of themselves constitute sufficient evidence to establish a lack of professional judgment. The evidence showed that a protective helmet, like a football helmet, will re-

25. For example, in an incident report of an injury sustained after Barbara K. began wearing the helmet, an RSAS suggested that Barbara K. should be kept in the T.V. room for the administration of her afternoon medications. This change was suggested because it appeared that her afternoon seizure activity often was triggered by her physical movement from the T.V. room to the day room for her medications. The QMRP agreed to implement the suggestion. Exh. 392(c). This is another exercise of professional judgment, as it manifests an assessment of the situation, and a decision to incorporate the suggestion into her plan of care. Similarly, elbow pads were obtained for Barbara K. to further decrease the incidence of injuries. Exh. 392(b), # 00600458.

26. Dr. Alvarez also noted several other residents who sustained injuries as a result of their seizure activity. According to Dr. Alvarez, some injuries necessitated sutures. The focus of Dr. Alvarez' opinion centered on the failure to utilize helmets generally, and the failure to utilize helmets that would protect the residents from injury. 36/94, 154.

spond to the impact it receives and cannot provide complete protection. 50/188. The helmet may shift and injuries may occur despite the helmet's presence. In addition, helmets may not be able to prevent injuries that result from contact with a portion of the head not intended to be protected by the helmet. *See* Exh. 392b, # 00590535 (injury from impact with flat block held by resident at time of seizure).

Seizures by their nature are unpredictable, and injuries can occur when helmets have been removed for reasons of hygiene and for sleeping. *See* Exh. 392b, # 00001073 (seizure occurred in bathroom before bathing). All that Dr. Alvarez' testimony established was the frequency of injuries. It did not include discussion of either the nature of the injuries or why the Center's care for those residents failed to meet minimum professional standards. *See* 36/92–94. The mere quantification of injuries, without more, does not establish the failure to exercise professional judgment.

## 2. PSYCHIATRIC CARE

According to the United States, the defendants' provision of psychiatric services is constitutionally inadequate because the Center: (1) fails to provide adequate psychiatric assessments; (2) fails to provide adequate psychiatric diagnoses; (3) fails to provide adequate psychiatric treatment; and (4) fails to provide adequate monitoring of the psychiatric treatment. 84/IX. The right of an institutionalized mentally retarded person to receive adequate medical care, as acknowledged by the Supreme Court in *Youngberg*, 457 U.S. at 315, 102 S.Ct. at 2457–58, must include provision for psychiatric care, where needed.

### a. *Psychiatric Assessment Techniques*

At the Center, psychiatric care is provided by a contract psychiatrist consultant, a psychology department, and the direct care staff. From 1986 to July 1993, Dr. Pauline Goldschmidt was the Center's contract psy-

chiatrist consultant (Exh. 616, exh. 1; 64/81), and she provided psychiatric services to the Center twice each month during two eight-hour sessions. The services were provided to residents pursuant to referrals from the primary care physicians and the interdisciplinary team. Dr. Goldschmidt's psychiatric services consisted of psychiatric evaluations, management of psychotropic medications, and supervision of the screening for side effects such as tardive dyskinesia. Exh. 616, exh. 3; 64/80.[27]

The Center employs Dr. Stratton, a psychologist, as the Director of Psychology. 62/220–21. Dr. Stratton supervises the psychological services provided to the residents by eight psychological service associates (PSAs). 62/220–1; 51/19. Six of the PSAs have master's degrees and the remaining two have bachelor's degrees. 37/15–16. The PSAs work Mondays through Fridays during daylight hours and are not available on evenings and weekends. 37/16. Psychological services can be obtained during off hours by contacting the professional on call. 51/20.

The PSAs have varying caseloads. Five have caseloads of forty-eight residents, two have caseloads of seventy-two residents, and one has a caseload of ninety-six residents. 37/15. Some psychological services are performed by nonpsychology staff. 51/135.

The United States contends that accepted professional practice requires the utilization of a disciplined medical approach to the provision of adequate psychiatric care. This approach entails obtaining an assessment of the resident, rendering a diagnosis, formulating a treatment plan, monitoring the treatment plan for its effectiveness, and revising it as indicated. 38/63–64. The United States asserts that the Center's psychiatric assessments are constitutionally deficient because the Center fails to employ this disciplined medical model. According to the United States' experts, the behavioral data and information collected by the Center is either non-existent or inadequate, and the psychiat-

---

**27.** Tardive dyskinesia (TD) is an irreversible side effect of certain antipsychotic medications. 50/34. TD produces an involuntary movement disorder (50/34), and the onset of this disorder is insidious, usually occurring only after the anti-

psychotic drug has been administered for years. 38/67. The disorder is manifested by tremors of the face, mouth, and hands as a result of a change in the brain's chemistry. 49/12.

ric consults are chaotic, disorganized, undisciplined and too infrequent. 84/IX/4–15.

Dr. Fahs, a neuropsychiatrist who specializes in the psychological care of mentally retarded individuals, testified that the Center's psychiatric assessments are inadequate because 100% of the records he reviewed were deficient. 38/79, 85, 88. Dr. Fahs explained that a psychiatrist usually sees an individual because of a particular concern which, in a population like that of the Center, is typically labeled as a "target behavior." In a setting such as the Center, the target behavior "presents" (*i.e.*, is manifested) as aggression or self-injurious behavior (SIB). 38/71. In addition to the target behavior, other behavioral difficulties may be present. 38/72. A proper psychiatric assessment involves the collection of information from an interdisciplinary team, including doctors, staff, and other personnel, in an effort to gain a thorough picture of the resident. 38/71. The team should gather information regarding the resident's symptoms, his behavior and his functioning with others. 49/144–45. Such information should detail the frequency, intensity and duration of the target behavior, as well as any other behavioral difficulties. 38/73. Objective information of this nature is essential for an assessment of a mentally retarded individual, since subjective symptoms may not be communicated effectively. 49/145. An assessment should also include information regarding the resident's past psychiatric history, past medication history, as well as the individual's past and present medical history. Such longitudinal data may facilitate the approach to treatment. 38/74. Dr. Fahs claimed that these components of a psychiatric assessment are universally accepted in the psychiatric profession. 38/75.

Dr. Fahs testified that the Center's assessments are inadequate for a number of reasons. 38/75. First, Dr. Fahs found the assessments deficient in that the Center collects the information for a psychiatric assessment on a universal data collection sheet (UDCS). 38/76. The UDCS is the data collection tool used to chart all behaviors for all of the residents. 38/76. It is designed to collect a single type of interval data; that is,

it tabulates the frequency of the target behavior by noting whether the target behavior occurred during a particular hour interval. The UDCS does not necessarily denote the number of times the target behavior occurs during that hour interval, nor does the UDCS account for the intensity or duration of the target behavior. 38/76. Additionally, the UDCS is geared to deal with only one target behavior. As a result, if there is more than one target behavior, or if other behavioral difficulties are present, it is difficult to distinguish this on the UDCS. 38/77.

Dr. Fahs next identified deficiencies with the psychiatric consultations that allegedly contribute to the overall inadequacy of the assessments. He observed some of the psychiatric assessments performed by Dr. Goldschmidt, and testified that the assessments were chaotic, disorganized and totally lacking in the conveyance of relevant information to the psychiatrist. 38/77. In particular, Dr. Fahs stated that behavioral information that was in the chart was not conveyed to the psychiatrist. 38/78. In addition, according to Dr. Fahs, Dr. Goldschmidt had related that she did not feel that she had sufficient time to complete a psychiatric assessment. 38/82.

Dr. Lubetsky, a psychiatrist and Director of the John Merck Multiple Disabilities Program, testified as one of the Center's expert witnesses in this area. He also had observed the psychiatric consultations of Dr. Goldschmidt. According to Dr. Lubetsky, each of Dr. Goldschmidt's consultations was performed at the resident's living unit, in the presence of the resident's psychologist, QMRP, primary care physician (if possible), and a member of the direct care staff. Often these consultations were attended by the Center's pharmacist. 49/109–10. Dr. Lubetsky testified further that Dr. Goldschmidt then obtained information from the staff members present concerning the resident's behaviors, daily activities, and medications. Dr. Lubetsky noted that if Dr. Goldschmidt did not receive enough information, she would ask questions. 49/112–13. In light of these observations, Dr. Lubetsky concluded that the consultations were adequate and satisfied professional standards.

Dr. Lubetsky agreed with Dr. Fahs that there was room for improvement in two areas. First, he opined that completing the consultation form before the consultation would improve the process. However, he did not believe that this flaw impaired Dr. Goldschmidt's ability to make a professional judgment. 49/114. Second, Dr. Lubetsky stated that documentation of the psychiatrist's "thought processes" during the consultation should be improved. According to Dr. Lubetsky, the events that occurred at the consult were not well-summarized in the chart. Nevertheless, Dr. Lubetsky concluded that this deficiency did not impair Dr. Goldschmidt's clinical treatment or preclude the exercise of professional judgment, and that Dr. Goldschmidt's reliance on information orally-conveyed at the consultation was not an impediment to the exercise of her professional judgment. He observed that psychiatrists in private practice often rely entirely on such information to render a professional judgment in the treatment of their clients. 49/114–15, 118.

Dr. Lubetsky's observations were confirmed by Dr. Hauser, another psychiatrist, who explained that the Center utilized an interdisciplinary team approach in providing psychiatric care. 50/27. Like Dr. Lubetsky, Dr. Hauser found Dr. Goldschmidt's written documentation of her consults to be sparse, and provided the Center with a form that he had created for purposes of documenting his own psychiatric consultations. The Center has since adopted the form and incorporated it into the psychiatric consultations. 50/58–60. Dr. Hauser noted that by providing his own form, he was not implying that the Center's care was deficient in this regard, but only that it was an area that could be improved. 50/60.

Dr. Hauser also evaluated the collection of data regarding a resident's target behaviors. He noted that the Center collects some hard data, and that this data is used at the consul-

tations. 50/65. According to Dr. Hauser, hard data is not an essential resource for the psychiatrist because subjective data from the resident and the staff also are obtained at the consultation. Dr. Hauser testified that reliance on subjective data is consistent with acceptable professional standards, because most psychiatrists rarely have hard data available to them. 50/64. Dr. Hauser unequivocally testified that professional judgment can be exercised without hard data to formulate an appropriate treatment plan, and that Dr. Goldschmidt received sufficient information to enable her to exercise professional judgment. 50/63, 68.

According to Dr. Hauser, the characterization of Dr. Goldschmidt's consultations as chaotic and disorganized probably resulted from the fact that the resident himself usually was present at the consult. Dr. Hauser, however, did not believe that the consultations were chaotic or disorganized. He noted that the presence of the resident at a consultation may, in fact, be an effective means of understanding the residents' behaviors. 50/106. Dr. Hauser conceded that the rooms where the consultations occurred were not ideally suited for the procedures, and that staff seemed to be always coming and going, much like consultations he has completed in group homes. 50/107.

Despite these sub-optimal conditions, Dr. Hauser found that Dr. Goldschmidt was able to gather and process data, talk with staff about treatment, and render a recommendation. 50/68–69, 108. He further noted that in his discussion with Dr. Goldschmidt, she reported that she did have an adequate amount of time in which to perform her consultations.[28] 50/68.

■ Dr. Lubetsky's and Dr. Hauser's opinions that the psychiatric assessments at the Center meet acceptable minimum profes-

---

**28.** With respect to the issue of whether Dr. Goldschmidt is afforded sufficient time for her consultations, the United States points to testimony from Dr. Fahs, Dr. Lubetsky, Dr. Hauser and Dr. Goldschmidt in support of its position that more time at the Center would improve psychiatric services. It goes without saying that it would benefit the residents if Dr. Goldschmidt could spend more time at the Center, but the issue in this litigation is whether the care provided is constitutionally deficient, not whether it could be improved. My review of the record fails to identify any evidence indicating that the two monthly, eight-hour sessions at the Center constitute a substantial deviation from accepted professional practice.

sional standards are persuasive.[29] I find that accepted professional practice includes use of assessments completed by an interdisciplinary team, collecting both objective data and subjective data. Because psychiatric assessments at the Center are consistent with accepted professional practice, they evidence the exercise of professional judgment, and do not violate the Constitution. 50/27.

### b. *Differential Diagnoses*

Dr. Fahs also testified that the Center fails to provide adequate psychiatric diagnoses for its residents because it does not properly formulate "differential diagnoses" for the residents. A differential diagnosis is the result of an evaluation which considers information obtained in the assessment phase to identify a resident's possible disorders. 38/160–61. After identifying the possible disorders, a practitioner then considers which particular disorder is most likely that resident's actual diagnosis. 50/71; 49/147. That is, the practitioner gives full consideration to the alternative hypotheses and selects the most likely cause for the resident's problem. 50/71.

The utilization of the differential diagnosis is an accepted practice in psychiatry. 38/85; 50/71. Initially, the process is "mental" in nature. 50/71. After completion of this thought process, however, standard professional practice requires some documentation in support of the diagnosis. 50/71. The United States asserts that the Center's care is deficient in this regard because the records do not contain documentation concerning the alternative diagnoses and the basis for the selection of the working diagnosis. 38/85. Dr. Fahs testified that Dr. Goldschmidt's documentation was too succinct, and that it failed to explain why alternative diagnoses were not applicable and/or why

changes were made. Instead, Dr. Fahs found that considerations of the differential diagnostic possibilities were scattered throughout the chart. 38/85–87. The United States points out that Pennsylvania's Inspection of Care Survey also found this area deficient in its October 21, 1991 survey. 38/90; Exh. 67/2–B.

Dr. Fahs contends that the Center's failure to employ the differential diagnosis method is evident from the fact that diagnoses are added or changed after treatment already has been initiated. 38/87. According to Dr. Fahs, the diagnosis normally precedes the treatment selection, and a faulty diagnosis results in a high probability that an improper treatment will be selected. 38/87, 89.

Dr. Fahs cited the diagnoses for several residents as examples of diagnoses which substantially depart from accepted professional practice. He pointed to the diagnosis of schizophrenia for one profoundly retarded resident who had self injurious behavior (SIB) and aggressive behavior, and noted that virtually universal agreement exists within the medical community that it is impossible to make a diagnosis of schizophrenia in a profoundly retarded person. 38/102. Dr. Fahs found no support for the diagnosis of schizophrenia in that resident's record except for his SIB and aggression toward others. 38/103. Another resident, Gary K., "seemed to be depressed," but had only a "so-called" diagnosis of aggressive behavior. 38/107. Dr. Fahs stated that aggression is not a diagnosis, and that the diagnosis of depression had never been articulated in the resident's chart. 38/107–08.

The case of Darren W. also was cited as an example of a disorganized diagnostic process. Darren W. was being treated for akathisia[30] with Inderal. The medication was abruptly discontinued, however, after a diagnosis of

---

**29.** Dr. Lubetsky's candor was telling. He had never before testified as an expert, and he candidly identified weaknesses in the Center's psychiatric practice—weaknesses which the United States stressed in its efforts to characterize the care provided at the Center as unconstitutional. The United States ignores the fact that the weaknesses identified by Dr. Lubetsky were areas that he said could be improved. They did not constitute substantial departures from acceptable pro-

fessional practices, and Dr. Hauser confirmed Dr. Lubetsky's findings.

**30.** Dr. Fahs defined "akathisia" as a neuropsychiatric condition marked by excessive restlessness, typically manifested by an individual engaged in a significant amount of general movement and pacing. The condition also may be associated with overactivity, aggression and other behavioral difficulties. 38/121.

asthma was made. Dr. Fahs criticized this diagnosis because asthma typically is a childhood disorder. 38/121–28. Darren W.'s condition deteriorated after this abrupt change, and he was then diagnosed with obsessive compulsive disorder (OCD). Dr. Fahs claimed that there was no supporting evidence for the OCD diagnosis. 38/128. He further testified that no supporting evidence existed for the diagnosis of OCD in any of the other residents receiving Anafranil, a medication used to treat OCD. 38/129.

Dr. Lubetsky explained in reply that psychiatric diagnosis of the developmentally disabled is very difficult. 49/119. Indeed, diagnosis of psychiatric conditions is difficult in a population that is *not* developmentally disabled. *See Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2644, 125 L.Ed.2d 257 (1993). Dr. Lubetsky explained:

> It's very difficult to use the DSM–3, which is a guideline for making psychiatric diagnoses; . . . it is very difficult to use [the DSM–3] in the developmentally disabled population, mainly because of the cognitive impairment, the lower functioning I.Q.s, and the nonverbal nature of many of the clients; so it is very difficult to make a diagnosis.

> The best attempt is to utilize those guidelines and see if you can come up with a differential diagnosis which is a variety of considerations. Many times the best you can come up with is looking at the symptoms and attempting to cluster the symptoms to give you some guide to make a choice about medication.

> In addition, you're always working through the diagnostic process. As you are seeing clients over years, your opinion may change about their diagnosis depending on the pattern of their symptoms, the pattern of behaviors. In response to medication. In general, psychiatry—what you're taught is to try to make the best diagnosis you can and try not to make your diagnosis based on the response to a medication.

> But I think most physicians will also agree that they do look at the response to medication to help in re-thinking whether

a diagnosis was accurate or whether there's another diagnosis to consider. 49/119–20.

■■■ Taken together, all of the experts' testimony of Dr. Lubetsky and Dr. Hauser provides strong evidence for the proposition that rendering a differential diagnosis for the mentally retarded is more of an art than a science. Against this backdrop, Dr. Fahs' specific cases of allegedly flawed differential diagnoses are, at worst, indicative of erroneous psychiatric evaluations, not constitutional violations.

Dr. Hauser explained that it is an accepted national standard in psychiatry that a diagnosis follow the classifications of the American Psychiatric Association's *Diagnostic and Statistical Manual,* 3rd edition revised, DSM–3–R. 50/36. Unfortunately, the DSM–3–R was not designed for specific use with developmentally disabled persons, who often are nonverbal. 50/37. Nevertheless, Dr. Hauser found that pressure exists at the Center to use the DSM–3–R coded diagnoses for purposes of "inspection surveys" which are conducted on a regular basis by the Pennsylvania Department of Welfare and other agencies for purposes of accreditation and licensure (Medicare, Medicaid, etc.). 50/40. The DSM–3–R is the most current DSM, and certain diagnostic terms used in earlier editions of the DSM have become outdated. This outdated nomenclature, however, may continue to be used for certain residents. 50/41.

The allegedly erroneous diagnosis of the resident with schizophrenia, though outdated according to Hauser, was generally consistent with the first *Diagnostic and Statistical Manual* and the liberal application of the diagnosis of schizophrenia for anyone manifesting a psychosis. 50/89–90. That is, the diagnosis is "a lingering artifact of the historical context" of diagnosing patients. 50/92. Dr. Hauser also observed that the persistence in the diagnosis of schizophrenia may be due to the fact that DSM–3–R does not account for persons who no longer can be diagnosed as schizophrenic because of their limited cognitive functioning. 50/90. In any event, Dr. Hauser was not troubled by the persistence of this diagnosis at the Center,

because the treatment for schizophrenia was appropriate treatment for that resident, who under DSM–3–R would be diagnosed with atypical psychosis. 50/91. The use of the outdated nomenclature, though perhaps not technically accurate, did not detrimentally affect the residents' treatment.

■ In contrast to Dr. Fahs' finding, Dr. Lubetsky testified that Gary K.'s chart *did* include the diagnosis of depression. 49/124. Nevertheless, even if the chart did not include that diagnosis, the documentation of the resident's behavior was indicative of depression, and he was treated with an antidepressant in a low dose in an effort not to precipitate seizure activity. 49/124–5; 38/189. This course was consistent with Dr. Lubetsky's observation that, at times, the best that one can do is look at the symptoms, and attempt to "cluster" the symptoms in order to find some guide to selecting a medication to treat that individual. Again, the Center's *treatment* of the resident was consistent with acceptable psychiatric practice, and the constitutional standard is concerned with the care provided to the residents, not conformity of nomenclature to the latest APA revision of the DSM.

According to Dr. Hauser, Darren W.'s asthma diagnosis and the discontinuation of the medication Inderal was not improper. Typically, asthma is considered a childhood ailment, but the diagnosis actually is consistent with the diagnosis of a bronchospastic condition, regardless of one's age. As Dr. Hauser explained, Inderal may have the side effect of causing bronchospasms, which would exacerbate an individual's asthmatic or other bronchospastic condition. As a result, as Dr. Fahs conceded on cross-examination (38/141–42), Inderal should be discontinued to avoid precipitating any bronchospasms, regardless of the risk of any withdrawal reaction that may occur. 50/108–11.

Dr. Hauser also testified that he did not find the diagnosis of OCD for Darren W. or other residents troublesome. While Dr. Fahs claimed that too many residents (al-though he could not provide the exact number) had this diagnosis (38/165–66), Dr. Hauser explained that one of the exciting developments in the field of psychiatry is the increasing recognition of OCD as a disorder affecting millions of individuals. 50/112. Dr. Hauser then explained that if the disorder OCD is widespread in the general population, it is logical that this disorder will be more prevalent among mentally retarded individuals. 50/112–13. Consequently, when Dr. Hauser sees a mentally retarded patient with "ritualistic behavior" (*i.e.*, behavior that occurs over and over again), he is willing to try treatment with a drug used for OCD. 50/114.[31]

■ I find that it is within acceptable professional practice for a complete differential diagnosis to be constructed from documentation found throughout a resident's chart. This, in fact, is what Dr. Fahs found: "a piece here in the record, a piece here in the record, a piece here in the record …" 38/85–6. Moreover, a correct differential diagnosis may be dynamic, initially eluding the practitioner and only becoming clear as time passes and additional data is available to consider. For this reason, treatment may have to be geared to the symptoms presented, as opposed to treatment of a diagnosis consistent with the DSM–3–R.

■ Documentation alone cannot establish that there is a deficiency that reaches constitutional dimensions. The focus must be on whether professional judgment was exercised, that is, whether the practitioner has considered the options and has made a differential psychiatric diagnosis for a resident that is in keeping with minimal professional standards. I find the Center meets this requirement.

I credit the testimony of Dr. Lubetsky and agree that the thought processes in this area of care at the Center are evident from the live consultations, although those consultations could often be better documented. 49/114. As Dr. Lubetsky pointed out, the

---

**31.** Darren W.'s behavior described by Dr. Fahs included overactivity, pica (persistence in eating that which is inedible), severe rectal digging and smearing of his feces—behavior that was persistent enough to require resort to the use of a jumpsuit to preclude further rectal digging. 38/125.

mini-staffing notes in the charts detail why changes are made, as well as the status of the residents' care. 49/115. Accordingly, I find that the live consultations and the treatment process itself do not fall below accepted professional standards.[32] While I agree that the Center's documentation of the differential diagnosis can and should be improved, the problems with documentation do not prohibit the exercise of professional judgment.

c. *Psychiatric Treatment*

The United States alleges that the Center fails to provide adequate psychiatric *treatment* in these respects: (1) the decision-making process for treatment is inadequate because different treatment options are inadequately considered and there is a poor coordination of treatment efforts; (2) inappropriate treatment selection unnecessarily exposes residents to the risks of drug side effects and unnecessary chemical restraint; and (3) the Center fails to provide adequate and appropriate behavioral programs at the treatment stage. *See* 83/IX–22–29.

The United States relies heavily upon Dr. Fahs' testimony in support of its first and third contentions.[33] Dr. Fahs testified that treatment efforts include behavioral treatment, drug therapy, or manipulation of an individual's social environment. More than one treatment may be appropriate at any particular time. 38/91. Thus, consideration of the available treatment modalities should result in the selection of the "treatment which has the best benefit to risk ratio." 38/91. Ideally, treatment changes should not coincide with other changes in a resident's environment, medication regimen or behavior programming. 38/105–06.

Dr. Fahs claimed that some of the Center's documentation gave the illusion that different treatment options were weighed, but he found that, generally, this was not the case. 38/92–93. According to Dr. Fahs, behavioral programs were not considered, and drug changes were not coordinated with program changes, and vice versa. 38/93. Dr. Fahs testified that, instead of careful consideration of treatment options, the Center relied on the diagnosis as justifying the treatment. 38/93. He further believed that the residents responded only by luck, and that they would continue to suffer from behavioral difficulties. 38/93.[34]

Dr. Fahs, Dr. Hauser and Dr. Lubetsky all agreed that non-drug treatment should be provided together with medication in treating psychiatric impairments. 38/113; 50/46; 49/148–49. Dr. Fahs explained that non-drug treatments should be selected before drug treatment if the benefit from each is equal because they do not pose the risk of side effects. 38/92, 169. Dr. Hauser agreed that the premature initiation of medication is a red flag in the field of psychiatry. 50/46.

I find that Dr. Hauser's testimony about trends in treatment at the Center to be credible evidence of acceptable professional judgment in psychiatric treatment. Dr. Hauser testified that the Center was: (1) reducing the number of antipsychotic medications prescribed, as well as reducing the dosage when used, 50/24; (2) administering only those medications which are necessary and avoiding the administration of multiple psychotropic medications, 50/33; (3) prescribing medications in concordance with the diagnosis, 50/36; (4) prescribing alternative medications to treat psychiatric manifestations, 50/26; (5) decreasing the restrictiveness of the intervention used to treat psychiatric impairments, 50/27; and (6) resorting to an interdisciplinary team process to provide

---

**32.** In making these findings, I also credit Dr. Hauser's opinion that the psychiatric services at the Center are within the range of accepted professional standards. 50/67, 128.

**33.** I will address the United States' first and last contentions at the same time, because behavioral programs actually constitute one component of the treatment options that, according to the United States, are neither considered nor coordinated with other treatment efforts at the Center.

**34.** The United States further submits that the Center has been cited repeatedly for its failure to integrate adequate behavior programs with its use of psychotropic medications, and even Dr. Goldschmidt noted that certain PSAs at the Center rely on psychotropic medications. Exh. 615/59. Finally, the United States relies upon Dr. Fahs' testimony regarding the alleged inadequacy of the treatment of six residents at the Center. *See* 83/IX–32–39.

psychiatric care, 50/27.[35]

The exercise of professional judgment in the selection of the proper treatment for a resident "requires thinking" about the modalities of treatment, and administering treatment that meets minimum professional standards. 38/91. The Center meets this requirement. Its weakness is its documentation of the process, a weakness that is not in dispute. But, even in the face of this shortcoming, the Center still provides psychiatric care that meets minimum professional standards.[36]

As noted above, the United States also contends that inappropriate treatment selection unnecessarily exposes the Center's residents to the risks of drug side effects. Dr. Fahs testified that accepted professional standards mandate that prescriptions for antipsychotic medications should be avoided if they are not indicated. 38/65. Dr. Hauser agreed, and noted that the current trend in the field of psychiatry is to avoid unnecessary antipsychotic medication in order to guard against the development of side effects such as tardive dyskinesia, neuroleptic malignant syndrome, and extrapyramidal syndrome. 50/24.

While the United States contends that residents are unnecessarily exposed to side effects such as neuroleptic malignant syndrome, it fails to cite one example of a resident who developed this syndrome. On the other hand, tardive dyskinesia (TD) is known to afflict some residents at the Center, but the record in this case contains no evidence to suggest that residents actually in need of medication who have this condition became afflicted as the result of the *unnecessary* administration of antipsychotic medication. Instead, the United States' evidence on this issue pertains solely to the Center's alleged inadequacy in screening to detect this condition, a matter discussed *infra*.[37]

Dr. Fahs asserts that a determination regarding the adequacy of the Center's psychiatric care cannot be based on just the raw percentage of residents on psychotropic drugs. Instead, he believes that the "only way the care could be determined is by looking at each individual, each individual client." 38/135. Dr. Fahs further testified that the Center's Behavioral Intervention Committee (BIC) and the 30–day review, elaborate "convoluted mechanisms" established to guard against inappropriate psychotropic drug use, fail to safeguard the residents. These procedural safeguards, according to Dr. Fahs, actually were just rote exercises that entailed minimal review of a resident's psychological status and the need for chemical treatment. 38/135–37.

Although Dr. Fahs rejected the relevance of the Center's raw percentage of residents on psychotropic medications, I do not. Dr. Hauser testified that percentages are "just

---

35. Dr. Hauser specifically noted that the Center used the interdisciplinary team approach (50/27), as evidenced not only by having the professional disciplines and direct care staff present during a psychiatric consultation but also by the use of a 30–day review, the behavior intervention committee, and the Human Rights Committee. Consideration by the team of the treatment options is evidenced by the fact that the Center has consistently reduced the dosage of antipsychotics prescribed, as well as the number of residents who receive them. 50/24–25. In addition, the Center has initiated treatment with alternative medications. 50/26–27.

36. I find the opinions rendered by Dr. Hauser and Dr. Lubetsky highly persuasive and credible. These experts attempted to maintain an objective analysis. Both recognized that few institutions are perfect, and both readily noted the documentation as the Center's weakness. The lack of documentation, however, did not preclude them from proceeding with their analysis of the psychiatric care provided to the residents. Dr. Fahs, on the other hand, essentially concluded that the lack of documentation indicated that deficient psychiatric care was being provided to the residents, and he did not take the additional (and necessary) step of determining whether the underlying process was as flawed as the documentation. In addition, Dr. Fahs reviewed thirty to forty records in rendering his opinion in this area, but he highlighted the care of only six residents. Although Dr. Fahs' testimony indicates his disagreement with the treatment chosen for these six residents, it does not support a finding that the processes for providing psychiatric care at the Center are generally flawed or that professional judgment is not being exercised.

37. The United States' position with respect to the side effect of extrapyramidal syndrome is, at best, a makeweight argument. The United States' experts did not address this syndrome, and neither will I.

numbers" which can be misused or taken out of context, but he still believed that there is "some usefulness for looking at frequencies of use of medication or the breakdown of categories of medication." 50/119. The percentages can serve as "red flags" indicating that something is wrong. 50/120–21. Dr. Hauser related how he initially counted the number of residents on antipsychotics and antidepressants in order to determine whether the use of these drugs at the Center was "in the ballpark" of what is reported for similar facilities. One of the sources he used was a book authored by Dr. Fahs. 50/120. Dr. Hauser concluded that the overall percentages were consistent with medication management in similar populations. 50/121.

■■■ Dr. Lubetsky, agreeing with Dr. Hauser, found that the Center had a "rough average of twenty-five percent of clients on psychotropics," 49/127, and that this was within the broad range of twenty-five to forty percent use of psychotropics reported in the *American Journal on Mental Retardation.* In addition, Dr. Lubetsky reviewed individual cases and concluded that the Center's use of psychotropic medications was within accepted professional practice. 49/128. Based upon my review of all of this evidence, I agree with the Commonwealth that its use of psychotropic medications meets constitutional minimum standards.

Finally, the United States argues that the Center fails to adequately monitor the psychiatric treatment provided. Dr. Fahs described this "monitoring" component of the medical approach as an objective weighing of the benefit the person is receiving from the treatment versus the impact of any side effects—or, stated another way, "monitoring" entails an evaluation of whether the drug did what it was prescribed to do, and whether this result can be proved. 38/99. If monitoring demonstrates that the drug did not benefit the resident, then the treatment should be changed. 49/153. Dr. Fahs testified that the Center's monitoring was inadequate in 100% of the cases he reviewed. 38/101.

The record at trial established that the medical community places great emphasis on monitoring the effects of antipsychotic medications to detect the development of tardive dyskinesia (TD), an irreversible side effect of certain antipsychotic medications. 50/34. TD is a red flag—it is an area closely scrutinized by the medical community, as well as surveyors, in an effort to reduce its occurrence. 50/34. As a result, a tracking form (the AIMS form [38]) has been developed by the medical community to screen for TD.

Dr. Fahs opined that the Center's monitoring efforts in general were inadequate, and he supported his opinion by specifically referencing the Center's monitoring efforts with regard to TD. Dr. Fahs claimed that the Center had a policy in place requiring the AIMS screening, but he believed that the Center did not engage in a regular, consistent review for side effects, including TD. 38/100.

Dr. Fahs' testimony also addressed the alleged inadequacy of the Center's monitoring efforts with respect to chemical restraints. Dr. Fahs defined chemical restraints somewhat loosely as including both the emergency sedation of a resident as well as the administration of medication without any indication of its efficacy. 38/94–95. Dr. Fahs concluded that the emergency chemical restraints at the Center were adequate, but that the Center routinely administered medication that might not be helping the residents, and that this practice resulted in an unnecessary "chemical restraint." 38/95.

In response to Dr. Fahs, Dr. Lubetsky explained that the AIMS tracking form actually was utilized and could be found in many of the charts. 49/111, 192. Dr. Lubetsky's observation is corroborated by the Inspection of Care Survey for August 1992, which noted an AIMs form in James R.'s chart. Exh. 67\8D. The evidence also demonstrated that Dr. Goldschmidt consistently made an effort to reduce the overall use of antipsychotic medication by either refusing to prescribe the medication for a resident or reducing the

---

**38.** The significance of the letters in the acronym AIMS is not discussed in the record by any of the experts.

dosage for a resident who had previously been prescribed the medication. 50/25; Exh. 616\53, 61.

■ The presence of TD in residents, some of whom may have developed TD before the medical profession began screening and prevention measures, does not of itself indicate that the Center has failed to exercise professional judgment in monitoring the usage of antipsychotic medications. ·To the contrary, the record evidence indicates that when Dr. Goldschmidt began treating the Center's residents in 1986, she noticed that a number of individuals already had TD as a result of the long-term administration of antipsychotics. Exh. 616\53, 102. As a result, Dr. Goldschmidt insisted that the Center monitor residents for this very condition in an attempt to avoid the development and/or exacerbation of side effects. Some residents continued to receive antipsychotics because the benefit derived outweighed the detriment of discontinuing the medication. 50/35. At least since 1986, professional judgment has been exercised in monitoring for TD.

Dr. Hauser described the emergency sedation aspect of chemical restraint, and explained that "chemical restraint" may also be found when medication is chronically used to restrain an individual. Signs of this type of chemical restraint are use of high doses of antipsychotic medications which cause stiffness, rigidity, and a blank facial expression in residents. 50/122. Dr. Hauser testified that he did not observe *any* chemical restraint of this nature at the Center.

■ I find Dr. Hauser's testimony persuasive in determining whether the Center meets the minimum standard of professional judgment in avoiding unnecessary chemical restraints that would result in stiffness, rigidity, and the constraining of one's movement. *See Sabo v. O'Bannon,* 586 F.Supp. 1132, 1140 (E.D.Pa.1984) ("Because the use of 'soft' restraints was found to implicate a liberty interest in *Youngberg,* it can scarcely be doubted that the use of drugs in order to restrain a patient must activate a similar interest."). As Dr. Hauser explained, the Center has consistently endeavored to reduce the dosage of antipsychotics and thereby avoid unnecessary chemical restraints.

In summary, the psychiatric care provided satisfies constitutional requirements. The Center's weak point is its documentation, but this deficiency does not preclude the exercise of professional judgment. The assessment and treatment routines established at the Center are not "substantial departures" from accepted professional standards.

### 3. GASTROESOPHAGEAL REFLUX AND ASPIRATION

Dr. Sulkes, one of the United States' experts, testified that the Center fails to provide appropriate medical care to residents with gastroesophageal reflux (GER) and/or who are at risk of aspiration, because the Center fails both to identify the residents who have GER and/or are at risk of aspirating, and fails to provide a proper medical "work-up" and treatment of the residents.[39]

Aspiration is the "inspiratory sucking into the airways [*i.e.* lungs] of fluid or [a] foreign body...." *Stedman's Medical Dictionary* 143 (25th ed. 1990). GER is the escape of the stomach contents into the esophagus, 41/88, a condition which afflicts approximately 10–15% of developmentally disabled children and adults. Crocker, Allen C., and Rubin, I. Leslie, *Developmental Disabilities: Delivery of Medical Care for Children and Adults* 178–79 (1989). Individuals with GER are at risk of aspirating because the stomach contents may travel backward from the esophagus into the pharynx and enter the trachea and lungs, 41/88, which predisposes the person to developing pneumonia. Reflux into the esophagus also causes discomfort because the stomach contents are normally very acidic, and over time, may erode the mucosa of the esophagus and precipitate bleeding. 41/89–90.

■ The United States contends that in "several cases, individuals had documented reflux and nevertheless were continuing to suffer bouts of aspiration pneumonia." 84/X–10, *citing* 34/107. The United States asserts that most of the residents reviewed

---

**39.** The United States' contention with respect to deficiencies in identification of residents with

GER_is addressed in the section regarding nutritional management. *See infra* at § III.C.4.

by Dr. Sulkes died at some point from 1988 to 1992. The occurrence of aspiration pneumonia, or even deaths without evidence that it was the result of medical treatment which substantially deviated from accepted professional practice, however tragic a loss, does not compel a finding that the constitution was violated.

Dr. Sulkes reviewed the care of Margaret D., who died in January 1992. Dr. Sulkes testified that her condition of reflux was known since at least 1979. 41/114. Treatment in 1991 included prescriptions of anti-reflux medication and iron for anemia. Margaret D. also received postural drainage and percussion on a regular basis. Despite these treatments, seven months later, she developed problems with mucous and choking after eating. Margaret D.'s physician noted that she experienced the excess mucous and choking only after eating, and he questioned whether she had an allergic rhinitis. He started treatment with an antihistamine, but did not order any further evaluation of the reflux. 41/115.

Two months later, Margaret D. was hospitalized for aspiration pneumonia. Her sixty-day nursing note after this hospitalization indicated that the same treatment was to continue. Tussi-organidin, an expectorant, was added to her medication regime. Exh. 331aa, # 00523176. Antibiotics were instituted when it was discovered that her mucous had pus in it. Thereafter, Margaret D. lost weight, and she continued to produce large amounts of thick mucous. At some point, the Center initiated manual suctioning of the mucous secretions to aid Margaret D.'s breathing. Exh. 331AA. No other intervention was initiated despite persistent documentation of chronic congestion and coughing. 41/119. In January 1992, during treatment for postural drainage, Margaret D. died. 41/120. According to Dr. Sulkes, there was a "lack of close monitoring and lack of a sufficiently aggressive work up early on, diagnostically, which might have led to some medical interventions, that might have prevented all of this ..." 41/120.

 The record at trial revealed, however, that the Center exercised professional judgment consistent with accepted medical practice in the treatment of Margaret D. The Center staff documented her persistent trouble with coughing and mucous production, monitored her condition, and treated her with anti-reflux medications. 34/82.

Steven S. died in May 1991 due to complications resulting from GER. Dr. Sulkes opined that Steven S. needed aggressive management of GER early on and did not receive it. He further testified that, in his opinion, Steven S. entered a "pipeline that ... carried him inexorably on to his death. All the way along, interventions might be available, but nobody thinks about them until it's way too late for them to do any good." 41/121.

The record reveals that the Center was aware of Steven S.'s GER since at least 1989. *Id.* In November of 1990, a gastrostomy tube was inserted into his stomach. This procedure had little effect, according to Dr. Sulkes, and emesis was discovered in Steven S.'s mouth as early as November 13, 1990. In December of 1990, blood was discovered in the emesis. Later that month, Steven S. was hospitalized for pneumonia. 41/122.

Dr. Sulkes lamented that this resident could have received fundoplication surgery up to two years before his death, but that he never did. 41/123. Fundoplication, using a cuff of the stomach muscle to wrap around the bottom of the esophagus as support for a weak gastroesophageal sphincter, could have prevented the escape of stomach contents into the esophagus when the stomach muscle contracted, 34/69, but the mortality rate for this surgery approaches fifty percent. 34/71. Fundoplication is major surgery, however, and the decision whether to perform this procedure is largely dependent upon the individual's health. The physician must assess the risks of additional surgery against the possible medical benefits to be obtained. 34/69.

 Steven S.'s physicians were aware of his condition and treated it by surgically inserting a gastrostomy tube. Unfortunately, Steven S.'s gastrostomy tube did not remedy the problem. Whether to proceed with fundoplication surgery was highly dependent upon Steven S.' individual medical condition,

and was a matter to be resolved pursuant to the sound discretion of the professional. 81/157. Experts in the field of gastroenterology for mentally retarded persons remain divided over the benefits of gastrostomy alone, as opposed to gastrostomy coupled with fundoplication surgeries. *See* Exh. HH., Bui, Hum D., *et al.*, *Does Gastrostomy and Fundoplication Prevent Aspiration Pneumonia in Mentally Retarded Persons*, 94 American Journal on Mental Retardation 16–19 (1989). Accordingly, I find that the Center's decision not to perform fundoplication surgery on Steven S. does not fall outside the realm of acceptable medical practice.

Keith T. also had GER and died. Keith T. had spastic quadriparesis, profound mental retardation and a history of problems with aspiration. 41/125–26. Dr. Sulkes noted that Keith T. had respiratory problems dating back to a respiratory arrest in 1986, and had been hospitalized repeatedly for aspiration pneumonia. In April of 1991, documentation indicated that Keith T. had reflux when he was sleeping which precipitated bronchospasms. One of his anti-reflux medications was increased at that time, 41/126, and he was continued on antacids, 41/127. The Center's care for Keith T.'s GER included well-recognized treatments in this field: anti-reflux medications, antacids, and even fundoplication surgery. 34/77, 82–83. Once fundoplication surgery is performed, positioning therapy and medications remain the only viable treatment options for such an individual. *See* 81/155.

Dr. Sulkes testified that at least some of Keith T.'s hospitalizations, as well as his death, were preventable. 41/128. Dr. Sulkes found it problematic that Keith T. had never had an evaluation for feeding problems, never had an evaluation to determine whether he had reflux, and had no records showing consults with a gastroenterologist. 41/126.

■ In rendering his opinion concerning the acceptability of care provided to this resident, however, Dr. Sulkes failed to acknowledge that Keith T. had undergone fundoplication surgery. This omission is particularly glaring in light of the importance placed on this surgical procedure by Dr.

Sulkes in rendering his opinion regarding the acceptability of Steven S.'s care. The record is clear that fundoplication surgery is complicated and could not have been performed by the Center's medical staff. Gastroenterological consults necessarily occurred to determine that such surgery was warranted, in light of Keith T.'s compromised medical status. *See* 34/55. I find that the Center rendered care which was consistent with accepted professional standards in the case of Keith T.

Jeff K. also died of aspiration pneumonia. Dr. Rubin, an expert pediatrician retained by the United States, noted that Jeff K. had a seizure disorder which required multiple medication changes. He then developed petit mal seizures which increased in frequency. Thereafter, Jeff K. became very difficult to feed, and he sustained a significant weight loss. A gastrostomy tube was placed, and he continued to lose weight while he was hospitalized. 81/109. Subsequently, he died.

Dr. Rubin opined that the medical care Jeff K. received was not consistent with accepted professional standards of care because it is well recognized among surgeons and gastroenterologists that a gastrostomy should not be done in individuals who have GER. The procedure, he testified, increases the risk of vomiting and aspiration because large amounts of food may be put into the stomach over a short amount of time. 81/109–10.

Dr. Rubin formulated his opinion regarding Jeff K.'s care after reviewing several documents, including a "Mortality and Morbidity" report prepared after his death. Jeff K.'s physician detailed in the report the patient's increasingly uncontrolled seizure disorder, and how the side effects from the anticonvulsant medication and the frequent petit mal seizures interfered with his ability to eat. As a result, a gastrostomy tube was placed to feed Jeff K. He then received his nutritional feeding continuously over a twenty-four hour period (*not* large servings over a short period of time, as Dr. Rubin erroneously assumed). Exh. 1108.

■ I find that Jeff K.'s care was consistent with accepted professional standards.

His treating physician was very familiar with his seizure disorder and its refractory nature. She also recognized that his seizure medications produced viscous secretions that affected his ability to swallow. As a result, a gastrostomy tube was used to avoid aspiration while eating. Exh. 1108.

While Dr. Rubin contends Jeff K. should not have had a gastrostomy tube to feed him in light of his reflux, I have not been able to find any reference in his record to GER or reflux. Rather, it appears from the record that the complications and risk of aspiration resulted from the thickness of his oral and pharyngeal secretions, factors which made the safe feeding of Jeff K. more complicated. Furthermore, Dr. Rubin's opinion regarding the inadequacy of Jeff K.'s care is undermined by his statement that he was impressed by the thoughtfulness that the staff had given to the Mortality and Morbidity report. 81/105–06. This thoroughness, I believe, more accurately reflects the quality of care that Jeff K. received at the Center.

The United States also challenged the care of three other residents: Sam B., James O., and Bobby Y. Sam B. died of aspiration pneumonia in April 1993 after a diagnosis of reflux esophagitis in 1980 and recurrent pneumonias thereafter. 41/132–33. Dr. Sulkes contended that after ten years of warnings, in March of 1993, Sam B. experienced increased difficulty swallowing and aspirated barium when a diagnostic procedure was being performed. 41/132. Despite this incident, the Center failed to request a respiratory evaluation.

James O. was hospitalized twenty-three times before his death in 1989. At no point in time did James O. have a swallowing work-up or a gastrointestinal or respiratory evaluation. Rather, his sixty-day medical note consistently noted as the plan of treatment "continue present therapy and care." 41/139.

Bobby Y. also died of aspiration pneumonia in December 1988. 41/139. Dysphagia had been diagnosed eleven years earlier, but his medical record revealed only two corresponding interventions. *Id.*

■ I cannot, based on the trial record, determine whether the care Sam B., James O., and Bobby Y. substantially deviated from accepted medical practice. The particulars of their care, despite the diagnosis of GER or the identification of the risk of aspiration, are absent. Nevertheless, Dr. Sulkes concluded that the Center's care was constitutionally inadequate because these residents died of aspiration pneumonia without the benefit of certain evaluations. I will not find constitutional violations merely on the basis of the unfortunate fact of their deaths and Dr. Sulkes' conclusory statements that are not supported by the record.

Finally, the United States cited the treatment of several current residents in support of its contention that the Center's medical care of GER is inadequate. For example, Dr. Sulkes disagreed with the Center's treatment of Patricia W. In response, the Commonwealth submitted testimony by a pulmonologist who examined her and concluded that "[g]iven her severe kyphoscoliosis, she will inexorably progress to chronic respiratory failure as a result of her respirative lung disease and repetitive pulmonary infections. Your current therapy is just about optimal, given her inability to cooperate.... I think her survival to this time is a testimony to the care you have provided her." 34/38. The pulmonologist's opinion supports a determination that the Center's care met the constitutional minimum.

■ That residents have died or sustained recurrent pneumonias does not support a conclusion that the Center is violating their constitutional rights to adequate medical care. Dr. Sulkes focused his analysis and testimony on the residents at Keystone, who are the most medically compromised at the Center. It is well-recognized that "[t]he life expectancy of people with mental retardation is shorter than that of the general population." Exh. HH, Eyman, Richard K., *et al., The Life Expectancy of Profoundly Handicapped People with Mental Retardation,* The New England Journal of Medicine 584 (1990). Life expectancy in that population is further decreased if motor disability is present. 34/60. Consequently, it is to be expected that some of the Keystone residents, who are

severely and profoundly retarded and physically disabled, may become ill at times and not recover, even though advanced medical care is being provided. GER by its nature is chronic, and it is accepted that non-surgical medical management should be attempted before resorting to surgical interventions. 81/155. During that period of non-surgical management, it is to be expected in some cases that the condition may worsen, and even if surgery can be performed, it is not a cure-all. 81/155. I find that the Center follows accepted medical principles in treating GER and the risk of aspiration.

## 4. NUTRITIONAL MANAGEMENT

The United States contends not just that the Center fails to provide adequate nutritional management to its residents, but that nutritional management does not even exist at the Center. 84/X–41. In particular, the United States asserts that the Center (1) fails to identify residents who are nutritionally at risk; (2) fails to assess residents with regard to their nutritional management needs; (3) fails to adequately and appropriately intervene at mealtime for residents with nutritional management needs; (4) fails to adequately monitor mealtime intake and interventions; (5) fails to provide adequate staff training in how to implement feeding plans; and (6) fails to insure that its professional staff is adequately trained in nutritional management. 84/X.

 *Youngberg* establishes that the Center has a duty to provide food for its residents. Food is "an essential of the care that the State must provide." 457 U.S. at 324, 102 S.Ct. at 2462. There is no dispute that the Center provides food portions which are generous. 35/104. But the provision of food in a disabled population is not met simply by preparing food and presenting it at mealtimes. Consequently, the Center must provide for the management of the nutritional status of its residents pursuant to the exercise of professional judgment which is consistent with accepted professional standards of practice. 457 U.S. at 323, 102 S.Ct. at 2462.

### a. *Screening*

The United States' expert witness, Ms. McGowan, testified that the Center fails to identify residents who are nutritionally at risk. Such identification is the first element in any adequate nutritional management system. 35/159–60. Residents at risk include those with feeding, swallowing and oral motor disorders, in addition to those residents who have any history of choking. 35/159. The constitutional flaw, according to the United States, is that the Center does not have any screenings for these disorders, and even when screening devices are prepared, the devices are inadequate and screenings are not completed as quickly as they should be. The United States points to the facts that dysphagia screening has been completed only in the Laurel unit and that the Keystone unit was in the process of screening as late as July 1993. The Center now plans to incorporate aspiration screening into each resident's care at the annual review, Exh. 637/42, but, the United States contends that the Center's efforts to identify residents who are nutritionally at risk has been too little, too late.

 Ms. McGowan testified that identification of residents who are at risk nutritionally should be accomplished by identifying

> people that look like they might be in trouble, then you go on to some more in-depth type of assessment, so that you can both figure out if, in fact, your screen produced persons who really were having difficulties, and then you actually go in some depth, take a look at what real kind of problems they're having, because they are not always what they seem.

35/160. Dr. Sheppard, the Commonwealth's witness, did not dispute that identification of potential nutritional problems by screening is important. 61/100. I conclude that accepted professional practice requires some type of screening mechanism to determine which residents are nutritionally at risk.

The Center has attempted to implement screening of residents at risk, by implementing an aspiration screening procedure, Exh. 855. The Center's dysphagia team has developed a dysphagia screening to be conducted on all residents, and has responded to

weaknesses noted by Dr. Sheppard and has developed a swallowing and screening tool. 61/102.

On direct examination, Dr. Sheppard was asked if the Center met accepted professional standards *prior* to the implementation of its screening tool for swallowing and screening. Dr. Sheppard hedged her response and opined:

[T]here was an aspiration screening tool that had been developed by the nursing staff, and there was good attention to individuals who were more severely involved, who were at risk for aspiration. I think most of the individuals in the Keystone Unit had been evaluated by the dysphagia team, and individuals who had had choking episodes were evaluated by the team following any choking episode; so individuals who were more impaired, who had a greater degree of dysphagia were being attended to; and certainly acceptable professional standards were being met in that area. It was the individuals who were less impaired that were not being—getting the attention that they needed; and also there was nothing in place that would track the deterioration with age of these individuals. Those individuals have marginal skills, so in that sense it was a needed component to make the program good; but I must say that there are not many institutions that have these things in place that I've been in, and so I think they were doing a job that was certainly acceptable by general practice.

61/103–04.

■ In light of Dr. Sheppard's demeanor during her testimony and the context of her opinion, I conclude that there were deficiencies in identifying residents who were nutritionally at risk prior to the development of the various screening mechanisms. However, since Dr. Sheppard's inspection, the Center has developed various screening devices, and is in the process of implementing and revising them. I therefore find that no deficiencies remain to be remedied.

b. *Assessment*

The United States also asserts that the Center fails to assess residents with regard to their nutritional management needs. In February of 1990, it notified the Center that it failed "to ensure that all residents' nutritional needs are met." Exh. 637, exh. 50, p. 3. Ms. McGowan testified that the assessment phase is an interdisciplinary process that evaluates the resident and how his nutritional status is impacted by his neurological system, medications, psychiatric factors, gastrointestinal conditions, respiratory status, and musculoskeletal considerations (such as positioning). 35/161–64. She opined that the Center focuses on "what happens during the actual meal time. . . . [But,] they are missing many of the real important components of this process." 35/164.

As explained above, the Center's efforts to identify residents who are nutritionally at risk were inadequate until it developed and implemented better screening procedures. Following this development and implementation by the Center, however, Dr. Sheppard concluded that residents "who presented with a problem [were] being attended to." 61/104. Dr. Sheppard's review of John B.'s chart illustrated her opinion. She noted how this resident had a problem with weight loss associated with a refusal to eat. The annual review noted the following: his loss of weight; that he was essentially a dependent eater; he had a body mass index of nineteen; his weight was adequate although it was the low range of normal; he had a pureed diet with double portions; he had good lip and jaw closure, but was practically edentulous; and his response with efforts to encourage independent feeding. Dr. Sheppard further noted input from the following disciplines regarding John B.'s nutritional status: dietary, nursing, OT, pharmacy, and the physician. 61/94–95. She opined that John B. had a moderate problem in light of the fact that his nutrition was fairly good, he was still eating, and he was not showing any compromise of his respiratory system. Dr. Sheppard concluded that the Center's nutritional management for this resident was appropriate and adequate. 61/96.

■ I am persuaded by Dr. Sheppard's testimony and find that the nutritional assessments performed by the Center satisfy

accepted professional standards. Although the annual review is not labeled "Nutritional Assessment," it satisfies the interdisciplinary process which is required by the accepted professional standards and addresses the acuity of the problem and the necessary interventions. The adequacy of the nutritional assessments performed by the Center is further supported by the fact that the assessments regarding physical therapy (PT), psychiatric issues, and neurologic care, all of which affect nutrition and feeding, have been found constitutionally sound.

The United States attempts to undermine Dr. Sheppard's testimony regarding nutritional assessments by pointing out the fact that Dr. Sheppard recommends utilizing the "body mass index" (BMI) [40] as a gauge of nutritional health and the fact that the BMI for the majority of the Keystone residents was below the normal range. Exhs. 967, 970. This statistic in and of itself has no bearing on the sufficiency of the assessment. Rather, it is a confirmation of the fragility of the population of the Keystone unit and the prevalence of dysphagia. 65/67.

The United States asserts that the inadequacy of the Center's assessments is evident in not only those assessments completed by the dysphagia team, but also those which the team has failed to conduct. The dysphagia team was created approximately in June of 1990. Exh. 641/12. The team includes the following: Kathleen Wagner, a speech therapist; Mary Frye, a Licensed Occupational Therapy Aide (LOTA); Karen Fulton, a registered dietician; and Marcia Stiles, a registered nurse (RN). Exh. 641/17. This team was created in response to what was perceived as the fragmented way dysphagia and swallowing difficulties were being managed, not because of any one incident that had occurred. Exh. 641/21. A regular scheduled meeting time was established in October of 1992. Exh. 641/26.

The dysphagia team first received referrals in January of 1991, Exh. 641/48, and the number of referrals has increased each year since then. Exh. 641/51. As of January

1993, the team relied exclusively on referrals in determining which residents to evaluate. Exh. 641/44. Any resident that had a choking episode was referred to the dysphagia team. Exh. 641/47; 35/166. The dysphagia assessment focused on the resident's ability to swallow. 35/165.

Since the team's inception, the basis for seeking dysphagia assessments has expanded. Dysphagia assessments increased over time as they were deemed necessary due to feeding problems or residents who were at risk of aspirating. Subsequently, a "meal observation" form was created as a means of identifying unsafe eaters. Exh. 637, exh. 16. This tool was to be completed by direct care staff. Subsequently, the team developed a dysphagia screening tool which was applied on a unit wide basis starting in April of 1993 in the Laurel unit. 61/130. The dysphagia screenings were then conducted at Keystone. *Id.*

The United States submits that the nutritional assessments which have been completed are inadequate. It notes that Dr. Sheppard agreed that the dysphagia evaluations need to include contributing causes and information regarding oral anatomy, 61/199, and points out that the team does not evaluate the effect of the resident's medication regimen.

■ These contentions do not alter my previous conclusion. Nutritional assessments are addressed by an interdisciplinary approach. Undoubtedly, there are ways to improve these assessments, but they meet professional standards. As Dr. Sheppard explained:

[T]here is a range of dysphagia problems that can be managed with fairly routine modifications and meal time procedures, and elaborate evaluations are not truly needed in those individuals. The—many of the mildly and moderately impaired individuals can be managed with limited assessment information.

It's when you have the severely involved individual who is eating at the very limits

---

**40.** The BMI is a ratio of weight to height that gives an indication of the adequacy of the weight. It is a standard utilized with the developmentally disabled because of the fact that their growth is atypical. 61/100.

of their capability, and eating poorly, that having total information may be more critical because there may be things in it that you—that it would lead you to do that, would help this individual continue to be able to eat orally; and it's in those individuals that a—a—the most comprehensive evaluation is useful. 61/201. I credit this opinion, which sheds light on the constitutional minimum required in this area. The record reveals that the Center's nutritional assessments meet the needs of the residents (*i.e.*, the basic evaluation is in place, which can be augmented when the need arises).

### c. *Intervention*

The United States asserts that the Center's mealtime interventions for nutritional management are inadequate. To the extent this contention raises the issue of unsafe feeding by the staff, that issue is addressed in the section regarding unsafe staff actions, under the duty to provide reasonable safety, and will not be repeated herein. *See infra* at § III.E.

The thrust of the United States' position, however, is that the Center failed to develop feeding plans for each resident who must be fed by staff (*i.e.*, those requiring assistance) until after Ms. McGowan's tour in 1992. Even though such feeding plans were then developed, the United States contends that this last minute effort is deficient because the feeding plans devised do not adequately address proper positioning and feeding techniques. *See* 84/X–56.

Ms. McGowan noted that the Center developed supplemental procedures for most of the individuals in Keystone which related to feeding techniques. 35/148. She reviewed the supplemental procedure for all 94 residents of the Keystone unit and found 25 of them to be "completely inappropriate." 35/149. That is, the photographs incorporated in the supplemental procedure showed heads in extension, poor positioning, and staff pushing the head back into extension. *Id.* She further opined that the feeding plans devised after her first tour of the Center were deficient because they did not detail "where to put the food in the mouth, what

kinds of pressure needs to be applied, how then to pull the spoon out of the mouth, what things not to do in terms of scraping the face; and so there are—that needs to be very specific for direct care staff, because they—they can't generalize those instructions to the very specific and very individual requirement of many of these individuals." 36/31–32.

Dr. Sheppard agreed that a feeding plan should address proper positioning and bolus presentation. 61/201. Dr. Sheppard noted that there are "specific components to bolus presentation; and for any one individual, fewer or more of those elements may be needed in the descriptives. Usually you only include in the prescription those elements that are special for this individual." 61/202. Dr. Sheppard concluded that the Center's feeding plans include the elements "as is appropriate, those items that are considered to be modified for this individual and need to be special. . . ." 61/203.

■ My review of some of the supplemental procedures reveals that the Center included specific components regarding bolus presentation. For example, James M.'s supplemental procedure directed that "[f]irm pressure is applied on midline of tongue with spoon." Exh. 137. Tim P.'s procedure addressed the feeder's positioning during the meal, presentation of the spoon and the manipulation of the spoon. *Id.* Moreover, the Center included components as appropriate for the individual. For example, Michael F.'s procedure notes that he will cooperatively open mouth and swallow when the food is placed on the tongue. Common sense dictates that the plan for this resident need not include any components regarding how to apply pressure to open the mouth, prompt the swallow, or remove the spoon. Accordingly, upon my review of the Center's plans and the testimony of both experts, I find that the Center meets the minimum professional standards in this regard. The Center's feeding plans include the elements appropriate for each individual.

### d. *Monitoring*

The United States also asserts that the Center fails to adequately monitor mealtime

intake and interventions. It contends that the Center did not have any system in place in living units other than Keystone to record the amount of food that residents consume until October 1993. The United States submits that it is accepted professional practice to have some type of mechanism to monitor how well residents eat at mealtimes. 61/133.

The Center has a policy regarding meal refusals by residents. The policy was documented in August of 1992 after Ms. McGowan's evaluation of the Center revealed there was no written policy. Prior to the approval of this written policy, however, the Center had been "doing exactly what the policy said for many, many, many years ... it was well understood by all staff that this was the procedure to be followed." Exh. 637/11. A "Meal Checklist" form was also generated in October of 1992 after Ms. McGowan's evaluation of the Center. Exh. 673, exh. 16. This checklist is completed daily for each resident and indicates the quality of the resident's intake. All forms are forwarded to the Unit Manager on Fridays after review by the nurse. *Id.* Although the checklist was generated in October of 1992, "the nurses have always summarized appetite or lack of appetite or an individual's preference for foods." Exh. 637/21.

██ I find that the Center has in place an adequate mechanism for monitoring how well residents eat at mealtimes as evidenced by the "unwritten policy," which was eventually memorialized in Ebensburg Center Policy # 356, as well as the long-standing nursing practice of documenting in a resident's summary the status of his or her appetite. These practices are consistent with accepted professional practice, which requires some mechanism for tracking meal times. 61/133–34.

The United States, however, contends that even these policies are flawed because they do not address liquids. It points out that policy # 356 states: "when an individual refuses a meal, or a substantial portion of a meal, staff are to notify the nurse on duty. When an individual has refused three consecutive meals, the nurse will notify the physician. Liquid supplements are not considered an individual's meal." Exh. 637, exh. 15.

This policy refers to refusals, and it is logical that a refusal of liquid *supplement,* an addition to one's regular meal, would not constitute a meal refusal. Consequently, this policy has no relevance to the Center's practice of monitoring the liquid intake at a meal.

As further support for its argument that the Center fails to properly monitor liquid intake, the United States asserts that Ms. Sponsky, the Director of Nursing, does not "consider liquids as part of a meal." Exh. 637/13. Ms. Sponsky's indication that liquids are not considered part of the meal was not emphatic. She admitted that she could not say whether a failure to take in liquids during a meal would be reported to the nurse and she did not know how the staff actually implemented the policy. Dr. Sheppard noted, however, that liquids are addressed in some of the units. She described how Keystone documents intake for food and liquids, and that the assessment of the meal in the Laurel unit included liquid intake as a component of the meal in its entirety. 61/135–36. She specifically recalled documentation noting "liquids refused" and her observations of mealtime intake, including liquids, were 100% congruent with the documentation of the feeders. 61/137.

The United States further contends that the Center's nutritional care is flawed because no formal policy exists for summarizing the information from the meal checklist. Dr. Sheppard noted that the information is conveyed to the physician after three meal refusals and to the QMRP after four fair intakes, *i.e.,* 50% to 74% of meal, and asserted that she was not sure that a written policy is so important. 61/139; *see* Exh. 637, Exh. 16. Dr. Sheppard's opinion is persuasive. At some point, the utility of a "summary of summaries" is questionable. I find professional judgment was exercised in monitoring mealtime intake which was consistent with accepted standards of practice.

e. *Training*

The United States' next contention is that the Center fails to adequately train staff to implement feeding plans. Ms. McGowan testified that staff training is key to ensuring

adequate nutritional management. 35/161–61. Ms. McGowan claimed that competency-based training should be part of feeding training. 34/28. Such training not only addresses general principles, but also gears the training for each feeder to the unique needs of each individual. 35/161–2. The United States contends that even the Center's expert, Dr. Sheppard, agreed that staff need frequent training that is specific with respect to the residents for whose feeding they are responsible. 84/X–60.

Dr. Sheppard's actual testimony, however, recognizes that professional literature regarding effectiveness of staff training and repetition is not extensive. In her opinion, staff training needs must be based on an assessment of the staff's abilities, how well feeding procedures have been retained and how effectively such skills have been implemented to determine how frequent training must be provided. 65/18. Dr. Sheppard then noted that although there had not been any formal training sessions by the dysphagia team, numerous mini-staffings are given every time a special procedure is developed or changed. Dr. Sheppard specifically opined that "there were professional judgments involved in determining how the program was to proceed." 65/20.

The United States submits, however, that Dr. Sheppard's opinion is not credible because the method utilized to train the direct care staff was nothing more than reading the supplemental procedure books for feedings. 65/21. I am not persuaded by this assertion in light of Velda Malloy's deposition testimony. Ms. Malloy is an RN who has worked at the facility since 1963 and served as a supervisor and QMRP in the Keystone unit since 1992. Exh. 622/8. Ms. Malloy noted that she feeds residents in Keystone and had been trained in the supplemental procedure. She further explained that she helped write the procedures after first discussing the specific needs of each individual with the OT (Lois Graham), a speech therapist (Kathy Wagner), and the direct care staff. In addition, Ms. Malloy actually observed the staff

feeding every individual. Exh. 622/84. Ms. Malloy explained that the direct care staff consult the special procedure books and ask questions of the professional staff that are always present in the dining room. Exh. 622/89. She further noted that if staff are feeding inappropriately, they are approached immediately by a professional to address the proper method of feeding. Exh. 622/95–96.

■ I find the Center's efforts to provide adequate staff training to implement the feeding plans satisfies the accepted professional practice described by both Ms. McGowan and Dr. Sheppard. In light of the staff's knowledge base in feeding the residents, training need not start at square one. Day-to-day assessments of actual feedings by the professionals present in the dining room provide ample opportunity for additional training to correct deficiencies or reinforce the proper method. Professional judgment is exercised.

■ The United States' final claim of deficiencies in the nutritional area is that the Center fails to insure that its professional staff is adequately trained in nutritional management. The evidence offered by the United States in support of this contention is nothing more than a list of training that the professionals at the Center would like to receive. That the Center's professionals desire additional training hardly proves a constitutional violation.

## 5. PHYSICAL THERAPY

The United States contends that the Center's physical therapy ("PT") services [41] are a substantial deviation from acceptable professional practice because the Center allegedly: (1) fails to conduct proper PT assessments; (2) fails to develop and provide adequate physical management for residents with physical disabilities; (3) fails to provide acceptable wheelchairs; (4) fails to properly handle, lift and transfer residents; and (5) fails to adequately train its staff in the physical management of its residents. 84/XIV.

---

41. PT, as developed by the United States in its pleadings and arguments, encompasses physical management, which is the manner in which the residents are handled, touched, transferred, positioned and facilitated to be functional, active individuals. 34/146. For that reason, this opinion will treat physical management as a component of PT, and not as a separate discipline.

The United States argues that the Constitution requires the Center to provide physical therapy services which enhance the residents' capacity to function, *i.e.*, help the residents to live as safely and as independently as possible. The United States believes that physical therapy, a professional discipline concerned with maintaining, restoring and/or acquiring one's maximum range of motion, should achieve the following benefits for the residents: (1) enable them to move more easily and efficiently; (2) avoid the development of contractures, deformities, and acute curvatures of the spine due to scoliosis; and (3) provide them with the opportunity to learn functional skills to enhance their independence. In effect, the United States argues that the Constitution requires the Center to provide residents not just maintenance to avoid or minimize loss, but also the therapy necessary to reach their maximum potential.

In support of this proposition, the United States cites the analysis of District Judge McCalla as set forth in his supplemental findings of fact in *United States v. Tennessee*, No. 92–2062–M1/A (February 17, 1994), ¶¶ 113–14 (*see* 92/Exh. A for the full text of Judge McCalla's supplemental findings of fact). As pronounced by Judge McCalla, the constitutional duty to provide physical therapy is quite far-reaching, and entails the provision of services at an institution in an effort to obtain the greatest possible amount of movement for the residents, resulting in their greatest possible independence.

■■■■■ Although mentally retarded individuals do not lose their liberty interests simply by virtue of their institutionalization, *Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2458, the Supreme Court in *DeShaney* cautioned against an overly-expansive interpretation of the Due Process Clause, and clarified that the Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." 489 U.S. at 196, 109 S.Ct. at 1003. As the *DeShaney* Court explained, *Youngberg* stands for the simple, albeit important, proposition "that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. at 1005.

■■■■ This constitutional obligation, however, differs dramatically from the type of affirmative duty that the United States seeks to place upon the Commonwealth here—to actually *improve* the condition of the residents by means of its physical therapy services. Justice Blackmun's concurrence in *Youngberg*, joined by Justice Brennan and Justice O'Connor, suggests that the failure of a State to *preserve* self-care skills acquired before institutionalization (an issue that was not before the Court in *Youngberg*) may present a question of whether there has been a constitutional deprivation. 457 U.S. at 329, 102 S.Ct. at 2465 (Blackmun, J., concurring). Consistent with the reasoning of Justice Blackmun's concurrence in *Youngberg*, I hold that the constitution imposes a duty upon the Commonwealth, pursuant to the exercise of professional judgment, to provide PT services at the Center which maintain the residents' maximum ability to move, but not a duty to achieve some optimal level of performance.[42]

■■■■ Stated differently, an infringement of a mentally retarded resident's liberty interests may occur if a loss in movement results from the Center's failure to provide necessary physical therapy training and/or services, but *not every instance where there is a loss of movement* indicates that a constitutional violation has occurred. The failure of the Commonwealth to provide training at

---

**42.** In articulating the duty imposed by the Constitution as it pertains to the provision of PT services for institutionalized mentally retarded residents, I am determining only the duty owed by the Center to its current population, which has a median age of 32.5 years, and all of whom have reached skeletal maturity. 62/163; 43/79.

I note that the duty articulated by Judge McCalla in *United States v. Tennessee, supra*, applied to a population which included individuals under the age of 22 years. While I have no occasion to decide this issue here, the nature of the duty to provide PT services may differ for individuals in a developmental stage.

the Center which *improves* the residents' basic care skills, absent proof that the failure to provide training results in the loss of a recognized liberty interest (*e.g.*, minimally adequate or reasonable training to ensure safety and freedom from undue restraint, as recognized in *Youngberg* ), does not implicate constitutional Due Process concerns.

> Where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no constitutional obligation to grant.

*Society for Good Will,* 737 F.2d at 1250.

▓▓▓ As explained below, pursuant to the foregoing standards, I find that the Center provides a broad spectrum of physical therapy services, and that professional judgment is exercised in an effort to preserve and/or maintain the residents maximum ability to move. Accordingly, I find no constitutional deprivation.

Most of the physical therapy services provided at the Center are rendered to residents who have a physical handicap. The Keystone unit is home to most of the residents who have one or more physical handicaps that impair their ability to move. Some physically handicapped residents also live in the Laurel, Horizon, Sunset and Villa living units. 34/98.

Approximately one-third of the residents of the Keystone unit are essentially immobile because of their physical handicaps. They have no active movement except for the ability to move their head or an arm or a leg slightly. 34/98. Another one-third of the residents of the Keystone unit have significant limitations. They may be able to perform a functional skill such as rolling over or sitting up, but not the host of functional skills that would enable them to move independently. 34/98. The other one-third of the residents of the Keystone unit have limitations of a minimal to moderate degree in their ability to move. Their physical handicaps impair but do not preclude independent movement. 34/98.

The physical handicaps manifested by the residents at the Center are the result of damage to the brain early in their lives, in almost all cases before preschool age. 34/107. As the residents age, they progress through three stages of development. The first stage is consistent with neuroplasticity, and involves a period of growth in response to abnormal neurological influences and secondary muscle imbalances. This stage lasts until approximately age seven. During this first stage, deformities actually begin to develop, and PT intervention is useful in order to prevent or limit their development. 52/45–47.

The second stage is that of skeletal maturation. This period spans from approximately age seven until skeletal maturity has been attained, and intervention efforts are geared toward retarding any progression of deformities that developed during the neuroplasticity stage. 52/45–47.

The third and final stage begins after skeletal maturity has been attained. At that point, the Center's intervention efforts focus on attempting to prevent the further progression of deformities, maintaining comfort, and providing positioning that is conducive to general health considerations. 52/45–47, 58.

▓▓▓ The residents at the Center who have physical handicaps have attained skeletal maturity. 52/60–61. As a result, the physical handicaps arising from the structural deformities are fixed and cannot be reversed. 52/60–61. These residents have a corresponding limitation in movement, and they have been in the positions they present for fifteen to twenty years. 32/151–52. The United States' PT expert, Ms. McAllister, and the Commonwealth's PT expert, Mr. Arnall, are diametrically opposed on the possibility of reversing postural deformities after skeletal maturity. My conclusion from hearing them testify is that Ms. McAllister may be on the leading edge of the PT field, but that Mr. Arnall represents the mainstream school of thought. The constitutional duty imposed by *Youngberg* and *Shaw* does not require the Center to embrace an unorthodox method, even if it is promising.

For these residents, maintenance of maximum movement has several benefits: (1) it

prevents a loss of mobility and skills associated with that movement; (2) it prevents a loss of strength; (3) it prevents the development of pressure areas, since movement can be effected to eliminate pressure; and (4) it can slow the progression of osteoporosis. 34/149–50. In short, preservation of a resident's maximum ability to move prevents or delays the development of osteoporosis or contractures, which, in conjunction with the structural deformity, may contort the body and affect the internal organs. 34/149.

The Center contracts for the services of a licensed physical therapist (LPT) to oversee the provision of PT services to Center residents. Prior to December 1992, the Center contracted for the part-time services of three LPTs, which was equivalent to one full-time LPT position. One of the contract LPTs retired at the end of December 1992, however, and had not been replaced as of the time of trial. Exh. 619, p. 11. One LPT was physically present on the premises for 222 hours from July 1989 to August 1993. Exh. 97. The facts do not indicate how many hours the other LPT spent at the Center during that same time period. The LPTs supervise six full-time physical therapy aides (PTAs). 34/229.

The Center also provides physical management services by employing one or two full-time licensed occupational therapists (OT), eight licensed occupational therapy assistants (LOTAs), and six occupational therapy aides. 64/131; 34/230–1. The Center staff provides PT and occupational therapy (OT) services Monday through Fridays, from 8:00 a.m. to 4:00 p.m. 34/231.

PT and physical management services at the Center are initiated and maintained pursuant to the order of a licensed physician. 52/28. *See* 63 P.S. §§ 1309, 1514. The PT and OT services at the Center are provided in the same manner as a care provider in a private home. 62/107; 34/146–47.

The Center performs an annual assessment for each resident who receives any PT or OT service. 34/126; Exh. 619/20. If a resident is not receiving any PT or OT service, then that resident is assessed for PT

needs every three years. 34/127; Exh. 691/20. If a resident uses a wheelchair but otherwise receives no PT or OT services, that resident also is assessed for PT every three years. 32/127.

The annual assessment for a resident receiving PT services is not attended by the LPT or the OT. Rather, a physical therapy aide or a LOTA attends and provides information to the primary care physician about that resident and the modalities employed. Discussion at the annual assessment does not necessarily address additional measures which could improve the resident's program. 32/127.

The PT's annual assessments are recorded on an interdisciplinary report. The report includes the PT's assessment of the resident's physical abilities (including range of motion flexion and abduction, strength and tone), and any recommendations the PT has for that particular resident. Exh. 34. Each patient's medical history—including ICD–9 codes,[43] physical development, and health and behavior modification programs—is kept in a separate chart. 52/40–41. Documentation of PT or OT service provided is done periodically by the physical therapy aide or the LOTA. The LPT or OT countersigns the documentation. 62/92, 94.

### a. *Assessment*

The United States asserts that the Center fails to conduct PT assessments according to acceptable professional practice. 34/119. The United States asserts that an adequate PT assessment of a resident's physical handicaps must establish what movement patterns a resident possesses and how that resident's movement is limited, which enables the development of a plan to maintain the degree of movement the resident possesses. 34/115.

The United States points to the fact that the Center utilizes a one-page PT assessment form (Exh. 34), which is rarely completed in its entirety. The form does not provide an area to denote the resident's diagnosis or pertinent historical information (*e.g.,* a resident's ability to maintain different positions

---

**43.** ICD–9 codes is a reference to the International Classification of Disease Codes. That is, a

system used to denote the applicable diagnosis(es). 52/40.

or perform functional and motor skills; the resident's existing reflexes; issues pertinent to the resident's physical management such as positioning, transfers and lifting). 34/120. In short, the United States asserts that the Center's PT forms provide neither a baseline of the resident's physical condition nor the most appropriate means to care for the resident. In contrast, the United States proffers an eighteen-page assessment form created by its PT expert, Ms. McAllister. Her form contains the areas and analyses that she contends are commonly accepted in the field. 34/124; *see* Exh. 71, Appendix III.

The United States also contends that the Center fails to meet acceptable professional standards by performing assessments only every three years, 34/127, and that the analysis performed at the assessments is inadequate, usually providing no more information than "reviewed,; no PT recommended." Exh. 979. Ms. McAllister testified that the assessments are flawed because they assume that the goal for the residents is nothing more than maintenance. 34/128.

■■ The Center's assessments fall short of the assessments urged by the United States. The United States' own expert admits, however, that those residents with physical disabilities receive a PT assessment. 35/3. The record reveals that a great deal of the information that the United States argues should be placed on the proffered eighteen-page assessment form is available elsewhere in the resident's chart. 52/40–42. Other sections of the eighteen-page form simply are not applicable to a number of residents. *See* Exh. 71, Appendix III (portions of assessment tool pertaining to sitting

and walking inapplicable to resident who is confined to cart).[44] The documentation of the Center's PT assessments is not constitutionally infirm. *See* 52/41–42 (forms are adequate in light of the fact that other portions of the chart, as well as supplemental procedures, detail and provide additional information).

■■ I also find the frequency of the PT assessments meet the professional judgment standard. The United States argues that the acceptable professional practice requires yearly assessments, relying on Ms. McAllister's opinion that yearly assessments are appropriate if there is an expectation of change for those individuals and that such assessments are commonly accepted in the field of PT. 34/127. Other credible record evidence indicates that there is no published standard within the field with respect to the need for annual evaluations, and that the standard to which Ms. McAllister testified is merely a personal opinion. 48/151; *see also* 52/41; Exh. 619/54 (the frequency of assessments at the Center is consistent with accepted standards for such a fixed and stable population). More importantly, the Due Process Clause does not require that the State improve the resident's condition. The record indicates that the Center's assessments are adequate for maintenance, which is constitutionally acceptable.[45]

One key aspect of the PT treatment provided to the Center's residents is the modality of range of motion (ROM) exercises. ROM may be active or passive in nature, and is geared toward maintaining the movement patterns that residents currently possess. ROM sustains the integrity and existing mo-

---

**44.** Portions of Ms. McAllister's eighteen-page form may serve as an excellent tool for detailing the range of motion that a resident has attained and how the Center is endeavoring to maintain that movement. That does not mean that the Constitution requires the Center to adopt it.

**45.** The United States argues that the Center's PT assessment analysis should be considered inadequate because the expectations of the assessments entail "maintenance, pure and simple." 34/128. The United States argues that the expectations should be to prevent the development of physical disabilities, prevent continued deterioration and attempt to reverse some of the deformity patterns. 34/155. Ms. McAllister opined that

these expectations are accepted across the country, noting that they have been relied upon in numerous lawsuits regarding individuals living in institutions. 34/158.

I accord little weight to any standard that is based on the result of lawsuits which have been resolved by consent decrees as opposed to adjudications. 34/158. The explication of a constitutional obligation should not be guided by settlement agreements, which may contain terms requiring the provision of services above and beyond the constitutional minimum simply in order to reach an amicable resolution among the parties and to avoid further litigation.

bility of the joint. 34/209; 52/102. The ROM exercise (that is, the movement of the joint by flexion and contraction of the muscles) helps to hold the minerals in the bone matrix by preventing further osteoporosis and increasing fragility of the bone. 34/151. Therefore, ROM is therapeutic for the residents because it maintains their current movement capabilities. 35/43; 52/102. ROM exercises are being provided to many of the residents of the Keystone unit, including the residents who are confined to carts. Due to the skeletal fragility of the residents in carts, the Center's orthopedic physician recommends ROM as the safest therapy. 52/25–27. The Center's LOTAs provide this service for the resident's upper extremities. 52/25. ROM for the lower extremities is provided by the PTAs. 610/59–60.

In addition to ROM exercises, the Center regularly changes the position of those residents who are physically handicapped and unable to effectively move. Repositioning a resident helps to maintain the integrity of the skin, avoids the development of pressure sores, and provides comfort. 34/152; 52/56. The residents of the Keystone unit who are confined to carts are routinely provided position changes. Currently, no resident at the Center has a decubitus (bed sore). 35/60; 52/91. Although residents sometimes experience redness of the skin, that condition is not necessarily indicative of skin breakdown. 52/91.

In addition to position changes, the Center utilizes "splinting" to assist in the prevention of skin irritations. Exh. 610/58. After residents undergo ROM therapy, they are "splinted" to allow air to reach their joints and to maintain their maximum amount of range. Exh. 610/59. Although one individual's range was actually increased due to splinting, the Center generally uses splinting to maintain the existing ROM and to improve the skin integrity. Exh. 610/59.

Another modality of treatment provided to eight of the Keystone residents is chest physiotherapy or percussion. 52/103. This assists the resident to effectively mobilize and expectorate fluid accumulations or secretions in his/her lungs, in an effort to decrease congestion and improve breathing. 32/20; Exh. 619/60.

Therapeutic positioning is also used at the Center to sustain the integrity and mobility of a joint. 52/102. Therapeutic positioning places a resident in a manner which attempts to approximate normal body alignment. 34/163. In addition, some therapeutic positions afford an opportunity for the muscles to work in opposition to the forces of gravity or the reflex pattern of spasticity manifested by the resident, allowing for weight bearing by certain joints. 34/165. As a result of therapeutic positioning, the muscles that are worked may be strengthened, and the mobility of some joints maintained. 34/163. It also may promote improved breathing and avoid the compression of organs. 52/31.

Therapeutic positioning, which provides an opportunity to experience normal body alignment conditions, and weight bearing may be contraindicated for some residents due to the progression of their physical handicaps and the attendant complications of immobility. Contraindicators are a fragile skeletal system and joints which are dislocated, common features of Center residents. 52/30–31.

If therapeutic positioning is contraindicated, adaptive positioning may be provided. This is positioning which places an individual in a comfortable position. It essentially adapts to the resident's deformity pattern. 34/162. Adaptive positioning is used for the eight Keystone unit residents who utilize carts during the day. Adaptive positioning is therapeutic for these individuals in that it aids in the prevention of further deterioration. 52/94.

Another modality of PT provided to approximately 125 (or one-fourth) of the Center's residents is gross motor function programming. 52/35. This programming, administered by mobility experts, vision specialists, and psychology staff, maintains or improves a resident's skills or ability to move utilizing large muscle groups, and includes activities such as ball throwing, treadmill walking and bicycle use. 52/35.

Despite the numerous PT services provided to the residents, the United States argues that the Center fails to develop and provide

adequate physical management for residents with physical disabilities, and that too many of the residents do not receive necessary therapeutic positioning and gross motor function programs to improve their functional capabilities. The United States notes that it is undisputed that the Center does not, in therapeutic positioning, place any resident in the "prone on forms" position or the "quadruped" position. 34/175, 177.[46]

On the other hand, the record reveals that the Center initiated "side-lying" into its program in the early 1980's (Exh. 610/28–29); "side-lying" positions oppose the reflex pattern of extension of the back and flexion into the fetal position. 34/168–69; Exhs. 710, 989. Mr. Arnall, the Center's contract LPT, asserts that its residents who are confined to a cart are not provided therapeutic positioning because of the fragility of their skeletal systems. 52/61. This assertion is supported by Ms. McAllister's published training guide, which states that certain positioning may be contraindicated for individual residents due to the resident's physical condition. Exh. 71, App. VI. Mr. Arnall further explained that the therapy received by residents is consistent with the recommendations of physicians treating those particular residents. 52/25–30. Furthermore, he noted that many of the residents are receiving physical management services in ROM exercises, or another modality of treatment. 52/63–67.[47]

■■■ I find that the Center's physical management of the residents does not substantially deviate from accepted professional practice. The fragility of many of the residents' skeletal systems is not disputed and warrants serious consideration by the professionals. The decision not to provide some residents with therapeutic positioning which may stress delicate joints is accepted practice. Moreover, the record reveals that professional judgment has been exercised in determining what physical management efforts will be deployed, whether ROM, splinting, percussion, or adaptive positioning. Here, as in many other areas of care at issue in this litigation, although the Center may not utilize the "best" or the "most current" options available, I find that professional judgment is exercised, and that the care meets the constitutional minimum.[48]

### b. *Wheelchairs*

The United States contends that the Center fails to provide wheelchairs that meet acceptable professional standards. Approximately 117 to 127 residents at the Center use a wheelchair as their primary means of mobility. 34/97. When a resident is placed in a wheelchair, the optimal position is for the pelvis to be tipped slightly forward in an anterior pelvic tilt. This places pressure on the ischial tuberosity and off of the tailbone or coccyx. This body position, if maintained, resembles an L, and is very stable and provides an element of control for one's trunk

---

**46.** The United States asserts that the Center staff believes that more could be accomplished with regard to physical management efforts than has been accomplished to date (*see* Exh. 604/94; Exh. 610/35–36), and that the Director of Occupational Therapy, Lois Graham, admitted that the residents would benefit if they received better positioning. Once again, it is not in dispute that the residents at the Center would benefit by the deployment of additional physical management efforts. The goals of the Center staff are irrelevant to whether the Center fails to meet its constitutional obligations. None of the Center's staff stated that positioning was inadequate or that the positioning employed at the Center was a substantial deviation from accepted professional practice.

**47.** Mr. Arnall admits that despite these measures, some residents have sustained a loss of movement. For example, Joe T. lost some ROM in his upper extremities despite receiving ROM exercis-

es and a splinting program. 52/66. This regression is explained, however, in Ms. McAllister's published training manual, which acknowledges that adults become increasingly immobile as a result of abnormal development patterns, slower rates of skill acquisition, and their increasing size. This process, as explained by Ms. McAllister, can render an adult "stuck" in one position or lead to a decrease in developed skills. Exh. 71.

**48.** As noted earlier, the United States contends that the Center's gross motor function program is inadequate. I find that the United States wholly failed to carry its burden in this regard because its expert, Ms. McAllister, spent most of her time at the Center focusing on the residents of Keystone, although the majority of residents who receive gross motor programs are located in the Horizon Unit and the JFK Learning Center. 52/35.

and head. 34/181. The seat belt to a wheelchair is one means of attempting to maintain a resident in the anterior pelvic tilt position. Seat belts should traverse a resident's body at the top of their pelvis or across their hip bones. 34/182. The seat belt should not be too tight. 34/189.

A loose seat belt and the movement of a resident while positioned in a wheelchair can result in that resident assuming a "C" position. 52/82–6. A "C" position is synonymous with a posterior pelvic tilt position in which an individual is positioned more on their tailbone or coccyx. As a result, the head falls forward and down, and the shoulders follow. 34/182.

Wheelchairs are individualized for the residents by the adaptive equipment department to provide a comfortable chair that is safe and properly supports the resident. Exh. 619/82–83. The Center's PTs, PTAs, and nurses monitor the needs of the residents, and the PTs determine the modifications necessary for the resident's safety, positioning and comfort. Exh. 619/81, 83–84. One section at a time of the wheelchair is modified in order to evaluate how the revision will work; at times, the adaptation process may take several weeks. Exh. 619/82, 86. While the resident's chair is in the adaptive equipment department, another chair is provided for him or her. Exh. 619/86. The LPT supervises the adaptations which have been requested. 52/99.

Ms. McAllister, testified that she did not see anyone in an appropriate wheelchair during her entire week-long observation at the Center. 34/206. Ms. McAllister also claimed that the staff never properly positioned residents in their wheelchairs. 34/188–89. The United States listed positioning deficiencies for thirteen residents which were described by photographs and a videotape. 84/XIV–50 n. 17.

Ms. McAllister opined that accepted professional practice requires the utilization of a mechanized positioning chair or simulator to produce wheelchairs for residents which meet their needs. 34/193–95; Exh. 731. A positioning chair is capable of having every conceivable angle and dimension changed while an individual is in the chair in an effort to identify exactly which position is best for that individual, based on comfort, safety and proper support. 34/194. The Center does not have a positioning chair. 34/195; Exh. 619/87. Instead, it continues to utilize the services of the adaptive equipment shop and the professional judgment of the LPT or OTR to adapt and modify standardized wheelchairs purchased from manufacturers. 52/98–101; 32/195; Exh. 619/84, 88.

The United States contends that positioning chairs or simulators have replaced the trial and error method of adapting wheelchairs that is used by the Center. 84/XIV–55. Mr. Arnall, however, who testified on behalf of the Center, explained that the simulator is a "high tech" substitute for adaptive wheelchairs which may increase convenience, but cannot act as a substitute for professional judgment. 52/98.

That technology can now boast a sophisticated piece of equipment as a replacement for the earlier trial and error method offers no insight whatsoever into whether an appropriate exercise of professional judgment has been made. Because the Center's method is accepted within the practice and demands of the exercise of professional judgment by the PTs (Exh. 619/87; 52/101), I find that it satisfies the obligations imposed by the Constitution.

The United States' arguments with respect to the thirteen residents who allegedly were provided with improper wheelchairs and/or positioned improperly are not compelling. 34/180–99. The Commonwealth explained that a number of those residents have the ability to move themselves from the correct positions in which the staff initially placed them. Exh. 619/80. Rather than unduly restrain the resident via a seat belt or other device, the resident is permitted to move and is repositioned as needed. 52/82.

In addition, as noted before, the record demonstrates that some of the staff were reluctant to intervene or act on behalf of the residents in the presence of the United States' experts. Other factors, such as the preferences of a resident or his family for a particular wheelchair, also have played a part in the Center's determination whether to ob-

tain a more therapeutic wheelchair for the resident. 52/81.

### c. *Transfers*

The United States also asserts that the Center fails to handle, lift and transfer residents according to acceptable professional standards. Residents are lifted and transferred to and from wheelchairs on a daily basis. These lifts should be accomplished by two care providers. Exh. 24. Some of the lifts and transfers are accomplished by the care providers placing their arms underneath the resident's arms and/or knees to lift them from one surface and lower them onto another. Such action exerts a pressure which, if sustained, could cause damage to the resident's arteries and nerves, and possibly to a joint. 34/216–17. Usually, such lifts and transfers do not last longer than thirty seconds. 52/104. The LPTs who provide PT services to the Center prefer to lift residents by placing their arms under a resident's arms and around the trunk, and then taking the forearms and positioning the resident close to their own trunk and lifting in conjunction with someone who is controlling the legs. This is set forth in the Center's policy regarding lifting and transferring. Exh. 82.

Ms. McAllister concluded that the staff's handling and lifting of residents is flawed because: (1) staff lift residents under the armpits; (2) staff lift residents under the knees; (3) staff do not control the head and trunk of the resident being lifted; (4) staff do not position the resident properly in a wheelchair or on the mat; (5) staff use the resident's limbs for turning; (6) staff resort to momentum for lifting and transferring which results in a "whisk and thud" transfer; (7) staff fail to arrange the environment before initiating the lift and transfer; and (8) staff use poor body mechanics. 84/XIV–58.

As a result of these flaws, Ms. McAllister contends the staff's care with regard to lifting and transferring residents fails to meet acceptable standards and subjects the residents to harm. 34/217, 221. The United States argues that Ms. McAllister's opinion is supported by the number of injuries sustained by residents while being lifted and transferred. Exhs. 85 and 791. The injuries

allegedly resulting from improper lifting range from abrasions, black and blue marks, scratches and/or lacerations, to fractures. Exh. 791.

Some residents sustain injuries while being lifted or transferred. The injuries range from abrasions to bruises, scratches, lacerations or fractures. Exh. 85. Historically, the LPTs have provided training to the care providers regarding lifting. 52/105. The Center currently is in the process of completing a Competency Based Lifting and Transferring Technique Inservice which is geared to review and reinforce principles relevant to safe lifting and transferring. Exh. 85, # 00004032; 52/105. The competency based training insures that each provider is capable of lifting and transferring an individual by actually performing a certain type lift and transfer under the supervision of an instructor. 52/105, 164–66. Such lifts would not be accomplished by the lifting of a resident under their arms.

The Center does not dispute that the cardinal rules for lifting and transferring are: (1) to control the environment; (2) to stay off the arms; (3) to lift as high on the legs toward the pelvis as possible; and (4) to control the body parts which do not have control or are abnormal. 52/172. Additionally, staff from the Center indicated that the Center's training with respect to lifting is consistent with the lifting procedures desired by Ms. McAllister. Exh. 610/105. The Commonwealth's evidence indicated, however, that the most "changeable" part of the environment is the resident, who may change the situation in the course of any transfer. 52/172; Exh. 85, # 00591020 (appropriate lifting procedures followed, resident jerked own head causing laceration); Exh. 85, # 0076504 (resident threw head back when being properly placed into bed, causing injury).

In addition, residents with osteoporosis may be injured during lifting and transferring even when the lifting complies with acceptable standards. Exh. 85, # 00006442 (fracture in resident with severe osteoporosis may have occurred during PT, seizure activity or self-repositioning). Finally, some of the injuries submitted by the United States

did not occur during lifting. Exh. 85, # 00589451 (injury occurred while resident was lying on the changing table).[49]

Historically, when the Center found that an injury occurred due to improper lifting methods, the Center provided additional staff training. For example, Harvey B. received "grasp" type bruises on two occasions caused by improper lifting. The facility director recommended lifting retraining, which had already been prescheduled by the Center's Facility Training Department, and additional training was provided by the Center as recommended. Exh. 85, Aug. 12, 1991, # 00589452.

▌ I recognize that there are incidents which have resulted in harm to the residents. For example, the United States points to the fracture sustained by Harold M. when he was lifted from his wheelchair and his leg was still contained in a velcro strap utilized to maintain his leg on the leg supports of his wheelchair. Exh. 85 (incident review of Harold M. of 6/11/91). Obviously, this lift was improper because the care provider negligently failed to release the velcro strap prior to lifting the resident, although she believed that she had. Isolated injuries, though extremely unfortunate, are bound to happen within a population which requires lifting and transferring on a daily basis. *See Society for Good Will,* 737 F.2d at 1245. The record does not reveal that such injuries due to improper lifting are commonplace, however, or that they go uncorrected.

In light of the residents' abilities to dramatically change a lift which is in progress, the presence of significant osteoporosis in this population, and the fact that the Center has a lifting policy which incorporates for the most part the above cardinal rules (Exh. 82), I do not find the Center's care in this regard constitutionally remiss. The evidence is clear that the presence of significant osteoporosis results in injuries which are neither related to actions by the staff (*e.g.,* fractures

precipitated possibly by self-repositioning or seizure), nor totally precluded by the complete adherence to acceptable professional standards.

Finally, the United States asserts that the Center fails to adequately train its staff in the physical management of residents, arguing that too often training is learned on the job and no formal inservice is provided. The United States claims that the Center's own staff recognizes the need for more inservices, and it points to the testimony of Mr. Tackett, who stated that he was handling residents on his first day on the job. 38/7–8. In addition, the United States faults the Center because it does not have an individualized written or photographed plan for handling each resident.

▌ I do not find persuasive the United States' contention that the Center's own staff recognizes the need for more training. This "admission" was obtained in a discussion after a demonstration by Ms. McAllister of positioning techniques for one of the residents. Exh. 610/35–36; Exh. 615/113. Ms. McAllister, an enthusiastic and motivating individual, sparked an interest in several staff members that undoubtedly will benefit the residents. Hopefully, the Center will take advantage of that interest and encourage learning opportunities in this and other areas of care. The professed desire of staff to receive continuing education, however, is hardly evidence of a deficiency which violates the Constitution.

Ms. McAllister testified that she believes that an individualized plan illustrated by photographs is common practice with therapists who work with the developmentally disabled. 35/63–64. She acknowledged, however, that such a plan comports with her own, personal standard for optimal treatment, and that only two states (Florida and Oregon) have embraced it. As a result, Ms. McAllister's testimony merely establishes the existence of var-

---

**49.** Some of the injuries attributed by the United States to flawed lifting and transferring have an unknown origin or no relation to lifting and transferring. For example, Beth S. sustained a fractured femur in April of 1993. Her injury was detected during morning care and it was surmised that it could have occurred while being lifted or changed. Exh. 85(a). Michael F. sustained a two inch laceration of his scrotum. His injury was detected during perianal care for a soiled *Attend,* and the injury could not be accounted for or related in any manner to a mechanical defect. Exh. 85, # MR 34–Sequence no. 0010D.

ious options from which a professional could choose, and provides no support for a finding that the Center's training substantially departs from accepted practice. *See Youngberg*, 457 U.S. at 321, 102 S.Ct. at 2461 (" '[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.' ").

The record demonstrated that the Center's training for direct care staff in this area included the viewing of a videotape about proper body mechanics and demonstrations of various lifts. 34/232–33. The Center's training sometimes provided the opportunity for return demonstrations, but this varied according to the class size. 34/232. The fact that each new hire was not provided an opportunity for a return demonstration on each type of lift, however, is not significant. The record is clear that training was provided, basic lifts were demonstrated, and inservices were given thereafter on an "as needed" basis. 52/105; *see* Exh. 85. I also note that the Center's practice requires that lifts be performed by two persons, thereby providing an additional "check" on improper lifting techniques. As a result, I find that there has been an ongoing exercise of professional judgment at the Center to provide training with regard to lifting and transferring.

 To summarize, I find that the Center's provision of PT services meets accepted professional standards. The United States' expert lamented that the Center provides only "maintenance, pure and simple." But that is what the Constitution permits. *See Society for Good Will*, 737 F.2d at 1250. While it may be regrettable that the Center's residents do not receive the optimal PT services available nationwide, my task is to determine only whether the record demonstrates that the physical therapy services

provided at the Center substantially deviate from accepted professional practices. I find that they do not.

### 6. GENERAL MEDICAL CARE

The United States contends that the Center fails to provide adequate continuity of care. Such care allows medical professionals to be "proactive" or preventive in nature, as opposed to being merely reactive. 41/146. Continuity of care is provided by a physician or group of physicians who provide medical care for an individual on a consistent basis for all of that individual's ailments. This long-term relationship between the medical practitioner and patient enables the medical practitioner to anticipate and identify problems which may arise. As a result, the medical practitioner can initiate treatment either to prevent or reduce the intensity of problems. 41/147.

Dr. Sulkes believes that proactive care is essential for the developmentally disabled population, and is "the reason to have physicians in a place like [the Center]." 41/147. He further opined that the Center's proactive care is inadequate because the size of the medical staff is too small and the medical record documentation upon which long-term proactive care is based is deficient. 41/148.[50]

Dr. Sulkes noted that the Center has four physicians, each physician with a caseload of approximately 120 residents. Dr. Sulkes believes this doctor/patient ratio is reasonable. 41/150. Vacations, holidays, sick time, and continuing education commitments raise the real average caseload, Dr. Sulkes contends, to 160 residents per doctor, which is too high because the physician must consider chronic problems, see more residents and consider long-range planning. 41/150.

Dr. Kastner, a pediatrician who works with the developmentally disabled, testified on behalf of the Center that the increased case-

---

**50.** The proposed findings of fact submitted by the United States regarding proactive medicine concentrate on the staffing ratios for the physicians and the inadequate documentation. *See* 84/XII. Mr. Bellomo testified that the Center routinely conducts the following: screenings for tuberculosis, the administration of flu vaccines, mammograms, chromosome studies, routine blood work such as chemistry and blood counts, pap smears, urinalysis, breast exams, and visual screening including glaucoma testing. 62/186. All of these measures constitute proactive medicine inasmuch as they are provided for the purpose of identifying an ailment before symptoms become apparent.

loads resulting from a physician being temporarily unavailable was not unacceptably high. He was "completely comfortable with a physician managing a hundred-nineteen residents and with that ratio going up when a physician is ill, on vacation, or at a continuing education program." 48/99. He noted that he has observed staffing ratios ranging from one physician per 96 patients, to one physician for 258 patients, 48/99, although he found the latter ratio unacceptable. 48/99.

Dr. Shertz, the Center's medical director and a physician, noted that the actual caseload for each physician varies, and that the residents with the "greatest medical problems have a better physician ratio." Exh. 632/32. Dr. O'Connor covers the Keystone living unit and her caseload is approximately 92 residents. Dr. Shertz' caseload is approximately 90 residents, and Drs. Lightbourne and Rayes have a caseload of approximately 130 residents. Exh. 632/33. Nor does coverage of another physician's caseload necessarily result in an equal division of that caseload among the three other physicians. The distribution is dictated by the demands of the caseloads which staff physicians have at the time that coverage is needed. Exh. 632/35–37. Dr. Shertz believed that the coverage provided was adequate and did not feel that another physician was necessary. Exh. 632/37–38. Dr. Shertz' comfort with the staffing ratios was partly attributable to the fact that the Center's physicians have a low turnover rate, which has enabled the physicians to become familiar with all of the residents over time. Exh. 632/41.

 I find that the Center's physician staffing ratio is within acceptable professional standards, and takes into account both the medical needs of the residents, as well as the familiarity of the physicians with those residents.

Dr. Sulkes' opinion that inadequate medical record documentation exists at the Center is grounded in his contention that that documentation does not accurately depict the resident's long-term care, and fails to coordinate and document input from consultants and/or hospitals. 84/XII–2–15. Dr. Sulkes opined that medical documentation enables the practitioner to grasp a long-term picture of the resident's health, and prevents medical problems from getting "lost in the shuffle." 41/157. Dr. Sulkes further described that there should be two levels of medical documentation: documentation of acute medical problems, and documentation on a chronic level. 34/2–3. He acknowledged, however, that the Center has three levels of documentation: daily progress notes for documenting acute medical matters; sixty-day notes for an overview of that two-month time period; and an annual review, which provides a summary of the chronic care for that resident. 34/3.

Despite these three levels of documentation, Dr. Sulkes concluded that the Center's documentation did not accord with accepted professional practice, and that it was incomplete, episodic and reactive. 41/149; 34/5. Dr. Sulkes opined that the documentation failed to establish follow-up on medical problems or acknowledgment of the resolution of a medical problem. 34/12. The United States contends that this inadequacy in documentation was noted in the January 1993 Inspection of Care survey. 34/12, *citing* Exh. 67/8–E.

Dr. Kastner agreed with Dr. Sulkes that there were problems with the medical records maintained by the Center. 48/142–45. He explained that the medical records were maintained on the residential living units, and that staff were familiar with and able to use the records. He noted that a resident's medical record did not include a list of active and inactive problems, but did include incident reports, and behavioral data. Laboratory data, procedure results and consultation reports also were maintained in the record, but there was rarely any documentation by the physician regarding such results or evaluations. Annual review notes were generally thorough and effective at maintaining continuity of care, he said, but could be more complete. Transfers from the Center to Mercy Hospital were noted as either incomplete or non-existent. Exh. HH, § G. As a result, Dr. Kastner opined that the medical records at the Center were "somewhat disorganized," *Id.* and the "most significant deficiency was the organization of the record." 48/145.

628

■ Inadequate medical record documentation does not mandate finding that medical care is constitutionally deficient. Paperwork exists to aid in patient care, not to satisfy some independent constitutional duty. Dr. Kastner concluded that these were "[w]eaknesses at the Center I did not feel were significant and did not adversely affect the quality of [care]." 48/148; *see also* Exh. HH, § G. Furthermore, he opined that "[i]n general, these [summary notes] are thorough and effective at maintaining continuity of care," and "[o]verall, the medical records of clients at the Ebensburg Center are effectively used by the medical staff to provide care to the residents." Exh. HH, § G.

Dr. Kastner also noted that residents have one comprehensive record that addresses not only medical care, but also habilitative programming, social services and other areas of concern. 48/142. This comprehensiveness, he noted, is both "its strength and weakness" because some parts are emphasized at the expense of other portions. 48/142–43. He also acknowledged that, as a physician, he feels that the record should emphasize medical issues, although the Center "made a very clear decision to deemphasize the medical nature of the records." 48/143.

■ I find the Center's medical record documentation, though sometimes flawed or inadequate, meets the acceptable professional practice standard. It is effective at maintaining continuity of care, which is how Dr. Sulkes defined proactive medicine. In addition, Dr. Kastner's objective testimony[51] shed light on what constitutes minimally accepted standards across the medical profession because it noted that the physician input into the medical record could be better, "just like in anyplace." 48/143. Despite guidelines which require extensive documentation by physicians, accepted professional practice tolerates documentation which does not necessarily meet those goals.

### 7. GENERAL NURSING CARE

The United States contends that the Center provides inadequate nursing care in the following respects: (1) acute and chronic nursing care does not meet professional standards; (2) nursing responses to injuries have been delayed; (3) nursing care plans are inadequate; (4) nurse recordkeeping is inadequate; (5) nurses need additional training; and, (6) the role of the Ebensburg Director of Nursing is too limited. 84/XII–20–29.

The United States' expert in nursing care, Ms. McGowan, asserted that acute and chronic nursing care did not meet professionally accepted standards. 35/168. In particular, she asserted that nursing care failed to identify or assess significant health care problems and formulate adequate treatment interventions for residents. 35/170–01. She claimed that, as a result, the health of some residents has deteriorated and necessitated hospitalization at times. 35/168–69.

■ Ms. McGowan opined that nursing care assessments, which should be initiated when a resident's health is compromised or at risk, are inadequate because they fail to include such basic nursing measures as auscultation of breath sounds, measurement of abdominal girth, testing for occult (hidden) blood in vomitus or stool, or a resident's vital signs. The failure of the nursing staff to initiate tests of vomitus or stool for occult blood does not show deficiencies in nursing care. Carole Sponsky, the Center's Director of Nursing, explained that tests for occult blood are performed by the laboratory pursuant to the order of the physician. Exh. 638/22. This testing is diagnostic, and may be executed by a registered nurse only as part of a medical regimen prescribed by a licensed physician. *See* 63 P.S. § 212. There was no evidence that nursing staff failed to carry out testing as directed.

The remainder of the United States' evidence about acute and chronic nursing care concerned the treatment of seven residents who died between 1990 and 1993, and testimony from a Center nurse acknowledging that assessments need to be more "in-depth." Exh. 638A/85. It is undisputed that nursing assessments can be improved at the Center.

**51.** Dr. Kastner scrutinized the Center and was willing to acknowledge not only its pros, but also its cons. I note his past experience as an expert consultant for the Department of Justice, various states and other entities. 48/27.

The relevant question, as in other areas, is whether the assessments meet minimum constitutional standards.

■ I credit the testimony of Marcia Stiles. Ms. Stiles, an employee of the Center for at least fourteen years as a registered nurse supervisor (RNS), conceded that she would like to see more "in-depth" assessments and documentation of such assessments. Nonetheless, she opined that nursing care was adequate. Exh. 638A/85–86. Carole Sponsky, the Director of Nursing, echoed this sentiment. Exh. 636/41. In contrast, Ms. McGowan could find nothing at the Center that was adequate. I am skeptical of such a blanket condemnation. The Center has 472 residents who receive nursing care, and the occurrence of seven deaths over a three-year period, while regrettable, does not demonstrate in and of itself constitutionally inadequate acute and chronic nursing care.

The United States also alleges that the Center's nursing care is inadequate because there have been delayed nursing responses to injuries; one resident, James W., was seriously injured by a resident who was hitting and kicking him. An RSA discovered the incident at approximately 8:30 a.m. and failed to report the same to the nurse until approximately 11:00 a.m., when James W. complained of chest pain. The nurse assessed James W. and observed bruising of the left lower rib cage and noted a "clicking" sound upon palpation. The nurse notified Dr. Shertz at 11:15 a.m., he ordered James W. sent to Mercy Hospital for evaluation, and an ambulance transported James W. to Mercy Hospital at 12:30 p.m. A CT scan at the hospital revealed a ruptured spleen, and a pneumothorax. A splenectomy had to be performed and a chest tube inserted. Exh. 501(dd)

■ The United States contends that such delayed response was unacceptable in light of professional standards. The initial delay in reporting the incident, however, was attributable to action by the RSA, and not the nursing staff. Exh. 501(dd). Therefore, nursing care cannot be found constitutionally remiss on this basis. Nor do I find the lapse of time between the report to the nurse and the nurse's report to Dr. Shertz—fifteen minutes—a substantial deviation from accepted nursing practice which requires the nurse to assess the resident and then advise the medical practitioner of her findings. Further, no evidence showed that James W. suffered any additional harm due to the delay in treatment.

■ The United States also points to alleged delayed responses in nine other recent incidents as further support for its contention that nursing care is inadequate. Exh. 790. Review of that exhibit, however, again shows that the delay in seven of the nine instances was attributable to the RSA staff, not the nursing staff. *Id.* Again, this cannot be the basis for finding nursing care constitutionally deficient. The evidence is insufficient to establish that the nursing care is inadequate because of delayed responses to injuries.

Documentation by the nurses at the Center is also constitutionally inadequate, according to the United States. The United States asserts that Ms. Stiles admitted the inadequacy of the recordkeeping. The United States also points to Ms. McGowan's testimony that in reviewing the records of residents, she "often had to search in as many as four or five different places to track one piece of information." 35/172. Ms. McGowan stated that the "[c]harting system is faulty. The nurses are not using accepted patterns." 35/180.

Ms. McGowan's testimony, however, failed to shed any light on what constitutes accepted minimum professional "patterns" for nursing care documentation. Because nursing documentation is used by both the nursing staff and the physicians, it is logical that nursing documentation would be consistent with the physicians' documentation and include entries on both an acute and chronic level. *See* 34/2–3 (two levels of medical documentation for medical practitioners) and discussion of physician proactive care, *supra.*

In this case, the evidence establishes that nurses document on two levels as well. Nursing documentation regarding acute care is set forth on the interdisciplinary progress notes addressing day-to-day matters. Exh. 637/13–14, 27; Exh. 622/49–54. Nursing documentation regarding chronic care is set

forth on the 90–day summaries. Exh. 637/27; Exh. 622/55. In addition to these two types of documentation, there is a daily log on each unit and a "Cardex" for each resident that relates the treatment ordered for that resident by the various disciplines. Exh. 636/72. There are also "quarterly physical assessments, nursing physical exams, . . . and annual in-depth assessments . . ." Exh. 638A/86.

■ While it may have been onerous for Ms. McGowan to search through the file to find such information, she does not work at the Center and therefore lacks the familiarity that would come from using the chart on a regular basis. Her personal viewpoint does not warrant a finding of constitutional inadequacy. Neither does the United States' assertion that Marcia Stiles "agrees that Ebensburg nurses need to better document their nursing assessments." 84/XII–27. Ms. Stiles stated that she would "like to see more in-depth assessment. I'd like to see documentation showing that assessment." Exh. 638A/85–6. She then elaborated that there is "a lot I'd like to see." *Id.* "I'm not criticizing what we're doing now, it's just that it can always be better." Exh. 638A/86. I find Ms. Stiles' testimony insightful. She finds the documentation acceptable, but she acknowledges that it can be improved. Undoubtedly it can. But the fact that there is a better way to accomplish a task is not tantamount to a constitutional violation.

Next, the United States submits that the nursing care is inadequate because nursing care plans do not meet accepted standards. Instead, the nursing care plans consist of nursing diagnoses which are not supported by data, and objectives which are not capable of being measured. 35/190–91. In addition, the United States notes that the nursing care plans are not individualized to identify, and provide for, each resident's needs, but instead consist of general instructions to direct care staff. *See* Exh. 638/exh. 30. As an example of a nursing care plan which fails to meet accepted professional standards, the United States points to the nursing care plan for Tim P., a resident confined to a cart at the Keystone unit.

The Center's nursing care plans are general, *see* Exh. 638/exh. 30, but the nursing staff modifies the plan to suit the residents' individual needs. Exh. 637/65. In fact, the nursing care plan for Tim P., which has been applied since March 1987, has been individualized, specifically references his cart, and addresses the potential for skin breakdown. Exh. 973. This nursing care plan for skin breakdown has been in effect pursuant to consistent reviews for its continued application. *Id.* The mere fact that it has been on Tim P.'s chart since March 1987, is of no significance. Tim P.'s inability to bear weight (*i.e.*, he has been confined to a cart) has been a constant. He therefore remains at risk for skin breakdown, and it is logical that the nurses continue to monitor him for signs of this condition.

■ The Center's standardized nursing care plans for problems frequently encountered by its residents, standing alone, would not comport with the accepted professional practice, which requires individualized plans. However, because these standardized plans are modified, amended and tailored for each of the Center's residents, I find that the plans fulfill the requirements of accepted professional practice and cannot be deemed constitutionally deficient.

The United States also asserts that the Center is deficient because the nurses lack sufficient training. 35/210. The United States cites Ms. Sponsky's deposition testimony that "training is important for nurses" (Exh. 637/88–89), and faults the Center for not requiring nurses to have any educational background or experience in working with the developmentally disabled at the time of hire, nor requiring additional training once hired. Exh. 637/82, 89. The Center's collective bargaining agreement with its nurses provides for the allotment of a certain sum of money for training. Exh. 624/29. The United States suggests that the Center's assistant director, Mr. O'Brien, acknowledged that "most nurses do not use that." Exh. 624/29.

■ The United States' position that the nursing care is deficient because of inadequate training constitutes nothing more than an assertion that mandatory continuing edu-

cation for the nursing staff would be better than the current practice, payment for optional training outside the Center. Whether another set of rules regarding training and/or mandatory continuing education for nurses would be better is not the issue that is before me. The Center's practice regarding additional training for its nurses is not a substantial departure from accepted professional practice. Pennsylvania's Professional Nursing Law, 63 P.S. §§ 211, *et seq.,* does not require the acquisition of a specified number of continuing education hours per year for license renewal. *See also* Exh. 624/29–30. Moreover, the record demonstrates that the Center does provide additional training, both optional and otherwise, for its nurses. As noted previously, the Center's collective bargaining agreement with its nursing staff includes an allotment for each nurse to obtain training outside of the Center, and some of the nurses take advantage of this opportunity. Exh. 624/29–30. In addition, training is offered at the Center on both a formal and informal basis throughout the year. Exh. 638/69. While the United States contends that Mr. O'Brien acknowledged that most nurses do not use the money for outservice training, I note that his deposition testimony did not specifically refer to the Center's nursing staff, but instead was a statement applicable to nurses throughout the Commonwealth.

Finally, the United States contends that the nursing care is inadequate because the role of the Center's Director of Nursing is too limited. It submits testimony from the Center's Director of Nursing and another nurse at the Center as support for this contention. *See* 84/XII–29–30. The United States offered no evidence to establish what constitutes an acceptable standard for a Director of Nursing position. I cannot create out of whole cloth what the acceptable standard should be.

### D. *Adequate Training And Freedom From Undue Restraint*

The next category of "liberty interests" secured by the Constitution that the United States claims has been violated at the Center concerns the right to adequate training and freedom from undue restraints. According to the United States, the administrators of state public institutions must provide training programs and other services that are "based upon appropriate assessments, developed to meet residents' individualized needs, consistently implemented, and designed to teach residents those skills necessary to live more normally and to avoid developing or exhibiting dangerous and other anti-social behaviors." 87/13.

The United States argues that the Center's training and behavior management practices are deficient in (1) assessment; (2) program development; (3) program implementation; and (4) program review. 87/15. The United States claims that the Center's living areas are barren and lack meaningful activity; the Center generally fails to develop and implement training programs, and those programs that do exist are inadequate (they are not appropriately revised, skills training programs lack psychology input, occupational therapy services are inadequate, and the speech and hearing staff at the Center fail to meet the residents' needs); the Center's behavior management services are deficient and do not comport with accepted professional standards; the Center has insufficient psychologists to provide services that meet accepted standards; the behavior programs are not individualized, effective, properly implemented, properly reviewed or properly revised. *See* 83/VI–1 through VII–60.

This failure to provide adequate training and behavior programs, the United States claims, has resulted in residents suffering "both serious injury and undue restraint" (87/13–14) in the following respects: 1) the Center's failure to implement proper training programs has resulted in the deterioration of residents' self-care skills and/or has failed to provide residents with the ability to enhance their level of functioning; 2) the Center has failed to implement behavior training programs and/or therapeutic living environments to address maladaptive behaviors, and residents are harming themselves and others; and 3) instead of developing training programs to address maladaptive behaviors,

the Center relies upon physical and chemical restraints to control the residents.[52]

■■■ A number of these issues are addressed elsewhere in this opinion, in part or in full (*e.g.*, the Center's duty with respect to safety; the Center's duty with respect to training; the issue of chemical restraints), and those discussions will not be reiterated here. For the reasons explained in the discussion above concerning physical therapy services, I reject the United States' contention that the Center is under a constitutional duty to provide services that *enhance* the residents' level of functioning. *See Society for Good Will*, 737 F.2d at 1250 ("We conclude that [the deprivation of a liberty interest] exists when institution officials fail to exercise professional judgment in devising programs that seek to allow patients to live as humanely and decently as when they entered the school, *i.e.*, when there is no individually oriented, professionally devised program to help [the] residents *maintain* the fundamental self-care skills *with which they entered the Center*." (*citing Youngberg*, 457 U.S. at 327, 102 S.Ct. at 2464)) (emphasis added).

As with all other areas in this case, the parties on both sides presented expert testimony concerning training programs, the treatment of maladaptive behaviors in the mentally retarded population, and the provision of behavior management programs. The United States' three psychology experts (Dr. Stark, Dr. Russo, and Dr. Amado) and the Center's psychology expert (Dr. Reid) all

agreed that "the more programming with meaningful activities that go on, generally the fewer accidents and injuries that occur." 51/35. *See* 43/53 ("[I]f you fail to provide adequate training programs to anybody, any human being, what happens after a while is that inactivity, boredom ... withdrawal, self stimulation, frustration, anger begins to set in. That leads to ... self injurious behavior."). Beyond this basic starting point, however, the parties' positions widely diverged.

At trial, Dr. Stark testified on behalf of the United States about the progress that has been made in the provision of services to mentally retarded individuals (43/67–71), asserting that care providers have "gotten away from custodial care." 67/71.

> Custodial care, meaning where you feed them, you clothe them, you just take care of their very basic needs. We're saying that that's not enough. We've gone to teaching, adaptive functioning skills. People have a right to habilitation, they have a right to training.

67/71–72. Dr. Stark's testimony, however, while certainly well-intended and a fine demonstration of the care to which many professionals aspire, provided little assistance to the Court in determining the applicable constitutional standard with respect to minimally adequate training and behavior management programs. *See* 67/85 ("My second concern is that the environment at Ebensburg is one which could be described as largely custodial as opposed to a teaching environment.");

---

52. The general tenor of the United States' position on these points is best summarized by its description of the alleged "pattern of harm" at the Center:

> This pattern of harm is pervasive at [the Center]. There are too many individuals with special needs confined in too small a space with too few staff and a lack of meaningful and stimulating things for the residents to do. This cramped and monotonous existence would be difficult for most individuals to endure for a prolonged period of time. It has been dangerous and destructive for the mentally retarded individuals who have been subjected to decades of this existence at [the Center]. Residents live in groups of approximately twenty-four individuals, with whom they spend the majority of their time, day after day, idle in large dayrooms on the living units. The residents do not have adequate activities and staff

interaction, particularly during mealtimes, medication administration, and afternoon and evening hours. Significant periods of the day are consumed waiting for toileting, and dressing, for the many residents for whom they are responsible. Rather than staff using these occasions as learning opportunities, these duties take on a custodial function. The scanty block of time during weekdays devoted to "program" hours off the living units is similarly wrought with much idle time for a number of individuals. Often, staff spend so little time with residents that programming is rendered meaningless.

87/16 n. 7. *See also* 87/14 ("Behavior management programs are grossly inadequate to address residents' serious behaviors, many of which have been created by the Defendants' deficient care and long term institutionalization in the first instance.").

67/223 ("And it simply is very hard to work in this environment to accomplish the kinds of things that can be accomplished. There's too many people, there's no individualization, and there's no hope that—the attitude is certainly not an habilitative attitude or it's an environment, custodial care."); 67/224 ("The point that I'm making here and the bottom line is that an awful lot can be done with that kind of money if you re-think and re-allocate how things are done, which are—we're losing ground here. People are getting hurt at an accelerated pace. And they're going to continue to get hurt because the aggression I feel is increasing; because what's happened is that people feel there's nothing that can be done and there's nowhere to go, and there's a loss of hope.... [T]hese individuals have had their body taken, but they still have a heart and a soul and a mind. And we need to attend to that.").[53]

According to Dr. Stark, he reviewed a large number of the Center's "Incidence Occurrence Reports" (a form at the Center which lists the name of a resident, categorizes the type of injury that has occurred, contains a narrative description, any medical interventions that took place, and what recommendations were made (43/101–02)), and determined that one of the reasons for what he characterized as "a lot of aggressive behavior, self injurious behavior" (43/105) at the Center was that "there's no meaningful activity going on. There's no training, there's no habilitation. And that causes that ... cycle of harm." 43/106. *See also* 43/120 ("Lots of times people, when you just get them doing something meaningful, enjoyable, and you could get rid of a lot of these behaviors."); 43/125 ("Aggression breeds aggression. People are both victimized and they're victimizers. It's almost as if there is a climate of aggression at this facility, and it's disturbing to see that it continues to be sort of a way of life there. It's like it's an accepted thing or it's like this is what mental retardation is supposed to be like, and it's not."); 43/163 ("This [type of activity] is what we did twenty years ago. This kind of thing is like walking back in time for me, into the early seventies. This kind of program, it's not programming; it's simply trying to keep somebody busy and putting something in front of them.").

Dr. Stark acknowledged on cross-examination that he could not point to any objective standard in support of his conclusion that too many injuries were occurring at the Center, and that this was simply his personal, professional opinion. 41/27.[54] In addition, much of Dr. Stark's testimony appeared to be offered for its shock value, or was conclusory and failed to provide an informative analysis of the situation.[55] Because of this, I accord little evidentiary weight to his testimony.

**53.** Dr. Stark acknowledged on cross-examination that he (as well as the associations with which he works) favors community placement for mentally retarded individuals over an institutional setting. 43/234. This bias was apparent throughout Dr. Stark's testimony. *See* 43/235 (Q. "Do you also remember, Doctor, criticizing Ebensburg because you say there is, quote, no mandate to move people out." A. "Yes, sir; I do remember that. And that was described to me by Mr. O'Brien, who I asked him if they were moving people out, and I was told that they were not and that that—that Ebensburg as an institution would always have to be there because there are not services in the community, which I disagree with."); 43/236 ("You asked me what my professional feelings are, the feelings of my association, the feelings that we have promulgated, our policies throughout the country, and in law. We gave an award to the State of New Hampshire because it's closed all of its institutions. State of New York has made a mandate to close theirs by the year two thousand. This is happening around the country, to close institutions, particularly larger institutions."); 43/237 (Q. "Doctor,

if you were giving an unbiased report, why weren't you able to think of even a single positive thing at Ebensburg when I asked you at the deposition to name one single positive thing?" A. "Single positive thing?" Q. "That's correct." A. "I don't know; was that the end of the day?").

**54.** Dr. Stark also acknowledged on cross-examination that the Center had recently revised its reporting criteria for injuries to include incidents that were "no injuries and very minor injuries." 41/30. This change in reporting to include additional incidents (previously unreported as "incidents") may have contributed to the alleged increase in injuries about which Dr. Stark testified.

**55.** For example, Dr. Stark made reference in his testimony to "Doug":

Another person, thirty-three, Doug, bit off three fingers of his hand in 1984, bit them off. All of his teeth were extracted following the incident. A lot of self injurious behavior, has not progressed ... I observed Doug during my

At trial, the Commonwealth presented compelling testimony by an expert in psychiatry, Dr. Hauser, about the complexities and the competing concerns in providing treatment for mentally retarded individuals:

> [A]fter a process of the primary psychiatrist and even a second opinion, there might be controversy about management. There might be controversy because of the natural tendency for polarization. You'll have the behavioral psychologist saying, "We should tackle this behaviorally"; and you have the medical doctors saying, "We should treat this with medication more aggressively"; and then you might have an advocate for the client saying, "Don't use medication, you're just trying to sedate them"; and then you might have a guardian saying, "What are the whole bunch of you doing," . . .—so people are stuck, people are in conflict. There are competing principles, and you might call in someone like me to try to help everybody achieve a consensus and focus back on the client and try to think of a treatment plan.
>
> \* \* \* \* \* \*
>
> There is definitely a tension between the two modalities of treatment [behavioral treatment and mental illness treatment], and that tension can reach the point of an adversarial process; and it has happened in the field of care for people with retardation over decades that that polarization has switched back and forth, and it has eventually come to rest now in the effort to have a combined approach or a comprehensive treatment plan of which behavioral modalities are one component and medication modalities are another; and it takes some effort and teamwork to get people to coordinate the care from the two different disciplines.
>
> But there is inevitable tension because some people will believe that further behavioral effort will work and allow to you [sic] avoid medication, but those same people are at risk for avoiding medication when it's appropriate.

50/56, 81–82.

The evidence at trial revealed that within this "polarized field" of care for mentally retarded individuals (where opinions differ widely concerning the appropriate training and treatment to provide to any given individual), the Center has an interdisciplinary system in place which allows it to exercise professional judgment and provide training and behavioral management services within the sphere of acceptable professional prac-

---

tour, and he's—an extremely agitated individual. The type of individual that I've treated, written about, trained about, etcetera. And he's been on the scene, behavior program since March of '88. That's five years or so. There's changes in time, but most of that is medication, not much of a change in behavior program.

43/150. On cross-examination, however, the following exchange took place:

Q. Doctor, would it surprise you if I told you the medical records indicate this history from him: He bit his index finger, he went to the hospital, it became infected, it was amputated at the hospital. He nibbled on his thumb and mutilated it; that had to be amputated also at the hospital. The doctor at the hospital—doctor recommend that his teeth be pulled, and they were pulled at the hospital.

A. That's fine. I think that's a pretty drastic move by any doctor to recommend that a person with mental retardation have their teeth pulled because you can't set up a behavioral program to keep them from biting their fingers.

Q. You do understand [the Center has] no control over Mercy Hospital . . .

A. I think you ought to have control over the hospital. I think somebody ought to stand up for that individual's rights and say to that doctor who recommended that that that not be done.

41/63–64. *See also* 62/147–49 (following amputation of right index finger while in Mercy Hospital, on "the first post op day, despite high doses of sedation, [Doug] became very difficult to control, and he was subsequently found to have bitten his amputation site and both his thumbs. . . . It was feared that his self-abusive behavior would result in a loss of all his digits. This was thoroughly discussed with the family [by the doctors at Mercy Hospital], and it was agreed that he should undergo surgical removal of all his teeth. . . . the night prior to the full mouth dental extraction [at the hospital]—his behavior became erratic and very difficult to control; and he subsequently autoamputated the distal phalanges of his right thumb with his teeth and also bit the left thumbnail off. The following morning the distal thumb was surgically amputated and the left thumbnail completely excised. Full mouth dental extraction was simultaneously performed . . .").

tice. For each concern raised by the United States' experts, the Commonwealth responded with credible expert testimony which demonstrated that professional judgment had, in fact, been exercised, and that the care provided did not substantially depart from acceptable professional practice.

Dr. Reid, an expert in applied behavior analysis, behavioral disorders, skill acquisition training and psychology services to the mentally retarded, testified at trial on behalf of the Commonwealth defendants. Dr. Reid, who in the past has been retained by other facilities involved in Department of Justice investigations and has found certain institutions to be *inadequate* (51/42), provided a broad overview of the psychological services provided at Ebensburg and compared them to the services provided in other institutional facilities and community-type agencies. 51/11. Dr. Reid explained that he made two separate visits to the Center to "evaluate the environment and the degree to which people living at [the Center] were participating in meaningful therapeutic activities" and to collect data "regarding the degree to which psychological programs for people with severe behavioral problems" were implemented by the Center's staff. 51/8.

With respect to the United States' contention that the Center is barren and lacks meaningful activities, Dr. Reid testified that he "found the treatment environment overall, based on the data we collected, comparing it to other institutional facilities and community-type agencies, that the degree to which people living at Ebensburg Center are participating in what we call active treatment or meaningful purposeful activities, while there's certainly room for improvement, it's representative of about the average in the field." 51/11.[56]

As Dr. Reid explained, the Center is organized along the lines of a "unit system":

A unit system is . . . [a] method of operation that really became popular in the 1970's, and the purpose there was to get away from the clearly delineated—what became isolated—roles of different professionals. Prior to the unit system there were a whole lot of problems in service settings in which the psychologist would come in and do one thing, the occupational therapist would come in and do one thing, and no one had any idea of what the other person was doing; and there was no person really responsible for coordinating all those services for one particular client.

The unit system generally was established to try to get a better coordination of all those services.

\* \* \* \* \* \*

[I]n our field not many things are perfect; and the unit system certainly isn't perfect, but I think the biggest advantage of the unit system is that it does allow for better coordination of services across disciplines. 51/17–18.

The Center has three levels of behavior programs, which are categorized according to the restrictiveness of the intervention. Not everyone at the Center has a serious behavior disorder or needs a behavior program plan. 51/16. A nonrestrictive program is designated as a "Level One." A "Level Two" program is more restrictive, and a "Level Three" program calls for intervention of physical restraints if a resident's maladaptive behavior poses the risk of harm to himself. 51/10; 37/26; Exh. 592.

The Level Two and Level Three behavior programs follow standard forms, Exh. 592, and are tailored to the resident. For each resident, the program identifies the undesirable behavior, the positive reinforcers for that resident, and the situations which help predict the occurrence of that behavior. The program also contains training of adaptive

---

**56.** Dr. Reid acknowledged that "although the degree to which their residents are involved in meaningful activities is representative of the average it could certainly be improved. The less time people spend doing nothing, the better." *Id. See also* 51/23 ("This is not to say that there shouldn't be improvements. I think there should, but that's a kind of service delivery that

never goes away. I mean keeping individuals with severe and profound mental retardation involved in meaningful activities is very difficult. It takes constant effort. So I would not agree that they [the residents] were perpetually in a situation of nonactivity. But I think it's an area that Ebensburg is doing relatively well, in light of the task at hand.").

behaviors (rather than merely attempting to eliminate undesirable behaviors (51/21)), as well as "DROs" (differential reinforcement of other behavior),[57] which the psychology staff create and implement. 51/21. Since behaviors such as biting, self-injurious conduct, aggression, kicking, and hitting are not limited to a single resident, it is to be expected that some behavior plans will be similar. *See* Exh. 856.

Dr. Reid specifically reviewed all of the plans for residents with the most severe behavior problems, and testified that "all of those were individualized." 51/21 ("There were individual differences in behavior definitions listed in the programs. There were individual differences in the reinforcers to be used or the consequences for desirable behavior. There were differences in the situations likely to evoke behavior problems. There are a lot of similarities across the programs, too, but there were differences.").[58] Dr. Reid also concluded that psychologists are involved in the development of "positive habilitative plans." 51/24–25.

■■■ The behavior plans are implemented throughout a resident's day—during leisure time as well as during active treatment. "Active treatment" is a means of providing stimulation to a resident to promote the acquisition or maintenance of skills and to re-duce the occurrence of maladaptive behaviors. 51/44–45.[59] Most professionals now agree that such treatment should attempt to incorporate the use of "age appropriate" materials (for example, avoiding the use of a child's toy in a training program for an adult). This cannot always be achieved, however, because some residents have mental retardation of a severe and profound nature, and some age appropriate materials do not provide safety features that are found in age inappropriate materials, such as those designed for young children. 51/35–36.[60] Most workshops, day activity centers, group homes and schools for mentally retarded individuals still utilize age inappropriate materials (51/36), and I do not find the Center's continued use of such materials a substantial departure from acceptable professional practice.

I further note that training is provided by the Center at the Gary Bain Center, a sheltered workshop that serves as a vocational program. Approximately one hundred individuals attend the workshop (some nonresidents participate in the program, but the vast majority are residents of the Center), Mondays through Fridays, from approximately 9:00 a.m. to 3:00 p.m. 37/17; 51/173. Dr. Russo, testifying on behalf of the United States, found the Gary Bain Center to be a

---

**57.** As explained by Dr. Reid, "if an individual is engaging in aberrant or maladaptive behavior, say aggression, then the DRO component of a program would be that we would want to reinforce that person for any other behavior besides aggression, with the idea being we could increase other behavior; as other behavior increases, the aggression is going to go down." 51/22.

**58.** In responding to the criticism by the United States that many clients have only one behavior program even though they have a multiplicity of problem behaviors, Dr. Reid explained, "[I]t varies from client to client and need to need. Sometimes individuals will need separate programs for separate [problems]; sometimes one program is sufficient for all the behavior problems. In some cases particular behavior problems are part of what we call 'response class.' They all serve the same function for the individual, even though their topography is different; and in that case one program would be sufficient. So it's an individual thing. In some cases one program is sufficient, and in other cases they're not." 51/31. It is a matter of professional judgment.

**59.** Dr. Reid did not find it problematic that the Center has been cited in state surveys as failing to provide active treatment to some residents, because the Center has never been "decertified" (which would occur if the Center was truly not providing such services). 51/83. *See also* 51/82 ("You know, I've gone through a lot of ICF state surveys. I have not in the Commonwealth of Pennsylvania. I've never seen a survey except one time in my twenty years in the field where they didn't cite anything. And I've experienced a lot of surveys. So, in all honesty, I don't put a whole lot of weight on ICF level deficiencies. If a facility has been decertified or is going through the steps to be decertified, then I would look at that carefully ...").

**60.** *See also* 51/95 ("By definition if it's a toy, unless it's an adult toy, it's not going to be age appropriate. It might be therapeutic, it might not. By definition, it's age inappropriate if it's a children's toy being used by an adult.").

positive aspect of the Center, and stated that it "is a program that is very representative of supported work programs for the mentally retarded." 37/120. *See also* 51/38 (the Center provides a variety of paid employment training opportunities for the residents).

The Center's primary data collection system with respect to behavior management, which is "relatively standard in the field" (51/28), involves the staff recording "on a twenty-four hour basis the frequency of target behaviors, behaviors that have been defined through the program plan." *Id.* For individual, special cases, the Center may utilize other data collection systems as well, "which is a pretty standard process, too; to have one overlying recording process, and then in individual cases bring in others." 51/28–29. The intensity or duration of behaviors are not documented as part of the Center's standard practice, but most schools, group homes and institutions do not maintain such data. 51/98–99. The data collection at the Center is adequate to provide acceptable treatment. 51/152.

With respect to the review approval and monitoring process for treatment plans (which Dr. Reid characterized as "excellent"), the Center is properly structured, with its "key people" reviewing programs beforehand, the behavior management committee meeting regularly, and the senior staff at the Center reviewing accidents and injuries. 51/36, 120–21; Exh. 93. Credible evidence was presented at trial that the staff implements the behavior programs effectively. 51/112.

In deciding whether medication should be utilized as part of a resident's program, "the model of service delivery at Ebensburg, as well as most agencies in the country, is a team process" (51/30), and the psychologists are involved in making the decision. As Dr. Reid explained:

> [A] psychologist certainly should be involved in the process through which it is decided whether medication is or is not going to be used in regard to behavior problems. It's not the psychologist's responsibility to prescribe it, or make a final determination; that should be the psychiatrist. But we certainly want a lot of individuals to have comments and offer recommendations.

*Id.*

▮ In light of all of the foregoing, I find that the Center's interdisciplinary approach to providing training and behavior management services does not substantially depart from acceptable professional standards. In reaching this conclusion, I credit the expert testimony of Dr. Reid, who compared the services at Ebensburg with those provided at other places of care for mentally retarded individuals. 51/9–10. The "weaknesses" at the Center are an unfortunate part of the difficult task that confronts care providers in this field, both institutions and other care environments. 51/162–63. This is not to say, however, that because things are "bad" elsewhere, the problems at the Center are acceptable. As Dr. Reid explained:

> Some of the weaknesses that I found at Ebensburg are characteristic ... of weaknesses in lots of different types of programs serving groups of people with severe disabilities, be it institutions, schools, group homes or whatever.
>
> Now, I'm not saying, getting back to your other question, if you find a whole bunch of agencies that are providing, in my opinion, poor services, does then finding one agency providing similar services make them adequate; no, I wouldn't make that conclusion. What I'm saying is, you know, our technology or lack thereof, if you will, of providing services to people with severe disabilities—and keep in mind I don't mean to be lecturing—but people at Ebensburg Center and the other agencies I'm talking about, they are a very small portion of the people with mental retardation. They have the most serious type of mental retardation and other types of problems.
>
> Our ability to provide an optimal therapeutic environment for them, frankly, is not real good. And I can go into what's considered the best school program that I know of, and I can find, a lot of time, a lot of weaknesses; so that's kind of how I'm evaluating it. If the weaknesses I found on [sic] the Ebensburg Center were much more serious or much more prevalent than

what I typically see in applied settings, then I would be very seriously concerned; and I have found those in agencies, but I did not find those at Ebensburg.

\* \* \* \* \* \*

What I'm saying is it's within the realm of standard practice, and it's not just—keep in mind the day treatment programs at Ebensburg were compared to school programs serving people with severe disabilities. The living units were compared to other living units in other institutions. It's not just an institutional area.

What I'm saying, if you take all the observations in the classroom—and I do qualify it, all the classrooms, thirty or forty something classrooms were in North and South Carolina, more restrictive part of the country.... The institutions were in a lot of different states. But Ebensburg services were at a par with what the average of those services in all those other sites were.

51/161–62.

The injuries that occur at the Center, which are sometimes quite serious and obviously not desirable, are "not unusual by any means" in similar care settings. 51/173.[61] The staff at the Center is "concerned and involved" (50/126–27), and expects the residents "to be able to benefit from the staffs' interaction and from the treatment modalities." 50/97.

 The United States claims that the Center does not utilize a "functional analysis" in its treatment of the residents' maladaptive behaviors, and that the failure to utilize functional analysis in conducting a behavioral suppression program constitutes malpractice.[62] Functional analysis endeavors to ascertain the function of a certain behavior for a particular individual—a "way in which causation is potentially inferred for a behavior problem, and it's a way in which one attributes a possible treatment to the behavior." 37/43. *See also* 51/26; Exh. 30/8. Ideally, if it can be ascertained why a resident resorts to maladaptive behaviors, behavior management plans can be developed which might be more effective in decreasing the incidence of maladaptive behavior and replacing it with alternative acceptable adaptive behavior. Exh. 30/9.[63]

Functional analysis does not always identify the cause of the behavior. Experts in the field do not agree on the degree to which it actually results in better treatment, and whether a formal functional analysis is necessary in order to exercise professional judgment in providing treatment. 51/26–27, 103. The Center began to perform formal written functional analyses on some of its residents beginning in March of 1993, and less formal, broadly defined "functional analyses" (as utilized in Pennsylvania's 1988 statewide policy on this issue) have been performed at the Center for "quite some time." 51/100–02; Exhs. 963, 964.

 The United States complains that the Center does not have psychologists on duty on weekends and nights, and that the Center does not have enough qualified psy-

---

**61.** *See also* 51/125 ("Now, if you take people with severe disabilities, with severe behavior problems—and I assume you're taking the fifteen people whose programs I reviewed ...—those reflect the most serious behavior problems at Ebensburg Center; and their current rate of injuries resulting from those is one per person per month. This might sound crude; that's not an unusual rate of injuries for those types of behaviors, for the most severe behavior disorder cases out of all of Ebensburg's client population. That would not be unusual. I—I'm not saying it's acceptable. Serious injuries are not acceptable, but they occur. That would not be unusual in a similar population in any setting I'm aware of, one per month."); 51/14 ("[M]y experience over the last twenty years is that [the mentally retarded population is] more accident-prone; and it seems to me to be expected, given the high

incidence of seizure disorders, the many types of physical disabilities that interfere with coordination.").

**62.** Malpractice, as explained a number of times already in this opinion, is not the governing standard in this action. Here, again, the United States chose to present evidence that was not tailored to the applicable constitutional standard.

**63.** The Pennsylvania Office of Mental Retardation's Statewide Behavior Management Policy, dated December 1, 1988, identifies functional analyses as a component of developing a formal habilitative plan, including the development of alternative acceptable adaptive behaviors. Exh. 30, p. 1.

chologists. The Commonwealth's expert responded:

> Well, I can assume that [having psychologists on duty on weekends and nights] could improve services; it would be extremely rare. I know of no residential agency in a community setting or state institution that has that. I mean what's generally expected is that there is some administrative person or senior person on administrative watch or on call that can be contacted on the weekends, twenty-four hours a day, if a psychologist is needed. Typically, it would be that person's responsibility to pull in the psychologist.

> \* \* \* \* \* \*

> I do not find a problem with the number of psychological staff [the Center has]. I based my conclusion on the finding that I thought their services are within the realm of acceptable practice. So then I assumed if their services fall within that realm, that they have sufficient staff to do that. I also assumed they could probably do more if they had more staff.

51/19–20. *See also* 51/129, 135. I find that the Center meets the constitutional minimum in this regard.[64]

With respect to the United States' contention that the Center does not properly address the problem behavior of biting, the Commonwealth responded with credible evidence that "many people manifest the behavior of biting, and it is a challenging problem to deal with in a facility like Ebensburg." 50/125. *See also* 51/14. Regardless of the treatment employed or the vigilance of the staff, the behavior cannot be eliminated in some individuals. 50/125–26; 51/14. Also, when medication and restraints are lowered, there is a corresponding rise in biting incidents. 50/126 ("If you have a certain level of biting and then you alter the level of one of the treatments, then it's inevitable if they're related, that the biting will go up or down depending on the impact on that particular person; and that you should assess that, and then weighing the risks and benefits of either

leaving the medication low and having the behavior high or . . . having the medication high and then have the behavior go lower again."). The record further reveals that, to the extent that "biting" has been identified as a target behavior in any given resident, the Center has an adequate treatment plan in place, including documentation, review of injuries, and follow-up action. 51/146–47.

■ The United States challenged the Center's behavior programs by examining the care of Ann B., a resident who spends a great deal of time in a restraint chair to prevent injuries caused by self-injury. In response, Dr. Reid explained:

> [Ann B.] has a lot of restraint, and that is not good, no doubt about that, and I was alarmed when I saw that. So I checked into it further. She's obviously a difficult case, very difficult harmful self-injurious behavior; and what I found when I looked into it was that Ebensburg staff had had considerable difficulty in finding ways to reduce her self-injury. They are currently primarily trying to protect her.

> And my comment was: "Well, you need to do more." I mean we just can't keep this—this is one case, mind you; and in response to that what they said, . . . "We're not sure what to do. We have . . . sought external consultation," from the Kennedy Institute, I believe, and . . . they were doing the kind of things that should be done when you have a very difficult case, calling in external consults.

> Okay. From what I could tell, that external consultation, nor Ebensburg's efforts at that point, had been successful in figuring out how to treat this gal's real severe self-injury, so they were protecting her. So it's a case that I'm not comfortable with. I work with cases like that too, where I don't know what to do, I haven't been able to find anybody else who does. The problem is they have gone through the process of seeking external professional help; good. If you're asking am I satisfied

---

64. Much of Dr. Stark's testimony suggested that the goal of care for the mentally retarded is to nurture them, much as if they were in a family home. Obviously, in that setting it would not be possible to have a psychologist always on duty as the United States suggests the Constitution demands.

with this case, no, I'm not. I hope Ebensburg is not and they continue to find ways to get her out of restraint.

51/116–17. Professional judgment has been exercised by the Center in attempting to treat the residents' severe behavior problems.[65]

 Contrary to the United States' claim that the Center relies excessively upon physical and chemical restraints to control the residents, I find that the record contains ample credible evidence that the Center's use of restraints does not substantially depart from acceptable professional practice. *See, e.g.,* 50/47 (Center's use of medication came after trying alternatives); 51/43 (Center's use of restraint is well below levels of restraint that occurs in settings serving similar populations); 51/70–71 (restraint used for safety and habilitative purposes).

### E. *Reasonable Safety And Protection From Harm*

 The United States claims that defendants have violated the residents' due process right to adequate safety by failing to protect them from harm in numerous ways. As explained above, the Supreme Court in *Youngberg* recognized safety as an "unquestioned duty" that the state must provide to institutionalized residents. 457 U.S. at 324, 102 S.Ct. at 2462. The United States argues that the number of incidents and injuries at the Center is increasing, and that serious injuries are pervasive, chronic and repeated. According to the United States, these injuries primarily have been caused by inadequate staff supervision, unsafe staff actions (particularly with respect to feeding and lifting), the failure of staff to intervene to stop dangerous behavior, and the general failure of staff to protect residents from repeated and preventable harm.

The United States contends that the total number of incidents and injuries sustained by residents at the Center has increased over the past four years. 43/88. It notes that the total number of reported incidents from February 1991 until February 1992 was 1,707. The number of reported incidents increased the following year to 2,433 (43/97), a 43% increase.

The United States also complains that a large proportion of the incidents are due to unknown causes or are behavior related. 43/103. Dr. Stark opined that such injuries are "easily preventable if the environment is structured properly." 43/103–04. He also claimed that the mentally retarded are not necessarily more injury-prone than the general population. 43/28. As an example, he noted that his son, who is "as severe as anybody" at the Center, had only one incident the whole year. 43/28.

Dr. Stark characterized the incidents occurring at the Center as widespread. He found that 77% of all of the residents had one incident during 1991, and that in 1992, 86% of the residents were involved in at least one incident. 43/98–99. He further noted that 131 residents were involved in an incident every other month during a fifty-month period from January 1989 to February 1993. *Id.,* Exh. 777. Dr. Stark's testimony specifically referenced a number of incidents that resulted in relatively serious injuries. According to Dr. Stark, the harm the residents sustain is visible "as you look at these individuals and talk to them, you can see that there is a lot of withdrawal, a lot of anger, a lot of scarring—both physical and emotional, mental scarring." 43/149.

Dr. Stark also claimed that the Center underreported incidents (43/19), and that the actual number of incidents is higher than the number of reports completed.[66] In addition, Dr. Stark faults the Center for allegedly minimizing the seriousness of the injuries, arguing that the Center rates most incidents as minor by designating them as an "01." Dr. Stark contends that, in reality, many of the incidents such as biting, pica and chok-

---

**65.** For another example of the challenged care of a resident and the Commonwealth's demonstration that professional judgment was exercised *see* 50/103–06 (treatment of Franklin B.) ("This is where we all have to sit together and tolerate the uncertainty and make a kind of a coherent treatment plan for the future and methodically try things.").

**66.** Mr. O'Brien conceded that there are a few occasions when this occurs. 66/56.

ing, are more serious and should be rated accordingly. 43/32, 34–35.

According to the directives of the Pennsylvania OMR, whenever a resident has been involved in a situation that could have resulted in an injury to a resident, an incident report must be completed. Mr. Bellomo explained that the Center fills out a report for the resident who did or could have sustained an injury, as well as a separate report for any resident who acted as an aggressor. 63/15. Consequently, situations involving two residents result in at least two incident reports; situations involving three residents result in at least three reports. 41/49. An incident report must be completed regardless of physical manifestation of an injury. 64/73.

Mr. O'Brien explained that the incident reports categorize the seriousness of an injury, and that the categories are determined by the Pennsylvania OMR. 64/81. There are three categories: 01, 02 and 03. An 01 incident is a minor injury which need not be reported to the OMR. If an incident requires a physician's intervention, it is categorized as an 02 injury. Such incidents are reportable to the OMR and include injuries such as fractures, sutures, unacceptable absences where non-facility persons participate in the search, clinically significant medication administration errors, reportable communicable infectious diseases, and deaths not categorized as an 03 injury. An 03 incident involves serious injuries that must be communicated to the OMR within twelve hours of its occurrence, including suspicious situations requiring some type of follow-up by an outside agency. Exh. 73. Such incidents include fires, abuse with serious physical injury, sexual abuse, negligence, accidental deaths, sudden/unexplained deaths without known causes, and unusual injuries of an unknown origin. 41/31; 63/105; Exh. 73.

The record reveals that the standards for classifying an occurrence are changed occasionally by the OMR. 64/81. For example, in July of 1992, injuries requiring the utilization of ethistrips or butterfly bandages could no longer be classified as an 01 incident; instead, such injuries are now reportable as an 02 incident. 62/82. Despite this change to include more injuries as 02 incidents as opposed to 01, the number of occurrences of injuries of a more serious nature at the Center actually has remained stable. *See* 64/83 (from 1991 to 1992, 153 02 injuries (which did not include ethistrip or butterfly treatments); from 1992 to 1993, 155 02 injuries (which did include ethistrip or butterfly treatments)).

The Center's incident reports not only provide a classification regarding the seriousness of the event, but also set forth information regarding the cause and effect of the incident, and the body part affected. Exh. 73. From February 10, 1992, to February 10, 1993, the cause for 40.8% of the occurrences was unknown, the cause for 34% was attributable to behavior, and the cause of 25.2% was due to other factors. Exh. FF. In an effort to better document incidents, the Center instituted daily "risk management" meetings in March of 1993. 63/77. These meetings address all incident reports from the previous 24 hours, and enable management to obtain any missing information from the reports much more quickly and efficiently than before. As a result, the percentage of occurrences attributable to an unknown cause has decreased to 28.1% since implementation of the meetings. 64/74–77; Exh. GG.

The Center has repeatedly attempted to improve, and has improved, its incident reporting system. As of March 1993, the night nurse supervisor must review the nurses' log in each living unit for any occurrence which happened that day requiring an incident report. At the risk management meeting the following day, the review of the nurses' log is presented. The absence of an incident report for any occurrence noted in this review log prompts an immediate request for completion of the necessary report. 64/123–24. In this sense, the Center has developed a cross-checking system to monitor the incident reporting procedure.

Dr. Kastner responded to many of the United States' criticisms about the number of incidents occurring at the Center. He disagreed with Dr. Stark's opinion that the mentally retarded population does not have to be more injury prone than the general population. 48/147. Dr. Kastner explained that the frequency of epilepsy is higher in the mental-

ly retarded population, and that factor alone places those individuals at risk of injuries. In addition, psychiatric and behavioral concerns further compound the risk of injuries. Given the extreme disabilities of the Center's population, "it's impossible to imagine that we could prevent all injuries." 48/148. *See also* 51/125 (number of injuries for Center's residents with severe behavior problems not unusual).

I conclude that the Center has not violated the residents' constitutional right to reasonably safe conditions. The increasing number of reported incidents is of minimal significance, because the evidence shows that the Center instituted daily risk management meetings in an effort to improve incident reporting. 66/56–57. It is to be expected, then, that the number of incidents reported would increase. *See* 63/83. It is also to be expected that as the use of restraints and psychiatric medications decreases, the number of incidents would increase. *See Youngberg*, 457 U.S. at 320, 102 S.Ct. at 2460 ("an institution cannot protect residents from all danger of violence if it is to permit them to have freedom of movement.").[67]

Nor do I find the actual number of incident reports troubling. First, a fair number of the incident reports involve relatively minor occurrences, such as bruises, brush burns, scratches, and red marks. Exh. 85. Additionally, as noted above, one incident often generates more than one report. *See* Exh. 117 (incident reports completed on aggressor). I find Dr. Kastner's opinion that it is "almost impossible to accept that" the mentally retarded population is not more injury prone to be more credible than Dr. Stark's opinion. 48/147. *See also* 6/61 ("[P]eople with developmental disability at times are physically challenged and, therefore, it makes it more difficult for them to be able to get from one place to another. By definition

also, people who have a developmental disability often have difficulty in making sound judgments; and, therefore, they will occasionally put themselves in harm's way."); 37/118 (aggression cannot always be predicted).[68]

Moreover, the number of injuries cannot be the sole criterion for determining whether the Center has violated its constitutional duty to provide reasonably safe conditions. As Judge Marsh observed in a CRIPA action resolved by consent decree, "the injury itself is not a constitutional violation unless it was the result of an unconstitutional action or omission by the defendants." Accordingly, in order to establish a constitutional violation in this area, the United States cannot simply rely on numbers, but must demonstrate that the Center failed to exercise professional judgment in addressing the issue of safety.

The United States contends that mealtimes at the Center are unsafe and a substantial departure from accepted professional practice because: (1) the Center allegedly permits eating to occur while the residents are in unsafe positions; (2) staff feed residents using unsafe practices; (3) residents eat unsafely without staff intervention; and (4) the dining environment is generally unsafe. 84/XI–1.

The United States relies upon the opinion of its expert Ms. McGowan to prove what they consider to be unsafe practices. Ms. McGowan is a registered nurse who has extensive experience with severely and profoundly retarded individuals who have developmental disabilities. 35/75. She has concentrated her career over the last ten to twelve years on "teaching health professionals to identify the unique set of health problems that are inherent to this population." 35/76. She was offered as an expert in nurs-

---

**67.** In light of these findings, I also reject the United States' virtually identical contention that the Center has systematically failed to determine the cause of injuries and/or to take preventative action.

**68.** Dr. Kastner also observed that Dr. Stark and some of the United States' other experts appeared to be more concerned with advocacy, rather than addressing the constitutional analysis

of minimally adequate treatment. "They want these clients to not have injuries; and because they want the injuries to disappear, they should disappear." 48/148. I concur with Dr. Kastner's observation. Dr. Stark's testimony constitutes advocacy for optimal treatment—treatment approximating that which his son has been provided.

ing services and nutritional and physical management services for individuals with developmental disabilities. 35/84. Ms. McGowan has no formal education in nutritional and physical management services, or in speech pathology. She explained that the knowledge she has acquired is from working extensively with interdisciplinary projects. 35/84.

During a tour of the Center, Ms. McGowan directed the videotaping of several meals. This evidence was offered by the United States and was described by Ms. McGowan, in an attempt to demonstrate the unsafe eating behaviors of some residents. 35/109–36.

Ms. McGowan testified that the dining area was "unsafe and very dehumanizing. That is, too many people, in a very loud cacophonous environment, where you can't pay attention to anything that is going on. There was some genuine health hazards around; flies all over the place." 35/92. She further testified that she recommended to Mr. Bellomo that the Center should "get out of those mass dining rooms.... If I had my option here, I'd blow these damn things up." 35/142.

 Ms. McGowan had little difficulty containing her distaste for the dining environment at the Center. But expert testimony is "relevant not because of the experts' own opinions—which are likely to diverge widely—but because that testimony may shed light on what constitutes minimally accepted standards across the profession." *Society for Good Will*, 737 F.2d at 1248. In this instance, Ms. McGowan's testimony fails to shed any light on what the constitutional minimum is with regard to dining facilities. Ms. McGowan's characterizations of the dining room were disputed by the Center's expert, Dr. Sheppard (61/42), and a videotape of the mealtime practices did not reveal any overwhelming problem with flies. *See* Exh. 258. I find no constitutional violation by the Center based on its continuing use of dining rooms.

Ms. McGowan also opined that residents engage in unsafe eating behaviors such as: eating at excessively rapid rates, taking large overfilled spoonfuls of food, shoveling food into their mouths, stuffing large chunks of food in their mouths, drinking cups of fluid without any visible pause, swallowing whole food without chewing, stealing food from other residents, eating food that had fallen to the floor, and jabbing utensils deep into their mouths. 35/91, 103–06, 134. Her opinion hinged largely on the amount and frequency of the food that was placed into the mouths of the residents and the potential for aspiration of that food due to poor head position, poor clearance of the oral cavity, or staff inattention to defensive mechanisms such as coughing. The United States asserts that more staff are needed at mealtimes to remedy these conditions. The United States notes that in a sixteen week period of time at the beginning of 1993, there were sixteen documented instances of a resident choking as a result of unsafe eating behaviors. Exh. 273; 35/144.

Ms. McGowan illustrated her testimony with a videotape of Kathy W. feeding herself at an extremely rapid pace. Exh. 258. A staff person across the table monitored the meal, but only intervened to offer a napkin when the meal was over. 35/134. The United States asserts that fast paced eating is exhibited by many residents, and that the Center is aware of the behavior but fails to intervene. It points to memoranda from Mr. Bellomo regarding the excessively rapid rate of eating by residents and the need to slow down the pace of eating. Exh. 165. Mr. Bellomo documented that meals concluded in as little as six, nine and twelve minutes. Exh. 165. He also documented eating at a rate of a spoonful every two and one half to three seconds. Exh. 165a.

To the lay observer, eating at a rate of a spoonful every three seconds or completing a meal in four or six minutes appears to be too fast. The Center's expert, Dr. Sheppard, a speech pathologist with training in eating and swallowing disorders, viewed the United States' videotape and analyzed the behaviors of the residents. 61/45–74. Dr. Sheppard's analysis carefully discussed the delivery of the food to the resident, the resident's control of his or her body, the resident's ability to receive and transport the bolus of food, and the actual swallowing. She noted the

pacing of individuals during their meals as it related to their swallowing. Dr. Sheppard agreed that Kathy W. does indeed stuff food and eat too rapidly at times, but she noted she was swallowing between mouthfuls in the videotape. 61/70. Dr. Sheppard cautioned that intervention is not simple with a resident like Kathy W., due to her psychiatric history. Intervention may cause her to decompensate and stop eating, or further aggravate the stuffing because the individual is afraid her food will be taken away. 61/70–01. In addition, Dr. Sheppard opined that ten to twenty minutes is an optimum for duration of a meal, 61/88, with the appropriate focus being actual swallowing, not the overall pace, 61/89.

 I find Dr. Sheppard's testimony persuasive. The duration of a meal should not be the sole criterion of whether care meets an accepted professional standard. I observed from the videotape that residents were afforded, for the most part, the opportunity to swallow before the next bite of food was offered. *See* Exh. 258.

The United States contends that the incidence of choking at the Center is evidence of the Center's inadequate care in feeding. It asserts that the Center has a 6.2% choking rate, 84/XI–45, and that rate continues to increase over time, 35/144. This increase is unacceptable, the United States contends, because Ms. McGowan's experiences over the past ten years have not included a facility with such a systemic choking problem. 35/204.

The increase in the choking rate is readily explained by the evidence. Choking is often prompted by food stuffing or stealing of a sudden nature which is not necessarily capable of correction by adding more staff to monitor a meal. *See* Exh. 273 (3 of 16 incidents involved stealing food and 1 incident was the result of stuffing). It is also doubtful that increased monitoring would prevent choking incidents for residents who have had or require a change in the consistency of their diet and a tailoring thereto of permissible foods. *See* Exh. 273 (Deborah S. choked on chopped bread, which now must be pu-

reed as well; Charles M., who choked on grapes after his diet was modified from pureed to chopped; James R., who choked after diet modification from pureed to chopped). Moreover, as Dr. Sheppard noted, the Center's population is stable and aging, and statistics for a general population reveal an increase in choking with age. 61/80, 84. Dr. Sheppard further opined that she did not find the choking incidents at the Center high in light of the nature of the Center's population and the marked swallowing problems. 61/85.

The United States contends, however, that the Center had notice of its deficiency in this regard because it has been cited since at least 1983 in the Inspection of Care surveys for deficiencies. Exh. 688. Dr. Sheppard noted, however, that of the twenty-one incidents listed as deficiencies in Inspection of Care Surveys, the few that relate to health and safety matters in the dining rooms occurred before 1989. 61/86.

 The Center's care with regard to mealtimes for residents who feed themselves meets the constitutional minimum. The upper end of the continuum of acceptable care is described by Ms. McGowan's testimony, which would require constant surveillance and monitoring in hopes of eliminating choking altogether. This objective is laudable, but it does not establish the minimum required by the Constitution. Moreover, the standard espoused by Ms. McGowan would restrict the residents' opportunity to eat on their own.

The United States' submits that the Center feeds residents at excessively rapid rates, feeds residents too large a quantity to swallow, uses spouted cups which do not permit the staff to control the volume of liquid delivered, feeds residents while they are coughing or their heads are in hyperextension, feeds residents while standing above their eye level, forcing the residents to place their heads in extension to be fed, scrapes food off of residents' faces, does not adhere to feeding programs, and the Center has too many different staff members feed residents with complex needs. 84/XI–19–20.[69]

---

**69.** The United States consistently expands the

number of alleged constitutional deficiencies by

Dr. Sheppard opined that the practices utilized by the Center at mealtimes, with the exception of very isolated instances, comports with accepted professional standards, and that the Center exercises appropriate professional judgment. 61/74–75.

Dr. Sheppard opined that the rate of feeding a resident need not consume a full thirty minutes, contrary to the opinion of Ms. McGowan. Dr. Sheppard testified that for severely compromised individuals, a meal of ten to twenty minutes may be optimal, and the focus should be the ability to swallow. She further noted that the time provided to swallow for many residents need not be very long since the bolus does not require any chewing, and socialization is minimal because the resident's focus is eating. 61/19. Moreover, although some residents ate rapidly, Dr. Sheppard observed that they were eating "steadily and moving food into their mouths in a continuous manner, that they swallow between each subsequent mouthful in eighty or ninety percent of the instances." 61/18.

I find Dr. Sheppard's opinion insightful in light of what I observed while viewing the videotape during the direct examination of Ms. McGowan and Dr. Sheppard. I find that residents who are fed either pace their feeder, or their feeder paces them. For example, Dr. Sheppard noted how Paul G. was able to control his upper body movement as a means of signalling his feeder regarding when he was ready for food, and the feeder used cues such as placing the spoon where he wanted Paul G.'s head to be, and shaping his position for swallowing by tapping his shoulders. 61/54–55. Harold B. also was allegedly fed unsafely because food was placed in his mouth while his head was rotated, the spoonfuls were overflowing and the pace was too fast. 61/117–8. Dr. Sheppard noted, however, that Harold B. "tends to move [his head] off of upright a few degrees for reception and then to bring it forward for oral transport ..." 61/55. She further noted that while the spoons were large, the feeder paced the resident so he could swallow before the next spoonful. Significantly, she observed that a nonchewable bolus can be moved through the mouth rather quickly even by an individual with a degree of disability. 61/56.

The United States submits that staff feed residents too large a quantity to swallow. I observed instances where residents were fed quantities which were too large for them. *See* Exh. 258. Most notably, Frank was a dependent feeder in a cart who was presented spoonfuls of food and a spouted cup. Dr. Sheppard observed that Frank regulated the amount he was going to swallow by ejecting the rest and signaling his feeder with his head movements. 61/49–50. I viewed the tape differently since it appeared to me that the feeder consistently provided Frank quantities which were too large. This was, however, an isolated instance within the evidence presented, and was not the norm even for those episodes depicted in the videotape.

The use of spouted cups is also a practice within the realm of accepted professional practice, because swallowing is provided for when the cup is used. For example, Beth S. was allegedly fed with a spouted cup for a solid fifteen seconds without a break. 35/120. Carefully viewing the videotape, however, Dr. Sheppard explained that "[o]ne can see by the throat sequential sips and swallows by this individual as the liquid is dispensed." 61/58.[70] She further noted there was not overfilling and the cup was withdrawn for the resident to take a breath and finish what was in her mouth. 16/59.

---

stating the same allegation in several different ways. For example, in this list of unsafe feeding practices, the United States lists "feeding residents at excessively rapid rates" and also lists feeding "in such a manner that they do not allow sufficient time to swallow between bites." Again, the United States lists as an infirmity "feeding residents with their head in hyperextension" and rewords this flaw by also listing feeding "by standing above their eye level forcing the residents to place their head in extension to be fed." Such duplication is not confined to this section about feeding, and it has resulted in the unnecessary expenditure of time and effort in the preparation of this opinion for a case which, even in the absence of such redundancy, is hugely fact-intensive.

**70.** Dr. Sheppard refers to this resident as Andrea S. 61/57. Although Ms. McGowan and Dr. Sheppard used different names, the residents are the same, as revealed by a comparison of the transcripts and the discussion of this resident immediately after Duane P. 35/118–19; 61/57–58.

While the United States submits that Dr. Sheppard opined that the spouted cups are a departure from accepted professional practice in her deposition and again at trial, Dr. Sheppard actually opined that she "would have made other choices, maybe, in regard to the spouted cups." 61/205. Dr. Sheppard's disapproval of spouted cups does not equate with a finding of a substantial deviation from accepted professional practice.

Dr. Sheppard also disputed the contention that staff fed residents while they were coughing. She observed that coughing consistently caused the feeders to stop feeding. This was evident in the videotape for Ronald E. Exh. 258; 61/48.

The United States vigorously asserts that the Center's care is constitutionally flawed because staff feed residents with their heads in improper positions such as hyperextension or rotation. 35/92. Ideally, a resident should have his head perpendicular to the floor when being fed. This position helps prevent the aspiration of food or drink while swallowing because the airway is covered by the epiglottis. 35/92–94. The videotape showed residents who accepted food from their feeder with their heads in hyperextension or rotated to one side. An example would be Harold B. accepting food with his head off of upright and then bringing his head forward to swallow. 61/55. Paul G., another example, also extended his head back to receive food. Because Paul G. uses his head and upper body to signal his feeder and establish a pace, Dr. Sheppard opined that a feeder should not immobilize his head to bring it to the desired neutral position because this could upset and irritate the resident and compromise his nutritional status. 61/53.

Dr. Sheppard further opined that the delivery of food to a resident who has his head slightly tilted back is acceptable if the resident brings his head forward during the swallowing phase. 61/79. She also opined that she did not observe any staff actively pushing a resident's head back to feed him or her. 61/20. She further stated that a bald spot on the back of a resident's head is indicative that a resident spends a significant time on his back; it is not the result of a nutritional management procedure that pushes a resident's head back. 61/45.

Based on my observations of the tape, which revealed residents who were being fed with ease, and Dr. Sheppard's testimony and opinion, I find that the Center's feeding practices with regard to head position when receiving food are not departures from accepted practice. They are often an accommodation of a resident's behavior which may pose a risk of aspiration or choking. These risks are weighed against the fact that correction of some of these behaviors may prompt residents to decompensate and not eat, or would require restraint (or additional restraint) to properly position their head to receive food which otherwise would not be necessary. Such action is consistent with the accepted professional judgment in the field.

Ms. McGowan asserted that scraping food from a resident's face is wrong because it causes "involuntary reflexes in individuals whose oral motor skills are already compromised." 35/114. Ms. McGowan fails to indicate how this adversely affects the residents, however. In contrast, Dr. Sheppard noted that certain reflexes may be elicited by touching the face. But, she opined that face wiping may be appropriate depending on the individual. 61/43–44. As a result, the fact that some food is scraped from a resident's face without more is not tantamount to a substantial departure from accepted professional standards.

The United States also contends that there is a failure to have the same staff members regularly assigned to feed residents with complex needs, but fails to indicate any testimony that supports such a finding. In contrast, Susan Fagan, a LOTA, testified in her deposition that she and another LOTA regularly alternate feeding Timmy P., Michael B., and James C. for breakfast and lunch. The LOTAs work Mondays through Fridays, and they alternate feedings so as to be current with regard to that resident's status. Exh. 610/61–62.

In light of the above, I find that the Center's care in feeding residents is constitutionally adequate. This conclusion is based largely on my observation of the videotape,

evidence which to a great degree requires no elaboration, and on the testimony of Dr. Sheppard, which I found to be persuasive. In contrast, Ms. McGowan's assessments were less complete, evaluating the factors affecting the resident's ability to eat, but rarely analyzing the mouth action of the resident. This may be due to the fact that she has no formal training as a speech pathologist, a discipline requiring considerable knowledge of disorders related to the use of the mouth.

Finally, the United States asserts that the Center uses the following unsafe positions to feed residents: flat on their back during the meal and immediately thereafter; head in hyperextension; head in hyper-extension and rotated; and trunks in improper alignment. I will not address hyperextension of the head again.

With respect to the argument that residents are being fed while flat on their backs, Ms. McGowan testified that such a practice is unacceptable because it can result in aspiration. It is clear to me, even as a matter of common sense and lay experience, that this is not a desirable way to be fed, but what positions are acceptable if a resident cannot be positioned upright? It appears that the alternatives which are professionally acceptable are to elevate the head and trunk above the pelvis and legs, and to position the resident in an elevated right side-lying position. 34/199–200.

■■■■ The United States asserts that the Center positions no one in the right side-lying position even though its speech therapist admits that it is an acceptable position. However, Dr. Sheppard's testimony that the elevated right side lying position should only be used if the individual has adequate control on that side of his mouth to effect the transport from the teeth to the pharynx. 61/97–98. The United States failed to proffer any evidence indicating that the residents at issue possessed the necessary mouth control, and in the absence of such evidence, I will not infer a substantial deviation from accept-

ed practice from the Center's failure to use a particular feeding position.

■■■■ The videotape illustrated that the Center does elevate the head and trunk of the residents. Even Ms. McAllister, the United States' PT expert, acknowledged that the Center staff is aware that the residents who are confined to carts need to be elevated. 34/199. She asserted, however, that the deficiency is that the head is usually all that is elevated. *Id.* I find that the Center's care in this regard is not constitutionally inadequate. Evidence showed that the staff strive to elevate the head and trunk above the pelvis and legs. *See* Exh. 258. Moreover, the fact that the Center exercises professional judgment in feeding residents is apparent in the decisions which are made to change the method of providing nutrition for residents. The record indicates that the assessment of the impossibility of easily feeding a resident at some point results in the decision to institute some mechanical means of meeting the resident's nutritional requirements, such as gastrostomy tubes. *See supra* re: Keith T. and Steven S.

I also note that the United States' contention that mealtimes are unsafe because residents' bodies are not properly aligned is another attempt to argue the inadequacy of the Center's wheelchairs. This point has already been covered in the section regarding physical therapy and physical management, and will not be addressed here. The section on physical therapy and physical management also addressed the United States' contention that the staff do not lift and transfer residents according to accepted professional standards. *See supra* § III.C.4.

The United States also argues that the Center does not adequately supervise and monitor residents, which results in injuries and the violation of the residents' right to reasonably safe conditions. The United States asserts that the majority of incidents are due to unknown causes and occur when the staff are involved in other functions. It specifically focuses on the occurrences of elopement and pica incidents [71] as evidence of inadequate supervision.

---

71. Pica is an "abnormal craving to eat substances not fit for food...." *Webster's New* *World Dictionary* 1021, 3rd College Ed. (1988).

The Center characterizes a wide range of occurrences as "elopements." An "elopement" is noted whenever a resident actually leaves the Center's grounds, as well as when a resident simply leaves a room without authorization and/or hides from staff. 41/50. The record reveals that the Center has taken several steps to curtail the number of elopements. For example, head counts are routinely taken on an hourly basis and in conjunction with the transfer of residents from one area to another. *See* Exh. 594c; 594a: 594d, # 00006800; and 594f, # 00560867. *See also* Exh. 594d, # 00006800 (Center's escort procedure revised after head count detected that resident was left behind in program area).

 Elopements involve individuals who are mobile and able to navigate to a certain extent. As a result, competing liberty interests are at issue. *See Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460 ("[A]n institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement."). Expert testimony, therefore, should identify the parameters of acceptable professional practice (*i.e.,* providing the residents with freedom of movement, while also attempting to prevent, detect and respond to elopements in such a population). Here, however, to a large extent, the United States simply relies on the fact that elopements occur, without providing any evidence that such occurrences demonstrate a substantial deviation from accepted professional practice.

For example, the United States points to a statistic that 31 elopements occurred from July 1, 1990 to June 26, 1993. Exh. 594(g). This statistic is taken from a report that fails to set forth any underlying factual details of the elopements. Consequently, it is impossible to determine whether any individual elopement actually involved the disappearance of a resident (or simply an attempt to elude staff), or whether the elopement was due to a lapse in monitoring by the Center's staff. Without such evidence, I am unable to determine whether a problem of constitutional proportions exists at the Center. Moreover, I note that the record contains evidence of action by the Center in response to specific incidents of elopement. *See, e.g.,* Exh. 594, # 00590686 (Diana D. eloped on two occasions, staff surmised the elopements demonstrated an effort to obtain a quiet place to look at magazines, and Diana D.'s interdisciplinary team revised her care to provide for a period of time on a quieter unit).[72]

The United States submits that incidents involving pica prove that staff are not adequately supervising and monitoring residents. It argues that the Center's staff were often unaware that residents had ingested a substance not fit to eat until after the resident was found in distress or the inedible object was discovered by observation of feces or vomitus, or confirmed by x-ray. 43/116. Dr. Russo admitted that pica is a common problem in the mentally retarded population, and that it is difficult to treat. 37/106, 108. In fact, pica is not curable; it can only be managed. 37/108.[73] My evaluation, therefore, focuses not on pica itself, but on the Center's efforts to manage this problem.

The record reveals that residents with pica have "flare-ups" of this behavior problem. *See* Exh. 590. The record also contains ample evidence demonstrating the Center's management of these flare-ups. *See* Exh. 590 (Margaret M., who had no history of

---

**72.** The United States emphasizes the elopement of Joseph C., one of the residents with ground privileges on October 1, 1992. *See* Exh. 313 (Joseph C. missing overnight and found hiding the following morning in trunk of employee's car). This incident, admittedly quite serious, cannot reasonably be characterized as a lapse in the Center's care of this individual. This particular elopement by Joseph C. was uncharacteristic of his prior behavior; his absence was immediately noted and efforts were made to locate him. A reassessment and revision of Joseph C.'s behavior plan followed, which included a consult with Dr. Goldschmidt.

**73.** Dr. Russo argued that the Center fails to individualize its behavior programs for residents with pica. 37/74–75. Dr. Russo's testimony, however, does not establish that the Center's care with regard to pica is a substantial departure from accepted practice. *See* 37/106 (admitting that, although he knew how to assess and evaluate pica, he did not know how he would treat it in any particular case). I have already rejected the United States' contentions with respect to behavior programs, and that discussion will not be repeated here.

pica, ingested part of a silk flower arrangement in her bedroom; staff intervention consisted of closely monitoring to determine if a new behavior was developing and referral to the dysphagia team for evaluation); Exh. 638, exh. 46 (refinement of Center's policy regarding disposal of medical treatment, diagnostic and examination material after resident ingested plastic cover from thermometer).

Finally, the United States faults the Center's efforts to address residents' inappropriate sexual behaviors, specifically citing the care of James W. and Clifford P. *See,* Exhs. 501(a) and 440. For both of these residents, however, the Center held numerous staff meetings/interdisciplinary team conferences, and contacted outside consultants and therapists in an effort to contain the residents' dangerous behaviors. *See* Exh. 501(a); Exh. 440; 63/119–20. In fact, Clifford P. was even transferred to another facility, Torrance Mental Retardation Unit, with the hope that he would improve. Unfortunately, that facility was unable to handle Clifford P.'s problems, and he was transferred back to the Center. 63/119–20.

At times, the Center's efforts to address these problems have been hindered by the unavailability of outside experts in this field. 63/116–119. The Center therefore has taken the initiative to send two of its staff members to attend classes to become certified sex therapists. The Center also has contracted with a sex therapist, Dr. Farr, to provide in-service training for its staff regarding how to deal in-house with problematic sexual behavior. 63/119. Thus, while the sexual behavior problems of certain residents pose a grave risk of harm, the Center exercises professional judgment in addressing these behaviors.

## IV. *CONCLUSION*

Professional judgment has been exercised in the provision of care to mentally retarded individuals residing at Ebensburg Center. The Center's care, although frequently not optimal, is, with the exception of blood level monitoring, a now remedied defect, consistent with accepted professional practice, and thereby meets the require-

ments of the Constitution. Moreover, where there have been lapses in care, the United States has failed to demonstrate that those deficiencies were the result of the Commonwealth's official customs and policies as implemented at the Center.

Advocates for the mentally retarded often strongly disagree on what constitutes appropriate care for these individuals. My task, however, has been to determine whether the Center exercised professional judgment in providing the minimum level of care required by the Constitution, not whether the difficult lives of the Center's residents can be improved. It is clear that many of the residents—probably most of them—would be better served by placement in the community. Mr. Bellomo conceded as much, but vigorously defended the quality of care offered by the Center:

> Do I think that it's better for people to live in a ranch-style home on the corner of someplace with a white picket fence and a station wagon in the driveway rather than living in a large congregate facility? Absolutely. And I believe Pennsylvania is moving in that direction. We have finally gotten to the point where there are more people living in the community than there are living in institutional settings, and I think that is a commendable trend.
>
> And until such time as I could see that those four hundred seventy-five people that live with us are going to be afforded that opportunity, it's my job to be critical of everything that goes on at the facility that I don't think is meeting the needs—the very specific, the very special, and the deserved kind of recognition that these people have. I'm not in the—I will not accept any kind of suggestion that we are overlooking things and that people that are living at our facility are not being afforded an adequate level of service.

63/170–71.

One of the hallmarks of a good and just society is the concern it shows for the needs of its least fortunate and most vulnerable members. If this litigation has proved anything, it is that the care of mentally retarded citizens evokes powerful emotions, that deep-

ly committed advocacy on behalf of the mentally retarded in this country is alive and well, and that it transcends differing schools of thought and competing professional interests. My lengthy review of the evidence, and especially my vivid recollection of the view conducted of the Center and its operations, has not left me unmoved. Indeed, it has left an indelible mark.

The operation of Ebensburg Center by the decent, fallible, human beings who administer it and who toil there in stressful and often thankless tasks conforms with constitutional dictates. Its administrators and employees must not, however, turn a deaf ear to their critics or to the voices of innovation. Constitutional minimums are not goals to which any professional should aspire. Much can be improved, and fiscal constraints should be no impediment to an institution's leadership to constantly exhort its professionals: "We can do better."

An appropriate order follows:

AND NOW, this 27th day of July, 1995, consistent with the foregoing opinion, the United States' Motion for Judgment (Docket No. 111) is DENIED. Judgment is entered for the defendants. The Clerk of Court shall mark this case CLOSED.